## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| (1) DCCC and<br><br>(2) OKLAHOMA DEMOCRATIC PARTY,<br><br>           Plaintiffs,<br><br>      v.<br><br>(1) PAUL ZIRIAX, in his official capacity as the Secretary of the Oklahoma State Election Board;<br><br>(2) TOM MONTGOMERY, in his official capacity as Chairman of the Oklahoma State Election Board;<br><br>(3) DR. TIM MAULDIN, in his official capacity as Vice-Chairman of the Oklahoma State Election Board;<br><br>(4) HEATHER MAHIEU CLINE, in her official capacity as a member of the Oklahoma State Election Board;<br><br>(5) JERRY BUCHANAN, in his official capacity as an alternate member of the Oklahoma State Election Board; and<br><br>(6) DEBI THOMPSON, in her official capacity as an alternate member of the Oklahoma State Election Board,<br><br>           Defendants. | Case No. 20-CV-00211-JED-JFJ<br><br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

Plaintiffs DCCC and the OKLAHOMA DEMOCRATIC PARTY file this Complaint for Injunctive and Declaratory Relief against Defendants PAUL ZIRIAX, in his official capacity as the Secretary of the Oklahoma State Election Board (the "State Board"); TOM MONTGOMERY, in his official capacity as Chairman of the State Board; DR. TIM MAULDIN, in his official capacity as Vice-Chairman of the State Board; HEATHER MAHIEU CLINE, in her official

capacity as a member of the State Board; and JERRY BUCHANAN and DEBI THOMPSON, in their official capacities as alternate members of the State Board, and allege as follows:

## STATEMENT OF THE CASE

1.     A highly infectious novel coronavirus is spreading rapidly through the United States and the State of Oklahoma. As of the date of this filing, 5,086 Oklahoma residents have tested positive for COVID-19—the disease caused by the coronavirus—and it has officially claimed the lives of 285 Oklahomans. These numbers are increasing daily. Yet, the Director of the Centers for Disease Control and Prevention ("CDC") is already cautioning of a second, more deadly wave coming in the fall, which he predicted will "be even more difficult than the one we just went through." It is anticipated to coincide with the beginning of flu season, just when Oklahoma's voters would ordinarily head to the polls to vote in the coming November 3, 2020 general election (the "November Election"). Thus, both the upcoming June 30, 2020 primary and the November Election are projected to occur during a public health crisis the likes of which this country has not seen for over 100 years.

2.     The disease spreads mainly from person-to-person transfer through respiratory droplets when an infected person coughs, sneezes, or even, in some cases, speaks or breathes. It has been increasingly discovered that a substantial number of people have become infected by contact with an entirely asymptomatic or pre-symptomatic carrier of the virus. Super-spreaders who are unaware that they are infected have spread the virus to large numbers of people at family gatherings, in their workplaces, at restaurants, at indoor sporting events, and even at a choir practice. The virus can also spread from contact with contaminated surfaces of objects. It is highly contagious and causes severe symptoms and even death in people of all ages. Elderly Americans are particularly at risk, but so are younger Americans with relatively common pre-existing

conditions, such as asthma. Some healthy young people have died of the virus, while others have suffered severe and debilitating large vessel strokes. More recently, an increasing number of children are exhibiting alarming symptoms that seem to be the result of an immunological response after they have fought off the virus. Some have ended up on ventilators, and a few have died. Experts cannot predict whether a particular person will die or suffer serious complications from the virus. Nor can anyone predict who will become an asymptomatic spreader, unwittingly infecting their friends, loved ones, and even strangers who they interact with as they go about their daily lives.

3.       As a result, public health experts around the globe, including in local and federal government here in the United States, have strongly encouraged broad social distancing and self-isolation measures in an attempt to flatten the curve of the virus while we learn how—and ensure that our hospitals have the capacity to—fight it. Consistent with that guidance, Oklahoma Governor Kevin Stitt has issued a series of executive orders in response to the crisis. The first was issued on March 15, 2020, when he declared an emergency in all 77 Oklahoma counties "caused by the impending threat of COVID-19" to Oklahomans "and the public's peace, health, and safety."[1] He ordered all residents over the age of 65 and those who have "serious underlying medical conditions" to stay home "to protect the health and lives of Oklahomans, especially our vulnerable populations," and directed those who do leave their homes to engage in social distancing "by staying out of crowded places, not gathering in groups, and staying *at least* 6 feet from other people."[2]

---

[1]             Governor's         Exec.         Orders         regarding         COVID-19, https://www.ok.gov/okdocc/News_Media/Governor's_Executive_Orders_regarding_COVID-19/index.html.
[2]    *See, e.g.*, Exec. Dep't Fourth Am. Exec. Order 2020-13, Apr. 24, 2020, https://www.sos.ok.gov/documents/executive/1937.pdf (emphasis added).

4.      The CDC has recommended that, in light of the significant health risks that requiring people to congregate in large numbers currently pose, jurisdictions encourage voters to vote absentee and broadly reduce methods of voting that lead to direct contact with other people, including among voters and between voters and poll workers. Jurisdictions that have held elections since the crisis began have, not surprisingly, found that extraordinarily high numbers of voters are choosing to exercise their right to vote absentee, while at the same time people who in the past would have volunteered to staff the polls (many of whom are elderly and thus in a particularly high risk group for serious complications from COVID-19) are refusing to do so, and many locations that previously served as polling places, such as senior centers and schools, are unwilling to open their doors for that purpose.

5.      In Oklahoma, too, it is certain that large numbers of voters will turn to voting absentee in order to exercise their right to the franchise. Oklahoma permits all of its registered voters to apply to vote absentee. Okla. Stat. tit. 26, § 14-105. But mere statutory access to voting absentee is not sufficient to protect voters' constitutional rights in the face of this pandemic. As the U.S. Supreme Court said long ago, "There is more to the right to vote than the right to mark a piece of paper and drop it in a box or the right to pull a lever in a voting booth. The right to vote includes the right to have the ballot counted." *Reynolds v. Sims*, 377 U.S. 533, 555 n.29 (1964) (citation and quotation omitted). Oklahoma law currently imposes several burdensome restrictions and procedures that threaten to deny countless of the State's lawful, eligible voters this right. Unless rectified, these barriers will force voters to choose between their health and the health and safety of their community on the one hand, and their fundamental right to vote on the other. This is a choice that the U.S. Constitution does not permit states to force its voters to make.

6.    The provisions at issue are Oklahoma's (1) onerous and unnecessarily burdensome notarization, witnessing, and Photo ID requirements, Enr. S.B. 210; Okla. Stat. tit. 26, §§ 14-113.2, 16-123.1 (the "Notarization/Witness/Photo ID Requirement"), (2) refusal to prepay for postage to return completed absentee ballots (the "Postage Requirement"); (3) rejection of absentee ballots delivered after 7:00 p.m. on Election Day, *id.* § 230:30-11-5(a); Okla. Stat. tit. 26 § 14-104; (the "Election Day Receipt Deadline"); and (4) ban on organizations, like Plaintiffs DCCC and the Oklahoma Democratic Party, from collecting absentee ballots except in the case of physically incapacitated or emergency incapacitated voters, Okla. Admin. Code §§ 230:30-9-6(g), 230:30-11-1.1(a); Okla. Stat. tit. 26, §§ 14-108(A), 14-115.1 (the "Absentee Assistance Ban").

7.    Absent injunctive and declaratory relief, these laws (together, the "Challenged Provisions") will operate independently and together to severely burden the right to vote of thousands of Oklahomans, in many cases resulting in complete disenfranchisement. For these reasons and those set forth below, this Court should declare unconstitutional and enjoin each of the Challenged Provisions.

## JURISDICTION AND VENUE

8.    Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation, under color of state law, of rights secured by the U.S. Constitution.

9.    This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the U.S. Constitution and laws of the United States.

10.    This Court has personal jurisdiction over Defendants, members of the Oklahoma State Election Board, who are sued in their official capacities only.

11.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because all Defendants are residents of Oklahoma, in which this judicial district is located, and a substantial part of the events that gave rise to Plaintiffs' claims occurred in this judicial district.

12.     This Court has the authority to enter a declaratory judgment and preliminary and permanent injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65 and 28 U.S.C. §§ 2201 and 2202.

## PARTIES

13.     Plaintiff DCCC is the national congressional committee of the Democratic Party, as the term is defined by and used in 52 U.S.C. § 30101(14). Its mission is to elect Democrats to Congress, including from Oklahoma's five congressional districts. DCCC works to accomplish its mission by, among other things, making expenditures for, and contributions to, Democratic candidates for U.S. Congress and assisting state parties throughout the country, including in Oklahoma. DCCC intends to expend significant resources to support Democratic candidates in the State this year.

14.     For example, DCCC will devote considerable time educating an Oklahoma-based field team to engage in aggressive get-out-the-vote ("GOTV") efforts, including educating voters about voting absentee, distributing absentee ballot applications to voters, and mobilizing and turning out voters in Oklahoma elections this year.

15.     DCCC's efforts will include focusing on supporting specific subsets of voters, including low income voters, voters whose essential work (including e.g., in medical care, food delivery, and grocery stores, to mention just a few) puts them at higher risk of contracting the virus, as well as on elderly voters, who are at high risk of complications from COVID-19, and thus have a significant need to vote absentee.

16.     DCCC will devote substantial time and resources explaining the Challenged Provisions as part of its voter education efforts, including the Notarization/Witness/Photo ID Requirement, which did not exist in its current form before this election. DCCC will inform voters that they must have their ballots notarized or, if they are "physically incapacitated" under the Legislature's new definition of that term or caring for someone "physically incapacitated," they must have their ballots witnessed by two individuals or submitted with a photocopy of valid photo identification. DCCC will have to divert more resources to educating voters about what types of identification are permissible, and that the individual is submitting the affidavit under penalty of perjury. DCCC will also instruct voters about the limited number of ballots notaries and witnesses are permitted to sign.

17.     In addition, DCCC will have to divert resources to explain the process for returning absentee ballots, including the methods (in person and by mail), the Postage Requirement, and the Election Day Receipt Deadline. DCCC will divert resources to give guidance on when voters should mail their absentee ballots to ensure that they are received in time to be counted.

18.     DCCC's efforts would also include assisting voters in delivering their sealed and voted ballots upon request, if not for the Absentee Assistance Ban. Absent the Ban, DCCC would concentrate on helping primarily low-income communities—that tend to have fewer polling locations and difficulty staffing these locations—for whom ballot collection is particularly important.

19.     The Challenged Provisions directly harm DCCC by frustrating its missions of turning out Democratic voters who face greater obstacles to voting, such as the elderly and lower-income voters, and electing Democratic candidates. The provisions make it harder for Democratic voters, DCCC's constituents who associate with them to further their shared political and

expressive ends, to vote. For example, the Notarization/Witness/Photo ID Requirement makes voting more burdensome by requiring many Democratic voters to leave their houses during a pandemic to locate notaries, who are difficult to find in the State and inaccessible to many, including low-income and rural voters. There are also an insufficient number of notaries for all registered voters to cast their ballots. Because fewer voters will be able to vote for Democratic candidates for U.S. Congress, the Challenged Provisions harm the Democratic candidates DCCC supports in Oklahoma. In addition, decreased voter turnout undermines DCCC's fundamental right to choose its standard bearers through a vote that accurately reflects the preferences of Democratic Party membership.

20.     Plaintiff the Oklahoma Democratic Party is the Oklahoma state party committee of the national Democratic Party, as the term is defined by and used in 52 U.S.C. §§ 30101(4), (15), and a political party within the meaning of 52 U.S.C. § 30101(16). The Oklahoma Democratic Party is certified by the State Board to nominate candidates for office to be voted on in a general or special election and nominates candidates on a regular basis by party primary. Okla. Stat. tit. 26, § 1-102. The Oklahoma Democratic Party has an interest in ensuring that voters have an opportunity to express their will regarding Democratic Party candidates running for elections, as well as ballot measures and initiatives those individuals support. The Oklahoma Democratic Party has hundreds of thousands of members and constituents from across the State, including Oklahomans who regularly support candidates affiliated with the Democratic Party and Democratic Party candidates. To accomplish its purpose, the Oklahoma Democratic Party engages in vitally important activities, including GOTV activities to support Democratic Party candidates in national, state, and local elections through a meaningful opportunity to cast ballots in Oklahoma.

21.      These activities include broad-based education campaigns for Democratic voters on the procedures and deadlines for voting both absentee and in person, including how to comply with the Challenged Provisions.

22.      This year in particular, the Oklahoma Democratic Party's GOTV efforts are even more important due to voter confusion surrounding the Notarization/Witness/Photo ID Requirement. The Oklahoma Democratic Party has already had to divert resources to respond to a high volume of calls and emails from Democratic voters unsure whether they must have their ballots notarized. This is due to the Oklahoma Supreme Court striking down a notarization requirement, only for the Legislature to enact a few days later a brand new and more complicated Notarization/Witness/Photo ID Requirement. As a result of voter confusion, the Oklahoma Democratic Party will divert resources to engage in paid canvassing and paid social media to clarify how voters must complete their ballots. This includes informing voters that they must have their ballots notarized or, if they are "physically incapacitated" under the Legislature's new definition of that term or caring for someone "physically incapacitated," they must have their ballots witnessed by two individuals or submitted with a photocopy of valid photo identification.

23.      Due to the Notarization/Witness/Photo ID Requirement, the Oklahoma Democratic Party has diverted resources from other programs and day-to-day activities that are core to its mission, including programs to elect Democratic Party candidates in Oklahoma, in order to attempt to help its voters overcome the barriers presented by the lack of safe means to cast their ballots. In addition, because a significant number of Oklahoma voters will be voting absentee for the first time this year, the Oklahoma Democratic Party will need to further divert resources to educate voters on how to complete their absentee ballots, despite the Challenged Provisions. This diversion

of resources will only increase, and will be unprecedented, as the primary and general elections get closer.

24.     Moreover, the Oklahoma Democratic Party's efforts would also include assisting voters in delivering their sealed and voted ballots upon request, if not for the Absentee Assistance Ban. Absent the Ban, the Oklahoma Democratic Party would concentrate on helping voters—particularly those with limited mobility and lack of ready access to postage—who reside in retirement homes and assisted living homes, and for whom ballot collection is particularly important to ensure that they are able to timely return their ballots to the appropriate elections officials.

25.     An election held without accounting for the COVID-19 pandemic directly harms the Oklahoma Democratic Party because it frustrates its mission and the effectiveness of its efforts to persuade and mobilize voters to vote for Democratic candidates and causes.  The Challenged Provisions impede Democratic voters' ability to exercise their constitutional right to vote. For example, the Notarization/Witness/Photo ID Requirement imposes an undue burden on many Democratic voters who are confused, so close to the primary election, whether they need to have their absentee ballot notarized, and who are required to leave their houses during a pandemic to locate notaries. Because fewer voters will be able to vote for Democratic candidates, the Challenged Provisions harm the Democratic candidates the Oklahoma Democratic Party supports. In addition, decreased voter turnout injures undermines Oklahoma Democratic Party's fundamental right to choose its standard bearers through a vote that accurately reflects the preferences of Democratic Party membership.

26.     Defendant Paul Ziriax is the Secretary of the Oklahoma State Election Board, the State's chief election official, and is named as a Defendant in his official capacity. The Secretary

oversees county election boards and is responsible for "promulgat[ing], repeal[ing] or modify[ing]" rules or regulations to "maintain[ ] uniformity in the application, operation and interpretation of the state and federal election laws[.]" *Id.* § 2-107.

27.     Defendant Tom Montgomery is the Chairman of the Oklahoma State Election Board and is named as a Defendant in his official capacity. Defendant Dr. Tim Mauldin is the Vice-Chairman of the Oklahoma State Election Board and is named as a Defendant in his official capacity. Defendant Heather Mahieu Cline is a member of the Oklahoma State Election Board and is named as a Defendant in her official capacity. Defendants Jerry Buchanan and Debi Thompson are alternate members of the Oklahoma State Election Board and are named as Defendants in their official capacities. These Defendants compose the Oklahoma State Election Board. Their responsibilities include, but are not limited to, administering and enforcing Oklahoma's election laws and overseeing elections. *See id.* § 2-106; Okla. Const. art. 3, § 2.

28.     At all times relevant to this action, Defendants have acted under color of state law.

## STATEMENT OF FACTS AND LAW

**A.      As the COVID-19 pandemic persists, an unprecedented number of Oklahomans will rely upon voting absentee.**

29.     Because of the risks of voting in person in the midst of this unprecedented public health crisis, states that have held elections since the pandemic begun have experienced dramatic increases in voting absentee by eligible voters.

30.     For example, Wisconsin reported issuing almost 1.3 million absentee ballots in the primary election it held last month, representing a striking increase from a total of 101,803 during the 2016 primary.

31.     That same month, Ohio experienced a 421 percent increase in requests to vote absentee in its primary when compared with absentee voter turnout in 2016, the last time the state held a primary in a presidential election year.

32.     There is no reason to expect that Oklahoma's electorate will not similarly choose overwhelmingly to vote absentee.

33.     In the midst of the pandemic, the risks of voting in person remain significant even when elections officials attempt to comply with social distancing and sanitizing requirements.

34.     In Wisconsin, for example, where thousands of voters did not receive the absentee ballots in time to vote or return them in time to be counted, a significant number of voters presented in person at the polls to vote on Election Day. Although the State imposed social distancing and took other precautions against the spread of the virus, public officials have identified over 60 people, including poll workers, who tested positive for COVID-19 after voting or working at polling places in the primary election.

35.     Even before Wisconsin, the CDC, recognizing the serious risks involved, advised states to encourage voting absentee and recommended that voters "use voting methods that minimize direct contact with other people and reduce crowd size at polling stations."

36.     Defendant Ziriax declared an "election emergency" in Oklahoma on March 18 and again on April 10, agreeing with the CDC's recommendations. The first election emergency "require[d] County Election Boards to accept resolutions adopted by the governing bodies of school districts, municipalities, technology districts and counties to move their April 7 elections to another date" to "help efforts to flatten the COVID-19 curve."[3] The second "election emergency"

---

[3] Okla. State Election Bd., *State Election Board Secretary Declares Election Emergency; Authorizes Local Entities to Reschedule* (Mar. 18, 2020), https://www.ok.gov/triton/modules/newsroom/newsroom_article.php?id=196&article_id=56539.

involved the "contests of candidacy"—where a candidate for state or federal office can challenge

another's candidacy for the same office—scheduled for April 21. Although the Board "historically

held all contest of candidacy hearings" in the State Capitol open to the public, Defendant Ziriax

agreed with "recommendations from the" CDC, "the Oklahoma State Department of Health" "and

other health experts that large public gatherings should be limited in an effort to decrease the risk

of the community spread of COVID-19." As a result, he "strongly encouraged" everyone to attend

the contests by teleconference or videoconference.[4]

37.     Since 1995, Oklahoma has permitted all registered voters to vote absentee in any

state and federal election without an excuse. *See* Laws 1995 c.290, § 14-105, eff. Nov. 1, 1995

(SB 556).

38.     Voters may apply for absentee ballots electronically, by fax, mail, telegram, or in

person. *See* Okla. Admin. Code §§ 230:30-5-13(a), 230:30-9-9.

39.     But mere statutory access to absentee voting is not sufficient to protect voters'

constitutional rights in the face of this pandemic.

40.     At issue in this case are several provisions of Oklahoma law that impose

burdensome restrictions and procedures that threaten to deny countless of the State's lawful,

eligible voters the right not only to cast an absentee ballot, but to have it counted.

**B.     The Notarization/Witness/Photo ID Requirement is dangerous for Oklahoma voters and cannot be justified by sufficiently weighty State interests.**

41.     Oklahoma requires that elections officials reject absentee ballots unless they have

their absentee ballot affidavit notarized. Okla. Stat. tit. 26, § 14-108. The affidavit is a separate

document sent to the voter with the ballot "stating that the voter is qualified to vote and that the

---

[4] Okla. State Election Bd., *Declaration of Election Emergency 2020-02* (Apr. 10, 2020), https://www.ok.gov/elections/documents/DECLARATION%20OF%20ELECTION%20EMERGENCY%202020-02-Sealed%20and%20Notarized.pdf.

voter has personally marked the ballots, and has not exhibited the marked ballots to any other person" (the "Notarization Requirement"). *Id.* § 14-107(A)(2). The only exceptions to the Notarization Requirement are for (1) physically incapacitated voters, (2) voters who are caregivers for physically incapacitated voters, and (3) voters who provide a photocopy of certain specific forms of photo identification (the "Photo ID Requirement"). *Id.* §§ 14-110.1, 14-113.2(A).

42.     The Photo ID Requirement was created by the Legislature in response to the Oklahoma Supreme Court decision in *The League of Women Voters of Okla. v. Ziriax*, No. 118765, -- P.3d --, 2020 OK 26, 2020 WL 2111348 (Okla. May 4, 2020) (citing Okla. Stat. tit. 12, § 426), issued earlier this month, in which the Court struck down the Notarization Requirement for all other voters, finding that it was sufficient for voters to, instead, simply sign the ballot affidavit under penalty of perjury.

43.     Four days later, the Legislature approved SB 210, which reinstated the Notarization Requirement and created the Photo ID Requirement, which allows a voter to avoid the Notarization Requirement if they both sign their ballot affidavit under penalty of perjury and submit, with their ballot, a photocopy of a form of photo identification that Oklahoma would deem acceptable had the voter cast his or her ballot in person. Okla. Stat. tit. 26, § 7-114 (listing acceptable forms of photo ID).

44.     Under Oklahoma law, qualifying photo identification for voting purposes contains a name, photograph, expiration date after the election, and was issued by "the United States, the State of Oklahoma or the government of a federally recognized Indian tribe or nation." *Id.* A "voter identification card issued by the appropriate county election board" also counts. *Id.*

45.     The Photo ID Requirement also allows a physically incapacitated voter, and those caring for physically incapacitated voters, to avoid having two individuals witness the voter's

signature and sign their signatures and addresses (the "Witness Requirement", *id.* § 14-113.2(A)), if the voters both sign their ballot affidavit under penalty of perjury and submit, with their ballot, a photocopy of a form of photo identification that Oklahoma would deem acceptable had the voter cast his or her ballot in person.

46.     Each of these requirements, which are referred to collectively throughout this Complaint as the Notarization/Witness/Photo ID Requirement, impose substantial, unjustifiable burdens on Oklahoma voters who vote absentee.

## The Notarization Requirement

47.     The Notarization Requirement requires that absentee voters who are not physically incapacitated or caring for physically incapacitated persons get their ballot affidavits notarized. *Id.* § 14-108.

48.     Almost all Oklahomans who need to find a notary will have to leave their homes in order to do so.

49.     There are currently 76,458 notaries registered in Oklahoma, as compared with the 2.09 million voters registered in Oklahoma, as of January 2020.

50.     Thus, in nearly all cases, the Notarization Requirement will compel the voters who must satisfy it to interact with another person—almost certainly outside of their home—and touch common objects, risking exposure to COVID-19, in order to exercise their right to vote.

51.     Oklahoma further forbids a notary from notarizing more than 20 ballots in a given election unless the notary is at his or her place of business. *Id.* § 14-108.1. Yet, as a result of the COVID-19 epidemic, substantial numbers of the State's notaries are likely not working from their "place of business," as many businesses remain shuttered for the safety of Oklahoma citizens.

52.     As a result, even if some number of notaries were willing to make themselves available and literally go door-to-door in order to notarize absentee ballots, finding some way to do so in a manner that kept themselves and the voters safe, they would be limited in their reach because of the restrictions placed on the number of ballots they may notarize.

### The Witness Requirement

53.     The exception carved out for physically incapacitated voters and those who are caregivers for physically incapacitated voters is equally problematic.

54.     To utilize this exception, voters must have their signatures witnessed by two other people, who must also sign the voter's affidavit and provide their addresses. *Id.* § 14-113.2(A).

55.     Voters who use the witness exception for physically incapacitated voters and their caretakers *must* return their ballots by mail—in person delivery is not permitted. *Id.* §§ 14-108(A), 14-113.2(A).

56.     In enacting SB 210, the Oklahoma Legislature amended the definition of what constitutes as "physically incapacitated" for these purposes to include a narrow sliver of Oklahomans affected by COVID-19.

57.     Specifically, *if* "a State of Emergency declared by the Governor related to the COVID-19 pandemic is in effect forty-five days prior to a scheduled election, or is declared within forty-five days of the election," "physically incapacitated" voters may also include the following narrow categories of voters: (1) those who have *tested positive* for COVID-19 and are receiving treatment or subject to quarantine under doctor's or health department orders; (2) people *tested* for COVID-19 *awaiting results*; (3) people *exhibiting symptoms* of COVID-19 *who have been advised by the voter's personal physician or the county health department to quarantine or self-isolate*; (4) people in "group[s] *considered at 'higher risk of severe illness'* due to age or underlying health

conditions as defined by the CDC, and as such are *subject to a 'stay at home' or 'safer at home' or similar order* by the Governor or by an authorized municipal authority; or (5) voters with a "*written recommendation from the voter's personal physician* that due to an underlying health condition the voter should not leave his or her home due to the COVID-19 pandemic."

58.     The written recommendations from public health officials telling all people to stay at home and at least six feet away from other people due to the risk of transmission via asymptomatic carriers do not qualify for the revised definition of "physically incapacitated," as enacted by the Legislature in SB 210.

59.     A substantial number of physically incapacitated voters will have to leave their homes and break quarantine—or invite additional persons in their home despite their self-isolation—to obtain the two witnesses required to satisfy this requirement.

60.     More than 416,000 people in Oklahoma live in households with fewer than three adults. Those voters cannot rely on members of their household to serve as witnesses and have no choice but to venture outside of their safe spaces, or invite others in.

61.     And these voters must interact with not just one but two other people, and touch common objects, in the process risking exposure to COVID-19, in order to be able to exercise their right to vote.

62.     Those newly designated as "physically incapacitated" by SB 210—i.e., those voters who have or are suspected by medical personnel to have an active case of COVID-19—will almost certainly fail to find two witnesses willing to risk exposure to the virus in order to assist the person in voting.

63.     The Witness Requirement also imposes a particular burden on physically incapacitated voters at long-term care facilities and retirement homes.

64.     In the current pandemic, visitors are broadly prohibited "from entering and visiting patients and residents at nursing homes, long-term care facilities, and retirement homes" except in end-of-life situations.[5]

65.     The new law, SB 210, requires "a designated official" at nursing homes and veterans' centers to serve as a witness for ballot affidavits. It is not clear if, by requiring this designation, the Legislature intended to permit residents of nursing homes and veterans' centers to comply with the Witness Requirement by obtaining only one witness signature, not the two otherwise required.

66.     That said, facilities like nursing homes, long-term care facilities, and retirement homes, have had some of the highest concentrated death tolls in the pandemic. Thus, requiring a single individual to serve as the witness for every voter's absentee ballot in such a facility, a process that requires the witness and voter to be in close proximity and handle the same document, creates an unnecessary, heightened risk in the heart of Oklahoma's most vulnerable facilities.

67.     SB 210 has no carveout for other long-term care facilities or retirement homes. Thus, physically incapacitated voters at those locations still must find two other residents or staffers willing to violate social distancing measures and handle the voters' ballots in order to exercise their right to vote.

68.     Neither the Notarization nor the Witness Requirement serves any State interest that can justify the burdens they impose on voters, particularly in the midst of this unprecedented health crisis.

---

[5] *See* Exec. Dep't Fourth Am. Exec. Order 2020-13, *supra* note 2.

69.     Oklahoma is one of only five states that require absentee voters to obtain notarization or two witnesses.[6] There is no evidence that the states without such requirements are overrun by voter fraud. Indeed, voter fraud is extremely rare in Oklahoma and elsewhere.

### The Photo ID Requirement

70.     Far from alleviating the burdens imposed on voters by the Notarization or Witness Requirements, the Photo ID Requirement imposes its own equally unjustifiable burdens on and hurdles to Oklahomans' successful exercise of the right to vote.

71.     The Photo ID Requirement requires voters to submit either a photocopy of "a voter identification card issued by the appropriate county election board" or a government-issued document that has their name, photograph, and an expiration date after the election. Enr. S.B. 210; Okla. Stat. tit. 26, §§ 14-108(A), 14-113.2(A). Voters must return their ballots in person or by mail. *Id.*

72.     To use the Photo ID Requirement, a voter must have access to a scanner and printer, which many voters do not have at home.

73.     As with most of the requirements, the burden falls heaviest on low-income and elderly voters, as well as students, many of whom do not own printers and scanners.

74.     A State Department of Education survey found that "roughly one in three students" in Oklahoma does not even have a computer at home.

75.     Almost 21 percent of Americans over 65 live in a household without a computer.

---

[6] North Carolina, Rhode Island, Mississippi, and Missouri are the others. *See* Ala. Code §§ 17-9-30(b), 17-11-7, 17-11-10; Alaska Stat. § 15.20.030; La. Stat. § 18:1306(2)(a); Minn. Stat. § 203B.07; Miss. Code §§ 23-15-627, 23-15-635, 23-15-633; Mo. Rev. Stat. §§ 115.279, 115.283, 115.295; N.C.G.S. § 163-231; Okla. Stat. tit. 26, §§ 14-108, 14-113.2(A); 17 R.I. Gen. Laws § 17-20-23; S.C. Code §§ 7-15-220, 7-15-230; Va. Code §§ 24.2-706, 24.2- 707; Wis. Stat. § 6.87(4)(b)1; *see also Voting Outside the Polling Place: Absentee, All-Mail and other Voting at Home Options,* NCSL, https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx.

76.     Countless voters who desire to use the Photo ID Requirement will thus have to leave their homes and risk being exposed to COVID-19 in order to do so.

77.     Even then, they may not be able to easily access a scanner and photocopy machine, because business and libraries are currently closed. If the voter finds one, they may very well have to pay a fee to utilize it. And, of course, in utilizing that machinery, they are likely to not only have to interact with other people, but also to touch surfaces that have been recently touched by other people, needlessly risking exposure to the virus.

78.     That the Notarization/Witness/Photo ID Requirement is not necessary to ensure the integrity of Oklahoma's elections (or serve any other legitimate government purpose) is demonstrated by the fact that Oklahoma does not impose any of these restrictions on uniformed-service or overseas voters who vote absentee. *See* Uniform Military and Overseas Voters Act, Okla. Stat. tit 26, § 14-136, *et seq*. Those voters need only sign the ballot affidavit and declare that "a material misstatement of fact . . . may be grounds for a conviction of perjury." *See id.* § 14-148.

79.     Similarly, no notarization, witness signatures, or photocopy of photo identification is required for emergency incapacitated voters—"voters who become[ ] incapacitated after 5:00 p.m. on [the] Tuesday preceding an election"—who return their absentee ballots by mail. *Id.* § 14-115.1.

80.     Multiple other Oklahoma laws ably and adequately deter and punish voter fraud, rendering the Notarization/Witness/Photo ID Requirement unnecessary.

81.     Voters who (1) "knowingly execute[ ] a false application for an absentee ballot[,]" *id.* § 16-102.2; (2) "knowingly swear[ ] or affirm[ ] a false affidavit[,]" *id.* § 16-103; and (3) "knowingly vote and submit[ . . .] absentee ballot[s] issued to another person" and who

"knowingly conspire[ ] to commit fraud or perpetrate[ ] fraud[,]" *id.* §§ 16-102, 16-105, are guilty of a felony.

82.     And voters who "interfere[ ] with a registered voter who is attempting to vote" or "with the orderly and lawful conduct of an election" or who "attempt[ ] to influence the vote of another by means of force or intimidation" are guilty of a misdemeanor. *Id.* § 16-113.

**C.     The Postage Requirement will require Oklahoma voters to pay to vote safely and cannot be justified by sufficiently weighty State interests.**

83.     Because Oklahoma does not provide prepaid postage on its absentee ballots, voters who mail in their absentee ballot must incur and bear a monetary burden in order for their vote to be counted.

84.     The Postage Requirement also presents several practicable problems that will prove for some voters, particularly in the context of the current pandemic, insurmountable.

85.     The severity of the burdens imposed by the Postage Requirement are significantly exacerbated under the present circumstances, when many Oklahomans are experiencing significant financial struggles due to the economic impact of COVID-19.

86.     Many people do not keep stamps at home. The volume of mail sent thorough the U.S. Postal Service ("USPS") has declined 43 percent since 2001. Many now pay their bills and otherwise conduct their communications online, and the result has been that stamps are no longer a household staple.

87.     Before the pandemic, a voter with access to reliable transportation could go to the post office to buy a single stamp; today, where many voters who request an absentee ballot will be doing so because they have underlying conditions that put them at higher risk for severe complications from COVID-19, doing so could pose an equally severe threat to their health.

88.     While there are some services that allow voters to print postage online, these services also require a printer, scale, and paid subscription.

89.     A voter can order stamps online on the USPS website, however, they take five to seven days to be delivered under normal circumstances, are not sold individually, must be purchased on a sheet of stamps that costs a minimum of $11.00, and require the purchaser to pay for shipping and handling of the stamps themselves.

90.     It is also not always clear how much postage a voter may need in order to return his or her ballot. Depending on the number of races at issue in a given jurisdictions, it may require more than one First-Class stamp to cover the return postage.

91.     While these financial costs may seem trivial to some, an estimated 275,000 jobs have already been impacted in Oklahoma as a result of COVID-19, with unemployment claims in the State at nearly five times higher than the 1991 record for first-time State filings.

92.     The reality is that that many Oklahomans are counting every penny, and this additional burden, together with legitimate concerns about exposing themselves to the virus, is highly likely to cause widespread and unjustifiable disenfranchisement.

93.      For voters who do not receive their ballots in the mail until close to Election Day— a problem that thousands of Wisconsin voters encountered in the recent primary election there— the cost to overnight or expedite their ballot to ensure that it arrives by 7:00 p.m. on Election Day discussed below, will impose further burdens on their right to vote.

94.     All of these burdens will fall disproportionately on the socioeconomically disadvantaged, many of whom are constituents of DCCC and Oklahoma Democratic Party.

95.     Lower income and younger voters are less likely to have a stamp on hand. Although people can buy stamps online, many voters do not have internet access, a credit card, and a printer.

96.     Even if voters have the means to purchase stamps, many voters will have to leave their homes in order to obtain them—a dangerous proposition during the COVID-19 crisis.

97.     The trip to a post office or other establishment that sells stamps is even more dangerous for those who lack vehicles and must rely on public transportation. Some rural voters in Oklahoma do not have viable public transportation options.

98.     There is evidence that postage costs broadly burden voters and that voter turnout dramatically increases when voters do not have to pay for postage. During the 2017 and 2018 primary elections in King County, Washington, thousands of voters received envelopes with postage prepaid. Those pilot programs resulted in a double-digit increase in the percentage of voter turnout in at least one town. In May 2018, Washington State started funding prepaid absentee ballots in the remaining counties.

99.     Oklahoma recognizes that postage is a burden on voters. That is why Oklahoma citizens living overseas and military personnel abroad need not pay for postage to mail their completed absentee ballots.[7] "Any American voter living overseas can mail his or her completed ballot back to the United States *free of charge* at the nearest American embassy, consulate, or Diplomatic Post Office (DPO). If the voter has authorized access to a military base, he or she can mail a ballot *free of charge* at the nearest Army Post Office (APO) or Fleet Post Office (FPO)."[8]

100.    The State's only conceivable interest in the Postage Requirement is budgetary, which cannot outweigh the burden on the right to vote.

101.    Governments, including Oklahoma's, already provide postage to enable citizens to readily complete other government forms. For instance, the U.S. Census Bureau sends surveys with postage-prepaid return envelopes. And, in compliance with the National Voter Registration

---

[7] *See Election Mail*, U.S. Postal Serv., https://about.usps.com/postal-bulletin/2020/pb22539/html/cover_006.htm.
[8] *Id.* (emphasis added).

Act, Oklahoma mails postage-prepaid voter registration cards for selected voters to confirm their address.

102.    For all of these reasons, the Postage Requirement is unconstitutional because voters must pay to vote safely and, at the very least, it imposes an unnecessary cost on the fundamental right to vote.

**D.    The Election Day Receipt Deadline will result in large-scale disenfranchisement that cannot be justified by sufficiently weighty State interests.**

103.    Voters can request an absentee ballot up until 5:00 p.m. on the Wednesday before the election, Okla. Stat. tit. 26, § 14-103, but Oklahoma rejects absentee ballots unless they are received by the secretary of each county election board by 7:00 p.m. on Election Day, regardless of when the voter first received the ballot from elections officials, when the voter actually mailed it back, or when the ballot was postmarked, *id.* § 14-104; Okla. Admin. Code § 230:30-11-5(a).

104.    Thus, even where voters overcome the multiple obstacles already discussed that operate to hinder their ability to complete and return their ballots, the Election Day Receipt Deadline threatens to disenfranchise them.

105.    Even before the current pandemic, in the past four years, nearly 3,000 absentee ballots were rejected in Oklahoma because of the Election Day Receipt Deadline.

106.    In many cases, the Election Day Receipt Deadline threatens to disenfranchise voters for circumstances entirely beyond their control.

107.    As a result of the anticipated deluge of absentee ballot requests and returns, understaffed clerk's offices, and the USPS's current budget crisis—as well as reductions in available staff, resulting from the current pandemic—which has rendered mail service increasingly slow and unpredictable, Oklahomans might receive their absentee ballots too late to return them before 7:00 p.m. on Election Day, even if they turned the ballots around immediately.

108.     Exacerbating the problem is the lack of clear and consistent guidance to voters from Oklahoma elections officials about when to mail their absentee ballots.

109.     The U.S. Election Assistance Commission recommends voters "assume one week for USPS delivery" of their ballots to election officials under normal circumstances, and that elections officials "consistently communicate[ this message] to voters who use absentee ballots.[9]

110.     And a study of USPS delivery of absentee ballots recommended that voters must place "their ballots in the mail five days prior to Election Day for states" with an Election Day receipt deadline.[10]

111.     There is no notice of these or any time frames on Oklahoma's State Board or county election board websites, so voters are left to make their own guess as to when they must mail their ballot in order to have a reasonable chance of it reaching the county secretary's office by the Election Day Receipt Deadline.

112.     The Election Day Receipt Deadline will threaten more voters with disenfranchisement than ever before in the coming election, when many voters who opt to cast their ballots by mail will be doing so for the first time.

113.     These first-time absentee voters are less likely to be familiar with the Election Day Receipt Deadline, especially when many other mail deadlines in Oklahomans' lives are postmark-related.[11]

---

[9] 2018 Election Cycle Preparation:  Tips for State and Local Election Officials, U.S. Election Assistance Comm'n Standards                           Bd.                -              USPS                Comm., https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_election_prep_vote_by_mail_one.pdf; *see also Voting by Mail/Absentee              Voting*,        U.S.        Election        Assistance        Comm'n, https://www.eac.gov/election-officials/voting-by-mail-absentee-voting.
[10] Bipartisan Policy Ctr., The New Realities of Voting by Mail in 2016, at 8, *available at* https://bipartisanpolicy.org/wp-content/uploads/2019/03/BPC-Voting-By-Mail.pdf.
[11] *See, e.g.*, Okla. Stat. tit. 68, § 221.1(A) (applying postmark deadline to tax returns and payments).

114.    Voters who have historically cast their ballots on Election Day at the polls are also accustomed to having until Election Day to decide for whom to vote. By effectively requiring these voters to cast their absentee ballots a full week before Election Day for those ballots to be counted, the Election Day Receipt Deadline forces Oklahoma voters to forego information about the election or the candidates that may arise in the final week leading up to Election Day that could influence their decision. The Election Day Receipt Deadline thus deprives voters of the ability to engage in this robust period of civic engagement.

115.    As noted above, the pandemic will only make the risk of disenfranchisement posed by the Election Day Deadline more severe and substantially more likely to impact a significantly larger number of voters than in the past. As in other states that have held elections since the pandemic began, county election boards—likely understaffed or working remotely due to the pandemic and related government orders—will be delayed in turning around absentee ballot requests. And strain on the USPS will compound that delay. Voters in other states have recently reported significant mail delays. As discussed above, the USPS is struggling financially, and operations have slowed due to the pandemic.

116.    In Wisconsin's April election, for example, thousands of voters had not received their timely requested absentee ballots by that state's Election Day receipt deadline.

117.    In litigation brought in part to protect voters from disenfranchisement as a result of that deadline, the U.S. Supreme Court affirmed an extension of the Election Day receipt deadline in Wisconsin, acknowledging that the state's interest in enforcing the deadline during the pandemic was far outweighed by the voters who would otherwise be disenfranchised if ballots postmarked by Election Day were not counted. *See RNC v. DNC*, 140 S. Ct. 1205, 1208 (2020) (per curiam).

118.     As a result, over 140,000 Wisconsinites had their absentee ballots counted instead of rejected as too late.[12] Absent this extension, those voters would have had to choose between risking their lives and not voting.

119.     Extending the Election Day Receipt Deadline also would not harm the State's interest in the orderly administration of elections in Oklahoma.

120.     Counting ballots continues after Election Day under normal circumstances. County election boards do not certify results for county offices until 5:00 pm on the Friday after Election Day, and the State Board does not certify results for state officers until after 5:00 p.m. a week after Election Day. Okla. Stat. tit. 26, § 7-136. Nor does state law mandate a particular time for public release of election results; it requires only that the results of the absentee ballots shall not be announced "earlier than 7:00 p.m. on election day." *Id.* § 8-115.

**E.     The Absentee Assistance Ban prohibits Plaintiffs and other organizations from rendering necessary aid to absentee voters during this global pandemic and cannot be justified by sufficiently weighty State interests.**

121.     Oklahoma's Absentee Assistance Ban prevents anyone but the voter from mailing or returning his or her absentee ballot. *See id.* §§ 14-108(A), 14-120; Okla. Admin. Code § 230:30-11-1.1(a).

122.     During a time when the mail is unreliable and people are rightfully afraid to leave their houses and come into contact with others, the Absentee Assistance Ban imposes unjustifiable burdens on the right to vote.

---

[12] The data regarding ballots that arrived between April 8 and April 13, 2020 in Wisconsin can be found at https://elections.wi.gov/blog and https://electionlawblog.org/?p=110746. As of 8:00 p.m. on April 7, 2020, there had been 990,129 absentee ballots returned. *See* Election Day Update Blog, Wis. Elections Comm'n, https://elections.wi.gov/blog. The Wisconsin Elections Commission reported that, ultimately, 1,132,923 absentee ballots were returned and counted, suggesting that 142,794 ballots were able to be counted that would not otherwise have been. *See 2020 Spring Election and Presidential Preference Vote Ballot Status as of April 17, 2020*, https://elections.wi.gov/sites/elections.wi.gov/files/2020-04/Ballot%20Data%20as%20of%20April%2017%202020.pdf.

123.     As discussed above, the methods by which the novel coronavirus is transmitted makes voting in person a risky proposition, even for younger voters with no known pre-existing conditions.

124.     Even under more normal circumstances, the Absentee Assistance Ban can impose a severe burden on the right to vote that falls disproportionately on low-income, minority, and rural voters who generally have less access to postal service, live in areas lacking reliable access to public transportation and broadband internet, and live farther away from their county election board's office (typically located in a city center), as well as voters who receive their ballots too late to be sure that they will be delivered to elections officials in time to be counted.

125.     Indeed, the Ninth Circuit recently struck down a statute criminalizing the collection and delivery of another's ballot because it disproportionately burdened minority voters. *DNC. v. Hobbs*, 948 F.3d 989, 1033 (9th Cir. 2020) (en banc).

126.     In the context of the current pandemic, the burdens imposed on the right to vote by the Absentee Assistance Ban are both more severe and more likely to detrimentally impact a substantially larger number of voters. Simply put, it prohibits an absolutely crucial means of ensuring that voters are able to safely and successfully cast an absentee ballot.

127.     But for the Absentee Voter Ban, DCCC and the Oklahoma Democratic Party could and would ensure that absentee voting is safe and reliable for many voters by collecting and timely returning voters' absentee ballots.

128.     The Ban's burden on voters and the organizations serving them far outweighs any State interest in its enforcement.

129.     The State has no inherent interest in who returns a ballot. (Indeed, the State probably cannot tell who dropped a particular ballot in the mail.)

130.    The Ban is useful only to the extent that preventing someone other than the voter from returning the ballot also prevents that other person from *filling out* the ballot. But Oklahoma's other laws making it a felony to vote another person's ballot or interfere "with the orderly and lawful conduct of an election" are better tailored to the goal of preventing voter fraud. Okla. Stat. tit. 26, §§ 16-102, 16-113. And, as mentioned above, voter fraud is virtually nonexistent in the State.

131.    It is now more critical than ever that organizations like DCCC and the Oklahoma Democratic Party be allowed to help voters safely express themselves at the ballot box.

132.    Absent the Ban, DCCC would focus on ensuring low-income communities, including voters living in public housing and high-stress communities, that tend to have fewer polling locations and difficulty staffing these locations, can cast their ballots.

133.    Similarly, the Oklahoma Democratic Party would collect the *sealed* and *voted* absentee ballots at the voter's request, particularly concentrating on elderly voters at retirement homes and assisting living facilities to enable those with limited mobility and who lack of ready access to postage to return their completed ballot.

### CAUSES OF ACTION

### COUNT I
**First and Fourteenth Amendments**
**U.S. Const. amend. I and XIV, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201–2202**
**Undue Burden on the Right to Vote**
**(All Challenged Provisions)**

134.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

135.    Under the *Anderson-Burdick* balancing test, a court considering a challenge to a state election law must carefully balance the character and magnitude of injury to the First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against "'the precise interests

put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

136.    "However slight th[e] burden [on the right to vote] may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (quotation marks omitted); *see also Fish v. Schwab*, No. 18-3133, 2020 WL 2050644, at *13 (10th Cir. Apr. 29, 2020).

137.    A state may just justify practices that impinge upon fundamental rights by citing concerns about "administrative convenience." *See Taylor v. Louisiana*, 419 U.S. 522, 535 (1975).

138.    Unless Plaintiffs are granted the relief requested herein, thousands of Oklahoma voters, including Plaintiffs' members and constituents, will suffer severe burdens on their right to vote as a result of the Challenged Provisions in the upcoming elections, some to the point of complete disenfranchisement.

139.    For the reasons discussed, the Notarization/Witness/Photo ID Requirement raise constitutional concerns in any context, but in the current unprecedented public health crisis, the Requirements force voters to violate social distancing measures and interact with other people and touch common objects—all actions that could expose them to COVID-19—and the burdens they impose cannot be justified by any sufficiently weighty State interest.

140.    Voter fraud is extremely rare in Oklahoma and in other states without such severe burdens on the absentee voting process. And the State's interest in maintaining the integrity of its elections is sufficiently served by a voter's affidavit sworn under penalty of perjury, as the

Oklahoma Supreme Court decided, combined with the threat of prosecution under Oklahoma's voter fraud laws for casting another's ballot. *League of Women Voters*, 2020 OK 26, 2020 WL 2111348.

141.    For the reasons discussed, Oklahoma's Postage Requirement also imposes an undue burden on the method of voting that is indisputably the safest during these unprecedented times. Its burdens, moreover, fall more severely on low-income voters, who already bear the brunt of the ongoing public health emergency. But no voter should be forced to leave his or her home in the middle of a pandemic in search of a stamp in order to exercise his or her most fundamental right. The only plausible State interest justifying the Requirement is a lack of administrative resources. But that concern cannot outweigh the heavy burden that it imposes on voters.

142.    The Election Day Receipt Deadline similarly imposes a severe burden on the fundamental right to vote, especially during the COVID-19 crisis, as the U.S. Supreme Court recently recognized in *RNC v. DNC*. Even before the pandemic began, the Election Day Receipt Deadline disenfranchised thousands of Oklahomans. Now, it threatens to disenfranchise thousands more. The State cannot offer an interest substantially weighty enough to overcome the burdens imposed on voters' fundamental rights.

143.    Finally, the Absentee Assistance Ban unduly burdens the right to vote because it cannot be justified by State interests under any circumstances, but in the current circumstances in particular, it denies Oklahoma voters the safest and most effective option to return their absentee ballots. The State's interest is in ensuring that the voter lawfully marks his or her own ballot, not in preventing others from assisting the lawful voter in returning that *sealed* and *voted* ballot. Oklahoma has many laws tailored to this specific interest, including making it a felony to fill out another's ballot, influence the vote of another, and/or interfere with the conduct of any election.

There is thus no justifiable basis for burdens that the Ban imposes under any circumstances, but this is doubly so during the ongoing health crisis.

144.     Because the Challenged Provisions do not sufficiently support a State interest to justify the resulting burdens on the right to vote, they violate the First and Fourteenth Amendments.

### COUNT II
**Poll Tax**
**U.S. Const. amends. XIV and XXIV, 42 U.S.C. § 1983**
**Imposition of a Poll Tax**
**(Postage Requirement)**

145.     Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

146.     The Twenty-Fourth Amendment to the U.S. Constitution provides: "The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax." U.S. Const. amend XXIV, § 1. Voters must not have to pay "a price for the privilege of exercising the franchise." *Harman v. Forssenius*, 380 U.S. 528, 539 (1965).

147.     Oklahoma's requirement that voters pay for postage in order to vote absentee imposes an unconstitutional poll tax in violation of the Twenty-Fourth Amendment. Voting absentee is the only option that allows voters to stay safely in their homes during the COVID-19 crisis.

148.     For the reasons stated above, Defendants have deprived and will continue to deprive Plaintiffs and its members and constituents of their right to vote in federal elections, granted to them by the Twenty-Fourth Amendment to the U.S. Constitution and protected by 42 U.S.C. § 1983.

**COUNT III**
**Due Process**
**U.S. Const. Amend. XIV, 42 U.S.C. § 1983**
**Denial of Procedural Due Process**
**(Election Day Receipt Deadline)**

149.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

150.    The Due Process Clause of the U.S. Constitution prohibits the states from depriving "any person of . . . liberty . . . without due process of law." U.S. Const. amend. XIV, § 1. Which protections are due in a given case requires a careful analysis of the importance of the rights and the other interests at stake. *See Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976).

151.    Courts must first consider the nature of the interest that will be affected by the government's actions as well as the "degree of potential deprivation that may be created" by existing procedures. *Id.* at 341. Second, courts consider the "fairness and reliability" of the existing procedures "and the probable value, if any, of additional procedural safeguards." *Id.* at 343. Finally, courts consider the public interest, which "includes the administrative burden and other societal costs that would be associated with" additional or substitute safeguards. *Id.* at 347 "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Id.* at 334 (quotation and citation omitted).

152.    Oklahoma's absentee voting system must comport with due process. *See Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990). "Such due process is not provided when the election procedures [for voting absentee]" do not adequately protect the right to vote or ensure that an "individual is not continually and repeatedly denied so fundamental a right." *Id.*; *see also Saucedo v. Gardner*, 335 F. Supp. 3d 202, 217 (D.N.H. 2018) ("Having induced voters to vote by absentee ballot, the State must provide adequate process to ensure that voters' ballots are fairly considered and, if eligible, counted.").

153.    The nature of the interest at stake in this case—the right to vote and to have that vote count—is the most precious liberty interest of all because it is tied to all other basic civil and political rights.

154.    Oklahoma's existing absentee voting procedures too often disenfranchise voters because (1) many voters do not learn of the Election Day Receipt Deadline before Election Day, and (2) even voters who do learn of the Election Day Receipt Deadline may not have their ballots counted, through no fault of their own, if they do not arrive at their county election board's office by 7:00 p.m. on Election Day.

155.    Oklahoma's Election Day Receipt Deadline is neither a reliable nor fair way to administer voting absentee. The Election Day Receipt Deadline and the corresponding cutoff for casting ballots is unreliable because many voters are not even sent their absentee ballots until after the mailing cutoff, leaving them with no safe mail alternative for their votes to be counted. Nor is the Election Day Receipt Deadline fair because it forces those voters to cast their ballots with incomplete information and before candidates have delivered their final messages to voters.

156.    The value of additional or substitute procedural safeguards to ensure that the absentee ballots of Oklahoma voters are both meaningfully cast and actually counted is readily apparent. A substitute procedure—requiring absentee ballots to be postmarked on or before Election Day and received by the county within seven days after Election Day to be counted, and moving the county and state certification dates by a week—resolves the inequities inherent in Oklahoma's Election Day Receipt Deadline.

157.    A postmark date not only offers a reliable date to Oklahoma voters by which they must cast their ballots, but it also ensures that voters who receive their ballots late, through no fault of their own, are still able to engage in the franchise. A postmark date additionally ensures that all

of Oklahoma's voters can consider any information that may arise and influence their choices in the final week of the election.

158.    Having introduced the option to vote absentee, Oklahoma must establish adequate procedures to ensure that voters have a reliable, fair, and effective method to cast their ballots. Because Oklahoma's Election Day Receipt Deadline is inadequate, and the State is readily capable of instituting a substitute procedure which would protect those voters' rights with minimal burden to the State, Oklahoma's Election Day Receipt Deadline violates voters' procedural due process rights.

### COUNT IV
**Free Speech and Association**
**U.S. Const. Amend. I, 42 U.S.C. § 1983**
**Violation of Free Speech and Associational Rights**
**(Absentee Assistance Ban)**

159.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

160.    The First Amendment protects against the passage and enforcement of laws "prohibiting the free exercise [of] or abridg[ment] of freedom of speech." U.S. Const. amend. I.

161.    The Supreme Court has applied "exacting scrutiny" to review laws governing election-related speech. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995); *see also League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 722 (M.D. Tenn. 2019) ("[L]aws that govern the political process surrounding elections—and, in particular, election-related speech and association—go beyond merely the intersection between voting rights and election administration, veering instead into the area where 'the First Amendment has its fullest and most urgent application.'") (quoting *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989)).

162.     Restrictions on such speech are unconstitutional when they "significantly inhibit" election-related speech and association and are "not warranted by the state interests . . . alleged to justify [the] restrictions." *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 192 (1999).

163.     Voter turnout efforts, including assisting voters with the return of their *sealed* and *voted* ballots, is one way in which DCCC and Oklahoma Democratic Party communicate their belief in the power and importance of participating in democratic elections.

164.     Such activity is "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 422-23 (1988); *cf. League of Women Voters*, 400 F. Supp. 3d at 720 ("Encouraging others to register to vote is pure speech, and, because that speech is political in nature, it is a core First Amendment activity." (quotation marks and alterations omitted)).

165.     The act of assisting voters by delivering completed ballots is inherently expressive, and an individual or organization that conducts such activities engages in speech by encouraging voting. *See Bernbeck v. Moore*, 126 F.3d 1114, 1115 (8th Cir. 1997) (rejecting argument that regulating an election "process" raises no First Amendment concerns).

166.     These initiatives also facilitate the political participation of voters who have experienced historically low turnout rates when compared to the rest of the population, or who for various reasons, including disability, advanced age, or lack of access to transportation, would have difficulty voting.

167.     This is why DCCC's and Oklahoma Democratic Party's ability to collect and deliver *sealed* and *voted* ballots would significantly further their missions to serve underrepresented populations as well as their members' and constituents' access to the ballot box.

168.    Furthermore, First Amendment rights "include the right to band together for the advancement of political beliefs." *Hadnott v. Amos*, 394 U.S. 358, 364 (1969). "An organization's attempt to broaden the base of public participation in and support for its activities is conduct 'undeniably central to the exercise of the right of association.'" *Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1202 (D.N.M. 2010) (citing *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214–15 (1986)).

169.    The conversations and interactions between DCCC and Oklahoma Democratic Party and their respective organizers and voters surrounding the submission of ballots are forms of protected political speech and association. *See Williams v. Rhodes*, 393 U.S. 23, 30 (1968) (describing "overlapping" rights "of individuals to associate for the advancement of political beliefs" and "of qualified voters . . . to cast their votes effectively"); *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 700–01 (N.D. Ohio 2006) (explaining "participation in voter registration implicates a number of both expressive and associational rights which . . . belong to—and may be invoked by—not just the voters seeking to register, but by third parties who encourage participation in the political process").

170.    Oklahoma's Absentee Assistance Ban violates that protection by "limit[ing] the number of voices who will convey [DCCC's and Oklahoma Democratic Party's] message," and "the size of the audience they can reach[,]" thereby burdening the speech and associational rights of DCCC and Oklahoma Democratic Party and the voters they serve. *Meyer*, 486 U.S. at 422–23.

171.    These burdens are severe, and the Absentee Assistance Ban is not narrowly tailored to advance a compelling State interest. Indeed, given the current public health crisis, the type of speech that DCCC and Oklahoma Democratic Party seek to engage in is "the most effective,

fundamental, and [likely] economical avenue of political discourse[;]" yet it is directly foreclosed by the Absentee Assistance Ban. *Id.* at 424.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and:

A. Preliminarily and permanently enjoin the Notarization/Witness/Photo ID Requirement;

B. Enjoin Defendants and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from rejecting ballots for failure to comply with the Notarization/Witness/Photo ID Requirement so long as the voter has signed his or her ballot affidavit, which shall be done under penalty of perjury;

C. Declare that the Postage Requirement violates the Fourteenth and Twenty-Fourth Amendments as an unconstitutional poll tax;

D. Preliminary and permanently enjoin Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from requiring that voters provide postage on their absentee ballots and further require that Oklahoma provide prepaid postage on all absentee ballots;

E. Declare that the Election Day Receipt Deadline violates the Due Process Clause;

F. Preliminary and permanently enjoin Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from rejecting ballots that are postmarked by Election Day and arrive at their respective county election board within seven days, and to interpret the term "postmark" to refer to any type of imprint applied by the USPS to indicate the location and date the USPS accepts custody of a piece of mail, including bar codes, circular stamps, or other tracking marks, and, where a ballot does not bear a postmark date, requiring the State to presume that the ballot was mailed on or before Election Day unless the preponderance of the evidence demonstrates it was mailed after Election Day,

G. Enjoin the county certification deadline of the Friday after Election Day and the state certification deadline of the Tuesday after Election Day, and postpone each by a week;

H. Declare that the Absentee Assistance Ban violates the First Amendment as an unreasonable restriction on speech and association;

I.      Preliminary and permanently enjoin Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the Absentee Assistance Ban, thus allowing voters to designate any third party—whether paid or not—to assist in the collection and submission of their absentee ballots;

J.      Award Plaintiff its costs, expenses, and reasonable attorneys' fees pursuant to, inter alia, 42 U.S.C. § 1988 and other applicable laws; and

K.      Grant Plaintiff such other and further relief as the Court deems just and proper.

DATED:   May 18, 2020

*s/ Frank W. Frasier*
Frank W. Frasier, OK# 17864
FRASIER, FRASIER & HICKMAN, LLP
1700 Southwest Boulevard
Tulsa, OK  74107
Telephone:   918.584.4724
Facsimile:   918.583.5637
FFrasier@frasierlaw.com

Marc E. Elias*
John Devaney*
Ariel B. Glickman*
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 800
Washington, DC  20005-3960
Telephone:   202.654.6200
Facsimile:   202.654.6211
MElias@perkinscoie.com
JDevaney@perkinscoie.com
AGlickman@perkinscoie.com

Charles G. Curtis, Jr.*
Sopen B. Shah*
PERKINS COIE LLP
33 East Main Street, Suite 201
Madison, WI 53703-3095
Telephone:   608.663.7460
Facsimile:   608.663.7499
CCurtis@perkinscoie.com
SShah@perkinscoie.com

*Counsel for Plaintiff*
*\* Pro Hac Vice Motion Forthcoming*