---

No. 20-CV-211-JED-JFJ

---

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

---

DCCC and OKLAHOMA DEMOCRATIC PARTY,
Plaintiffs,

vs.

PAUL ZIRIAX, in his official capacity as the Secretary of the Oklahoma State Election Board;
TOM MONTGOMERY, in his official capacity as Chairman of the Oklahoma State Election
Board;  DR. TIM MAULDIN, in his official capacity as Vice-Chairman of the Oklahoma State
Election Board; HEATHER MAHIEU CLINE, in her official capacity as a member of the
Oklahoma State Election Board; JERRY BUCHANAN, in his official capacity as an alternate
member of the Oklahoma State Election Board; and DEBI THOMPSON, in her official capacity
as an alternate member of the Oklahoma State Election Board,
Defendants.

---

PLAINTIFFS' MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION

---

Frank W. Frasier, OK# 17864
FRASIER, FRASIER & HICKMAN, LLP
1700 Southwest Boulevard
Tulsa, OK  74107
Telephone:   918.584.4724
Facsimile:   918.583.5637
FFrasier@frasierlaw.com

August 19, 2020

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF THE ARGUMENT ..................................................... 1

BACKGROUND ................................................................................................................... 3

   I.   The pandemic threatens the November election. ................................................................. 3

   II.   Oklahoma's vote-by-mail system, as recently amended, will disenfranchise thousands of voters in November. ....................................................................................................... 5

      A.   Voting in Oklahoma before COVID-19 .......................................................................... 5

      B.   The Oklahoma Supreme Court invalidates the Notarization Requirement, and the State immediately responds by imposing burdensome new restrictions. ................................. 7

      C.   Oklahoma's June 30th election ....................................................................................... 9

STANDARD OF DECISION ................................................................................................ 10

ARGUMENT ....................................................................................................................... 10

   I.   Plaintiffs are likely to succeed on the merits. .................................................................. 10

      A.   The Amended Notarization Requirements impose severe burdens on voters. ................ 10

      B.   The Election Day Receipt Deadline is unconstitutional. ................................................. 15

      C.   The Absentee Assistance Criminalization provisions are unconstitutional. ................... 18

      D.   The Postage Requirement is unconstitutional. ............................................................... 23

   II.   An injunction is required to avoid irreparable harm ........................................................ 24

CONCLUSION .................................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**CASES**

*Am. Ass'n of People with Disabilities v. Herrera,*
    690 F. Supp. 2d 1183 (D.N.M. 2010) ...................................................................23

*Anderson v. Celebrezze,*
    460 U.S. 780 (1983) ...................................................................................................15

*Burdick v. Takushi,*
    504 U.S. 428 (1992) ............................................................................................10, 15

*Common Cause Ind. v. Individual Members of Ind. Election Comm'n,*
    800 F.3d 913 (7th Cir. 2015) ...................................................................................14

*Common Cause R.I. v. Gorbea,*
    No. 20-1753, 2020 WL 4579367 (1st Cir. Aug. 7, 2020), *stay denied sub nom.*
    *RNC v. Common Cause,* No. 20A28, 2020 WL 4680151 (Aug. 13, 2020) ...............3, 4, 11, 13

*Crawford v. Marion Cty. Election Bd.,*
    553 U.S. 181 (2008) ...................................................................................................11

*Cunningham v. Adams,*
    808 F.2d 815 (11th Cir. 1987) .................................................................................25

*Democratic Exec. Comm. of Fla. v. Lee,*
    915 F.3d 1312 (11th Cir. 2019) .........................................................................10, 24

*DNC v. Bostelmann,*
    Civ. No. 20-cv-249-wmc, 2020 WL 1638374, at *17 (W.D. Wis. Apr. 2,
    2020), *stayed in part sub nom. DNC v. RNC,* Nos. 20-1538 & 20-1546, 2020
    WL 3619499 (7th Cir. Apr. 3, 2020)*, stayed in part,* 140 S. Ct. 1205 (2020) .........15

*DNC v. Bostelmann,*
    Civ. No. 20-cv-249-wmc, 2020 WL 1638374 (W.D. Wis. Apr. 2, 2020),
    *stayed in part sub nom. DNC v. RNC,* Nos. 20-1538 & 20-1546, 2020 WL
    3619499 (7th Cir. Apr. 3, 2020) .......................................................................15, 25

*DSCC v. Simon,*
    No. 62-CV-20-585, 2020 WL 4519785 (Minn. Dist. Ct. Aug. 3, 2020) .................23

*Fla. Democratic Party v. Detzner,*
    No. 4:16cv607-MW/CAS, 2016 WL 6090943 (N.D. Fla. Oct. 16, 2016) ...............13

*Fla. State Conference of N.A.A.C.P. v. Browning,*
    522 F.3d 1153 (11th Cir. 2008) ...............................................................................18

*Frank v. Walker*,
    819 F.3d 384 (7th Cir. 2016) ................................................12

*Harman v. Forssenius*,
    380 U.S. 528 (1965).............................................................24

*Harper v. Va. State Bd. of Elections*,
    383 U.S. 663 (1966).............................................................24

*Jones v. Governor*,
    950 F.3d 795 (11th Cir. 2020) ............................................24

*League of Women Voters of Fla., Inc. v. Detzner*,
    314 F. Supp. 3d 1205 (N.D. Fla. 2018)...............................19

*League of Women Voters of Okla. v. Ziriax*,
    463 P.3d 524 (Okla. 2020) ................................1, 7, 11, 14

*League of Women Voters v. Hargett*,
    400 F. Supp. 3d 706 (M.D. Tenn. 2019)..............................23

*League of Women Voters of Va. v. Va. State Bd. of Elections*,
    No. 6:20-CV-00024, 2020 WL 2158249 (W.D. Va. May 5, 2020)........................................11

*League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224 (4th Cir. 2014) ...13, 22, 24, 25

*Libertarian Party of Ill. v. Pritzker*,
    No. 20-cv-2112, 2020 WL 1951687 (N.D. Ill. Apr. 23, 2020), *stay denied pending appeal*, No. 20-1961 (7th Cir. June 21, 2020) ........................................11

*Luft v. Evers*,
    963 F.3d 665 (7th Cir. 2020) ................................................12

*M.L.B. v. S.L.B.*,
    519 U.S. 102 (1996)............................................................24

*Martin v. Kemp*,
    341 F. Supp. 3d 1326 (N.D. Ga. 2018), *appeal dismissed sub nom. Martin v. Sec'y of State of Ga.*, No. 18-14503-GG, 2018 WL 7139247 (11th Cir. Dec. 11, 2018) ...........................................18, 25

*McDonald v. Wise*,
    769 F.3d 1202 (10th Cir. 2014) ..........................................18

*Meyer v. Grant*,
    486 U.S. 414 (1988)............................................................22

iv

*N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*,
    854 F.3d 1236 (10th Cir. 2017) ...................................................................10

*Ne. Ohio Coal. for Homeless v. Husted*,
    696 F.3d 580 (6th Cir. 2012) .....................................................................17

*Norman v. Reed*,
    502 U.S. 279 (1992).............................................................................10, 21

*Obama for Am. v. Husted*,
    697 F.3d 423 (6th Cir. 2012) ................................................................24, 25

*Paher v. Cegavske*,
    No. 3:20-cv-00243-MMD-WGC, 2020 WL 2089813 (D. Nev. Apr. 30, 2020) ...................13

*People First of Ala. v. Merrill*,
    No. 2:20-cv-000619-AKK, 2020 WL 3207824 (N.D. Ala. June 15, 2020) ...........................14

*People First of Ala. v. Sec'y of State of Ala.*,
    No. 20-12184, 2020 WL 3478093 (11th Cir. Jun. 25, 2020) (Rosenbaum and
    Pryor, JJ., concurring), *stayed*, No. 19A1063, 2020 WL 3604049 (U.S. July 2,
    2020) ...............................................................................................11

*Raetzel v. Parks/Bellemont Absentee Election Bd.*,
    762 F. Supp. 1354 (D. Ariz. 1990) ...............................................................18

*Reynolds v. Sims*,
    377 U.S. 533 (1964)................................................................................15

*Saucedo v. Gardner*,
    335 F. Supp. 3d 202 (D.N.H. 2018)...............................................................18

*Taylor v. Louisiana*,
    419 U.S. 522 (1975)............................................................................24, 25

*Thakker v. Doll*,
    No. 1:20-cv-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020) ...........................24

*Thomas v. Andino*,
    Nos. 3:20-cv-01552-JMC & 3:20-cv-01730-JMC, 2020 WL 2617329 (D.S.C.
    May 25, 2020)......................................................................................11

*Yes on Term Limits, Inc. v. Savage*,
    550 F.3d 1023 (10th Cir. 2008) ...................................................................22

**STATUTES**

Ala. Code § 17-9-30.......................................................................................14

Okla. Stat. tit. 26, § 16-102 ................................................................................14

Okla. Stat. tit. 26, § 16-102.2 .............................................................................14

Okla. Stat. tit. 26, § 16-103 ................................................................................14

Okla. Stat. tit. 26, § 16-105 ................................................................................14

Okla. Stat. tit. 26, § 16-113 ................................................................................14

Okla. Stat. tit. 12, § 426 ......................................................................................7

Okla. Stat. tit. 26, § 7-114 ...................................................................................7

Okla. Stat. tit. 26 § 7-116.1 ...............................................................................17

Okla Stat. tit. 26, § 7-136 ..................................................................................17

Okla. Stat. tit. 26, § 14-101.1 ...............................................................19, 20, 22

Okla. Stat. tit. 26, § 14-104 .................................................................................6

Okla. Stat. tit. 26, § 14-108 ..............................................................5, 6, 19, 20

Okla. Stat. tit. 26, § 14-110.1 .........................................................................7, 20

Okla. Stat. tit. 26 § 14-113.2 ..............................................................................5

Okla. Stat. tit. 26 § 14-115.1 ............................................................................20

Okla. Stat. tit. 26, § 16-102 ..............................................................................22

Okla. Stat. tit. 26, § 16-102.2 ...........................................................................22

Okla. Stat. tit. 26, § 16-104.1 ...............................................................19, 20, 22

Okla. Stat. tit. 26, § 16-105 ..............................................................................22

Okla. Stat. tit. 26, § 16-113 ..............................................................................22

Okla. Stat. tit. 26, § 16-126 ...................................................................19, 20, 22

Okla. Stat. tit. 68, § 221.1 .................................................................................16

**OTHER AUTHORITIES**

U.S. Const. amend. XXIV, § 1 ..........................................................................24

S.B. 1779 ...........................................................................................1, 2, 3, 8, 9, 19

S.B. 210...................................................................................................................7, 8, 20

Okla. Admin. Code § 230:30-11-1.1 ...............................................................................19

"Voting Outside the Polling Place: Absentee, All Mail and other Voting at Home
    Options," NCSL, https://www.ncsl.org/research/elections-and-
    campaigns/absentee-and early voting.aspx ..............................................................14

Election Fraud Cases, The Heritage Found.,
    https://www.heritage.org/voterfraud/search?state=OK ............................................14

Nat'l Conference of State Legislatures, VOPP: *Table 11: Receipt and Postmark
    Deadlines for Absentee Ballots*, (June 15, 2020),
    https://www.ncsl.org/research/elections-and-campaigns/vopp-table-11-receipt-
    and-postmark-deadlines-for-absentee-ballots.aspx..................................................16

## <u>TABLE OF ABBREVIATIONS</u>

| | |
|---|---|
| Andrews ¶ ___ | Declaration of Alicia Andrews (Ex. 10) |
| Andrews Dep. | Deposition of Alicia Andrews (Ex. 11) |
| CARES Act | H.R. 748, CARES Act, Public Law 116-136 |
| DNC | Democratic National Commitee |
| Habrock ¶ ___ | Declaration of Lani Habrock (Ex. 5) |
| Meredith ¶ ___ | Declaration of Dr. Marc Meredith (Ex. 2) |
| McAfee ¶ ___ | Declaration of Nicole McAfee (Ex. 7) |
| Newman ¶ ___ | Declaration of Jacqui Newman (Ex. 9) |
| RNC | Republican National Committee |
| Stroman ¶ ___ | Declaration of Ronald Stroman (Ex. 3) |
| Troisi ¶ ___ | Declaration of Dr. Catherine Troisi (Ex. 1) |
| USPS | United States Postal Service |
| Ziriax Dep. | Deposition of Paul Ziriax (Ex. 4) |

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

When the pandemic began, Oklahoma was one of only three states that required absentee ballots be notarized. On May 4, as the State surpassed 4,000 COVID-19 cases, the Oklahoma Supreme Court struck down the notary requirement in favor of a simple statement signed under penalty of perjury. *See League of Women Voters of Okla. v. Ziriax* ("*LWV*"), 463 P.3d 524 (Okla. 2020). The relief afforded by the Court was short-lived. Three days later, Governor Stitt signed S.B. 210, which reinstated the notarization requirement subject to two limited exceptions applicable only during any COVID-19 State of Emergency: instead of notarization, a voter may (1) attach a copy of a photo ID or, (2) if "physically incapacitated" due to actively having COVID-19, or if at high risk for contracting the disease and subject to a stay at home order, the voter may have *two* witnesses sign their ballot.

The Legislature's revisions continued.  On May 21, the same day Oklahoma surpassed 300 deaths while reporting 5,680 positive virus cases, S.B. 1779 was signed into law. That bill makes it a crime—often a felony—simply to assist another voter in obtaining or returning an absentee ballot at that voter's request. Now it suddenly is a *crime* for a voter to return his spouse's sealed ballot when he goes to vote in person, and a friendly neighbor commits a crime if she helps an elderly shut-in by returning his ballot. In addition to these new restrictions, Oklahoma voters still had to contend with other impediments to their ability to successfully vote absentee, including the State's rejection as void any ballot received after Election Day, even if the voter is not at fault for the delayed return, as well as the State's refusal to prepay postage on ballot-return envelopes.

The chilling effects of these laws became clear in the June 30th election. The absentee-ballot return attrition rate—which was already historically higher in Oklahoma than in neighboring states—worsened, as nearly 30% of ballots mailed to voters were never returned. Many that were returned were voided because they lacked the required witness signatures or notary stamps. In

total, nearly 4,500 voters were disenfranchised by absentee ballot rejections alone, and many more were forced to risk exposure to COVID-19 to vote in person because they had no real alternative. Just two weeks later, Oklahoma set a single-day record for coronavirus infections. As of this filing, the State has recorded nearly 50,000 positive cases and 682 Oklahomans have died.

With the November election quickly approaching, the voting rights and safety of Oklahoma citizens face threats that grow worse by the day. Plaintiffs ask this Court to enjoin the following:

- The requirement that absentee ballots be notarized, include a photo ID copy, or be witnessed by two people (collectively referred to as the "**Amended Notarization Requirements**"), which force voters to interact with others when absentee voting, in contravention of sound medical guidance and responsible election administration.

- Rejecting ballots that arrive after 7 p.m. on Election Day (the "**Election Day Receipt Deadline**"), which will disenfranchise thousands of voters.

- Criminalizing voter assistance (the "**Voter Assistance Criminalization provisions**"), which compounds the problems in obtaining and casting ballots that will be counted.

- The State's failure to prepay postage (the "**Postage Requirement**") for absentee voters.

Collectively, these restrictions burden all Oklahoma voters by making absentee voting more burdensome (and sometimes inaccessible) for thousands even under normal circumstances. But during the pandemic—when voting by mail has become the "safety net"—these provisions are wholly unjustifiable and will disenfranchise many thousands more Oklahoma voters. Under these circumstances, Plaintiffs are entitled to a preliminary injunction.

Plaintiffs' right to preliminary injunctive relief is demonstrated by the multiple declarations, including from (1) Dr. Marc Meredith, a political scientist who describes the burdens the challenged provisions impose on Oklahomans' voting rights and how any state interests in them fall far short of outweighing the burdens; (2) Dr. Catherine Troisi, an infectious disease epidemiologist who explains that the COVID-19 pandemic will continue to be a significant threat to public health in the fall and will make the availability of absentee voting vitally important; and

(3) Ronald Stroman, the former Deputy Postmaster of USPS who describes the incompatibility between Oklahoma's voting deadlines, including the Election Day Receipt Deadline, and the increasingly long time it takes to deliver absentee ballots through the mail—an incompatibility that will disenfranchise thousands of lawful Oklahoma voters unless this Court acts.

## BACKGROUND

### I.   THE PANDEMIC THREATENS THE NOVEMBER ELECTION.

The novel coronavirus continues to spread, with an average of 678 cases reported per day in Oklahoma over the last week. Troisi ¶ 27. As of August 18th, 49,326 cases had been reported in Oklahoma, 682 of them resulting in death. *Id.* There is strong consensus among experts that the pandemic will continue into the fall and ever-deepening concerns about an even more difficult second wave. *Id.* ¶¶ 22, 29. Americans are urged to take extensive precautions until a vaccine is widely available, which will likely not be until 2021. *See id.* ¶¶ 17-19, 23. The CDC estimates that only 1% to 6.9% of the population in ten U.S. cities (none in Oklahoma) are immune. *Id.* ¶ 25.

The situation in Oklahoma is dire. The testing positivity rate is at 7.6%; this high rate and the lack of stay-at-home orders, are likely to lead to a surge of cases. *Id.* ¶¶ 27, 29. Long ranked in the bottom 20% in terms of health status among states, Oklahoma faces heightened risks: high percentages of residents with pre-existing conditions that put them at high risk if infected; 16.1% of Oklahomans are 65 or older, a group at increased risk of death after infection; and significant populations of groups that are particularly vulnerable (African-Americans, 7.8% of Oklahomans; American Indians/Alaska Natives, 9.4%; and Asians, 2.4%). *Id.* ¶¶ 13–14, 28.

Oklahoma's high rate of community spread hangs over the upcoming November election, because voting in person indisputably increases the risks of contracting COVID-19. *See id.* ¶ 30; *see also Common Cause R.I. v. Gorbea*, No. 20-1753, 2020 WL 4579367, at *2 (1st Cir. Aug. 7, 2020) ("Taking an unusual and in fact unnecessary chance with your life is a

3

heavy burden to bear simply to vote.") (denying motion to stay consent judgment and decree suspending "notary or two-witness requirement" for mail ballots), *stay denied sub nom. RNC v. Common Cause*, No. 20A28, 2020 WL 4680151 (Aug. 13, 2020). The CDC recommends that voters minimize contact with others, making voting by mail vital. Troisi ¶¶ 20-21, 30-32. Indeed, the risk of infection from COVID-19 makes in-person voting *infeasible* for many. Without accessible and reliable mail voting, large numbers of Oklahomans will be disenfranchised. Meredith ¶¶ 20-21, 29, 42, 48, 51, 59-60, 61, 68, 84, 95, 97.

Requests for absentee ballots have surged across the country, with many states going from less than 10% absentee voting to more than 50%. *Id.* ¶ 26 (Table 1). In Oklahoma, however, the volume continues to be strikingly low, which correlates with Oklahoma having more barriers to voting by mail than almost all other states. *Id.* Because of these barriers, many Oklahomans must choose between risking their health to vote in person or not voting at all. Indeed, while many other states have had exponential increases in absentee voting in 2020, with a majority of people voting by mail, only 14% of voters in Oklahoma's June 30 primary voted absentee. *Id.* ¶ 25.

But even this relatively low level of absentee voting is a marked increase for Oklahoma, which typically has had only about 3-4% absentee voting in prior elections. *Id.* For election officials around the country, increases in absentee voting have created many challenges. Officials have been overwhelmed by the volume of requests for absentee ballots; ballots have been late to reach voters; and the highly publicized, politically charged shortcomings of USPS have resulted in severe mail delays. *See* Stroman ¶¶ 5-6, 10, 17. Many voters have received their ballots too late to return them on time. Meredith ¶¶ 61-68. In Oklahoma's June 30 primary, for example, 2,385 ballots arrived in the mail after Election Day and were not counted. *Id.* ¶ 62 (Table 5). In Ohio, the Secretary of State reported that postal delays "as long as 7-9 days" and "in excess of 10 days"

jeopardized absentee voting. *Id.* ¶ 78. The USPS, reeling from budget cuts, staffing shortages, and operational delays, has cautioned that many states' vote-by-mail systems—*including Oklahoma's*—have deadlines that "put ballots at *high risk* of not being delivered to voters before an election." Ex. 2 to Stroman at 6. In July, USPS started actively leaving mail behind while warning states that their ballot-receipt deadlines threaten voters with disenfranchisement. Meredith ¶ 75. In August, Oklahoma and most other states received alarming notices from USPS warning it cannot ensure timely deliveries of ballots in November. Stroman ¶¶ 8–18 & Ex. 3.

## II.   OKLAHOMA'S VOTE-BY-MAIL SYSTEM, AS RECENTLY AMENDED, WILL DISENFRANCHISE THOUSANDS OF VOTERS IN NOVEMBER.

### A.   Voting in Oklahoma before COVID-19

Oklahoma requires citizens who want to vote by mail to overcome a series of sequential obstacles. *First*, if a voter's absentee ballot is not accompanied by a notarized affidavit, it is rejected. Okla. Stat. tit. 26, § 14-108. Oklahoma further forbids a notary from notarizing more than 20 ballots in an election outside her place of business. *Id.* § 14-108.1.[1]

*Second*, Oklahomans who mail in their ballots must pay for postage. For those fortunate to have unlimited mobility and reasonable financial resources, this may not seem like much. But for many others, this is a true barrier to voting. In addition to the cost of stamps, the Postage Requirement presents several challenges that are insurmountable for some voters, particularly during the pandemic. These are detailed in Meredith ¶¶ 84–94. While many states have used election funds provided under the CARES Act to provide prepaid postage, Oklahoma has

---

[1] Historically, the only exceptions have been for physically incapacitated voters and those who care for them, who instead must obtain two witness signatures (the "Witness Alternative Requirement," *id.* § 14-113.2(A)). Voters using this exception must return ballots by mail—in-person delivery is not permitted. *Id.* §§ 14-108(A), 14-113.2(A).

refused—even though, as the Secretary of the Election Board acknowledges, the State has not spent all of its CARES funds. Ziriax Dep. 154:6-8.

*Third*, Oklahoma rejects mail ballots received after 7:00 p.m. on Election Day, regardless of whether factors outside a voter's control—such as USPS delivery delays—caused the ballot to arrive late. *See* Okla. Stat. tit. 26, § 14-104. This requirement has had dire consequences. In the June primary alone, the absentee ballots of 2,385 Oklahomans arrived after the deadline and were not counted. Meredith ¶ 62 (Table 5). Over the past four years, more than 6,394 voters have been disenfranchised by this requirement. *Id*. For many reasons, the deadline is virtually certain to disenfranchise thousands more this November. Oklahoma law allows voters to request absentee ballots up to a week before Election Day. But in the current circumstances, ballots requested a week before the election are unlikely to make it to a voter by mail in time to be returned through the mail by the deadline. Stroman ¶¶ 11–15. Indeed, the two-week round-trip that USPS is anticipating establishes that *even* ballots requested *two* weeks before Election Day are at high risk of being voided by the deadline. It is thus highly likely that thousands of ballots will arrive after November 3 and will not be counted—especially when ballots are sent to a voter a week before the election. *See* Ziriax 31:6–33:10 ("I can't disagree with your math[.]"). The system is designed to fail, and the expected surge in absentee voting will lead to unprecedented numbers of disenfranchised voters in November. Meredith ¶ 68; Stroman ¶¶ 6, 10, 16, 18; Ziriax 72:6–73:3. This will shatter public confidence in the fairness and integrity of Oklahoma's elections.

*Fourth*, with limited exception, Oklahoma also prevents anyone but the voter from mailing or returning her ballot, even where a home-bound voter asks her adult child or a friendly neighbor to deliver the ballot. *See* Okla. Stat. tit. 26, § 14 108(A). As of this May, the adult child, friendly neighbor, or anyone else who assists a voter in returning a ballot is subject to criminal prosecution.

**B.**     **The Oklahoma Supreme Court invalidates the Notarization Requirement, and the State immediately responds by imposing burdensome new restrictions.**

Three months into the pandemic, the Oklahoma Supreme Court ordered the Secretary to recognize as valid affidavits made under the provisions of state perjury statutes (Okla. Stat. tit. 12, § 426), in effect striking down the Notarization Requirement. *LWV*, 463 P.3d at 524. Within three days, the Governor had signed S.B. 210, which reinstated the Notarization Requirement and created the Photo ID Alternative Requirement, which allows voters to avoid either the Notarization Requirement or the Witness Alternative Requirement if they sign their ballot affidavit under penalty of perjury and submit with it a photocopy of a photo ID. Okla. Stat. tit. 26, § 7-114.[2]

The Photo ID Alternative Requirement imposes its own equally unjustifiable burdens on Oklahomans' right to vote. Many voters now must leave their homes to make copies of their ID, forcing them to interact with others and increase their health risks. Meredith ¶¶ 22, 36, 54-58; Habrock ¶¶ 20, 22–23. And, unlike in-person voters who can sign an affidavit or vote provisionally, voters without documentation cannot vote by mail. Nor did the Legislature stop at the "Amended Notarization Requirement." S.B. 210 also had ramifications for the Witness Alternative. In S.B. 210, the Legislature temporarily amended the definition of "physically incapacitated"[3] to include a narrow sliver of voters affected by COVID-19. *See* S.B. 210, § 3(C). Under these provisions, Oklahomans who actively have or may have COVID-19, and those who are at a severe risk of illness or death if exposed to the virus, now must get their ballots witnessed

---

[2] A qualifying photo ID must contain a name, photograph, and expiration date after the election, and be issued by "the United States, the State of Oklahoma or the government of a federally recognized Indian tribe or nation." *Id.* A "voter identification card issued by the appropriate county election board" also counts. *Id*.

[3] A physically incapacitated voter must be "physically unable to vote in person at the precinct on the day of the election."  Okla. Stat. tit. 26, § 14-110.1.

by *two* other people, provide a copy of their photo ID, or vote in person. *Id.* In the midst of the pandemic, these heath-compromised voters will often fail to find two witnesses willing to risk exposure to the virus to assist. Their only option will be to break quarantine to obtain a copy of their ID or vote in person.[4]

The Witness Alternative Requirement also imposes an especially pronounced burden on physically incapacitated voters in long-term care facilities and retirement homes who are at higher risk from COVID-19. *See* Troisi ¶ 13. S.B. 210 requires "a designated official" at nursing homes and veterans' centers to serve as a witness for ballot affidavits. S.B. 210, § 3(B). According to the Secretary, these ballots still require two witnesses (Ziriax 93:7–94:5), creating a heightened risk in the most vulnerable facilities. And unlike nursing homes and veterans' centers, the law has no carveout for other long-term care facilities or retirement homes. Thus, physically incapacitated voters at those locations still must find two other residents or staffers willing to violate social distancing measures and handle the voters' ballots in order to exercise their right to vote.

The Legislature went even one step further by enacting S.B. 1779. As of May 21, it became a *felony* to return 10 or more sealed and voted absentee ballots on behalf of voters, and a misdemeanor to do the same with fewer than 10. S.B. 1779, §§ 1(A)(2), B(1), (5), 12, 14. Oklahoma thus has *criminalized* the process of assisting voters during the worst national public-health emergency in over a century, at a time when voters desperately need such assistance. *Id.*[5]

---

[4] More than 416,000 people in Oklahoma live in households with fewer than three adults, at least 166,000 of whom are age 65 and older. Ex. 6. Those voters cannot rely on members of their household to serve as witnesses and will have no choice but to venture out of quarantine or invite others in, and in the process risk exposure to COVID-19 in order to vote.

[5] There are very limited exceptions. According to S.B. 1779 § 1(B), illegal "ballot harvesting" does *not* include (1) a voter's assistant or agent under Title 26 of the Oklahoma Statutes; (2) assistance by an absentee voting board member given to a nursing home or veterans center resident; (3) employees of the Federal Voting Assistance Program facilitating voting by the

The law also created a new ballot *request* criminalization provision, which makes it a felony in most circumstances even to *request* 10 or more absentee ballots for eligible voters, and a misdemeanor to request fewer than 10.[6]

### C.    Oklahoma's June 30th election

The June 30th election demonstrated that the State lacks sufficient safe options for many voters. While Oklahoma experienced an increase in mail ballots cast, the increase was significantly smaller than in other states. Meredith ¶ 26. Despite the "expanded" availability of the "physically incapacitated" exception, the number of voters claiming the exception significantly *decreased* in June compared to March (from 27% to 14% of mail ballots). *Id.* ¶¶ 39, 41. Meanwhile, poll workers, many senior citizens, were faced with a heightened danger for transmission of COVID-19 due to the prospect of being in close proximity to voters and other poll workers. *See* Troisi ¶ 20.

Those who did choose to vote by mail had to overcome the challenged provisions, and thousands were disenfranchised by them, as described above. Ziriax 40:7–15. The additional transactional costs imposed by the challenged provisions were unjustifiable even before the pandemic: Oklahoma has historically had unusually high rates of unreturned ballots—described as the "attrition" rate—as compared to neighboring states. Meredith ¶¶ 38, 59. But the return attrition rate became more severe in the June election (climbing to 30%), as did the rate of rejections of returned ballots. *Id* at ¶¶ 39, 62. Despite these spikes, the State has made no inquiry into why tens of thousands of ballots were not returned, nor has it adopted any policies to reduce

---

Department of Defense or Oklahoma National Guard; (4) a spouse, relative in the first or second degree of consanguinity or affinity or cohabitant of a voter who forwards an absentee ballot to the voter when absent from the home; (5) a voter's spouse; and (6) election officials.

[6] There are exceptions for physically incapacitated or emergency incapacitated voters, whose "assistant or agent" may request one on their behalf; for an absentee voting board member who assists a voter confined to a nursing home or veterans' center; and for an election official taking official action authorized by law. *See* S.B. 1779, §§ 1(A)(1)–(4), (B)(1), 12, 14.

the number of ballots that will be rejected in November. Ziriax 40:16–20, 56:1–10.

## STANDARD OF DECISION

Plaintiffs must demonstrate (1) they are substantially likely to succeed on the merits; (2) they will suffer irreparable injuries absent an injunction; (3) their injuries will outweigh burdens Defendants might face because of an injunction; and (4) an injunction is in the public interest. *N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1246 (10th Cir. 2017).

## ARGUMENT

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.   The Amended Notarization Requirements impose severe burdens on voters.

The Amended Notarization Requirements unduly burden the right to vote by imposing multiple barriers to casting a mail ballot, particularly during this pandemic. Under the *Anderson-Burdick* test used to evaluate federal constitutional challenges to state voting restrictions, courts must "weigh 'the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,'" considering "'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788–89 (1983)). *Anderson-Burdick* is a sliding scale, where "the rigorousness of [the court's] inquiry . . . depends upon the extent to which a challenged regulation burdens [voting] rights." *Burdick*, 504 U.S. at 434. "The more a challenged law burdens the right to vote, the stricter the scrutiny to which [federal courts] subject that law." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318, 1319 (11th Cir. 2019). Thus, when voting rights are subject to a "severe" burden, the challenged restriction must be "narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 289 (1992). Less severe burdens remain subject to balancing; "[h]owever slight" the burden on voting rights "may appear,"

"it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (controlling op.). In evaluating burdens, a court must focus on both the burdens on the electorate generally, and on the individuals directly impacted by the law. *See id.* at 201–02.

**The restrictions' severe burdens.** The Oklahoma Supreme Court has specifically rejected the Notarization Requirement as an unnecessary burden on voters because Oklahoma law allows affidavits to be made under penalty of perjury. *LWV*, 463 P.3d at 524. Other courts have recognized the unjustifiable burdens that witness and notarization requirements place on voters, enjoining or modifying those requirements for at least the duration of the pandemic.[7]

---

[7] *See, e.g.*, *Common Cause R.I.*, 2020 WL 4579367, at \*2 (concluding "the incremental interest in the specific regulation at issue (the two-witness or notary rule) is marginal at best"); *Libertarian Party of Ill. v. Pritzker*, No. 20-cv-2112, 2020 WL 1951687 (N.D. Ill. Apr. 23, 2020) (applying *Anderson-Burdick* in light of pandemic, and alleviating signature and witnessing requirements for minor party candidates), *stay denied pending appeal*, No. 20-1961 (7th Cir. June 21, 2020); *Thomas v. Andino*, Nos. 3:20-cv-01552-JMC & 3:20-cv-01730-JMC, 2020 WL 2617329, at \*21 (D.S.C. May 25, 2020) (finding "strong likelihood that the burdens placed upon [plaintiffs] by" witness signature requirement "outweigh the imprecise, and (as admitted by [defendants]) ineffective, state interests of combating voter fraud and protecting voting integrity"); *League of Women Voters of Va. v. Va. State Bd. of Elections*, No. 6:20-CV-00024, 2020 WL 2158249, at \*8 (W.D. Va. May 5, 2020) ("The Constitution does not permit a state to force" voters to choose "between adhering to guidance that is meant to protect not only their own health, but the health of those around them, and undertaking their fundamental right—and, indeed, their civic duty—to vote in an election."). The Eleventh Circuit upheld a district court's suspension of Alabama's witness and photo ID requirements for voters at high risk of complications from COVID-19; two of the judges issued a careful concurring opinion explaining all the reasons to enjoin witness-certification requirements during this pandemic. *People First of Ala. v. Sec'y of State of Ala.*, No. 20-12184, 2020 WL 3478093, \*1–\*9 (11th Cir. Jun. 25, 2020) (Rosenbaum and Pryor, JJ., concurring), *stayed*, No. 19A1063, 2020 WL 3604049 (U.S. July 2, 2020). Although the Supreme Court stayed that decision in a one-paragraph order, Alabama's lead argument for a stay rested squarely on *Purcell* grounds and had nothing to do with the merits. Specifically, the district court issued its injunction on June 15 for an upcoming July 14 runoff, and the injunction applied only in 3 of Alabama's 67 counties. *Id.* Neither of those factors apply here. There is comparatively much more time, and Plaintiffs seek uniform statewide relief.

In fact, Oklahoma virtually *ensures* that voters who are actively infected with COVID-19, but who lack a means to make a photocopy of their ID, must come into contact with at least two other people to exercise their right to vote. Requiring *known infected voters* or those under instruction to self-isolate to interact with two witnesses is a severe burden on the right to vote because it will be difficult, and often impossible, for these voters to find the necessary witnesses. But the potential for exposure is unnecessarily high for a host of voters, not just those infected or possibly infected with the virus. Uninfected voters who do not have a required form of ID, or who do but lack a photocopier, must venture out to satisfy the Photo ID Alternative. Habrock ¶ 22; Meredith ¶ 36; Troisi ¶¶ 2, 30.

Many voters will also be confused or unaware that an exception applies to them, in part because the State Board does not communicate to voters what must accompany a ballot for it to count. Meredith ¶¶ 44-45. The Secretary admitted his office has not offered any interpretations of what the "physically incapacitated" provisions mean or issued regulations relating to the same, and has no plans to do so. Ziriax 116:15–117:3. Data from the primary demonstrate that voters are confused by what "physically incapacitated" means. Meredith ¶¶ 46–47. The percentage of voters who designated themselves as "physically incapacitated" *dropped* from the March 2020 election to the June election. *Id*. More disturbing, the *decline* in the percentage of mail-ballot voters who designated themselves physically incapacitated was the highest among voters *over* 70, all of whom the CDC classifies as high-risk if infected with COVID-19. *Id.* ¶ 46.

The Amended Notarization Requirements thus impose severe burdens on large numbers of voters, from disenfranchisement to risk of illness and death. The rate of unreturned and rejected ballots is constitutionally inexcusable, as it demonstrates that each eligible voter is not being given a reliable path to cast a vote. *Frank v. Walker*, 819 F.3d 384, 386 (7th Cir. 2016) ("[T]he right to

vote is personal and is not defeated by the fact that 99% of other people" are not seriously impacted.); *cf. Luft v. Evers*, 963 F.3d 665, 677, 679 (7th Cir. 2020) (holding "each eligible person must have a path to cast a vote[,]" which requires State to "ensure[ ] that every eligible voter can" comply with law with reasonable effort as part of a "*reliably implemented*" process).[8] "If disenfranchising thousands of eligible voters does not amount to a severe burden on the right to vote, then [it is not clear] what does." *Fla. Democratic Party v. Detzner*, No. 4:16cv607-MW/CAS, 2016 WL 6090943, at *6 (N.D. Fla. Oct. 16, 2016). The Amended Notarization Provisions should thus be evaluated using strict scrutiny. *Id.*

**Lack of justification.** Regardless of the standard applied, the drastic burdens imposed by the Amended Notarization Requirements far outweigh any state interest in applying them, particularly in the current pandemic.

No precise state interests are articulated for the Notarization or Witness Requirement, save for "confirming the identity of the voter" (an interest sufficiently accomplished through self-executing affidavits). Ziriax 109:1-5. The perennial yet unsubstantiated risk of "voter fraud" carries little weight under the circumstances. Indeed, Secretary Ziriax concedes "voter fraud is exceptionally rare in Oklahoma and not a major issue here[.]" *Id.* at 108:6-22. Nor is it an issue elsewhere, even where the relief Plaintiffs' seek is used. Meredith ¶¶ 103-05 ("[T]he evidence shows that almost no voter fraud is committed using mail ballots.").[9]

---

[8] These burdens are not be distributed equally, but fall disproportionately on lower income voters, students, minorities, those over 65, and those with other high-risk factors for COVID-19. *See* Meredith ¶¶ 88, 94; Troisi ¶¶ 13–14, 28; McAfee ¶ 10.

[9] The First Circuit was slightly off in recently stating Rhode Island "may be the lone state" that still has a notary-or-two-witness rule. *Common Cause R.I.*, 2020 WL 4579367, at *2 (noting specter of "fraudulent [mail] ballots" is "surely correct as a matter of theory. But it is dubious as a matter of fact and reality"); *see also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 246 (4th Cir. 2014) (explaining "states cannot burden the right to vote in order to address

As for the Notarization Requirement, it has already been invalidated by the Oklahoma Supreme Court. *LWV*, 463 P.3d at 524. The addition of the Photo ID Alternative does not change the calculus. The Amended Notarization Requirements provide little, if any, additional protection against fraud. Meredith ¶¶ 3, 98, 106. The State allows UOCAVA voters to self-authenticate their ballots via affidavit. Ziriax 110:8-13. *See also People First of Ala. v. Merrill*, No. 2:20-cv-000619-AKK, 2020 WL 3207824, at *18 (N.D. Ala. June 15, 2020) (noting "[t]he state has not explained why, consistent with its interest in preventing voter fraud, it can exempt" some voters and not others from a photo ID requirement) (the subsequent history of this case is described in full in footnote 7 above).  The Secretary is not aware of any instances of voter fraud in Oklahoma related to these self-authenticating ballots. Ziriax 139:18-140:1. And although Oklahoma is one of only a few states that require notarization or the signatures of two witnesses, there is no evidence that the states without such requirements suffer from increased voter fraud.[10]

Finally, Oklahoma has multiple, strict voter fraud laws that deter and punish the acts that could give rise to voter fraud. *See, e.g.*, Okla. Stat. 26 §§ 16-102, 16-102.2; 16-103, 16-105, 16-113. The burdens imposed by the Amended Notarization Requirements are thus unnecessary. *See Common Cause Ind. v. Individual Members of Ind. Election Comm'n*, 800 F.3d 913, 928 (7th

---

dangers that are remote and only 'theoretically imaginable,'" such as threats to "electoral integrity and fraud prevention," with little to no evidence that such dangers exist); *Paher v. Cegavske*, No. 3:20-cv-00243-MMD-WGC, 2020 WL 2089813, at *1 (D. Nev. Apr. 30, 2020) ("[The State's] interests in protecting the health and safety of Nevada's voters and to safeguard the voting franchise in light of the COVID-19 pandemic far outweigh any burden . . . premised on a speculative claim of voter fraud.").

[10] Alabama, North Carolina, Rhode Island, Mississippi, and Missouri are the others. *See* Ala. Code § 17-9-30(b); *see also* "Voting Outside the Polling Place: Absentee, All Mail and other Voting at Home Options," NCSL, https://www.ncsl.org/research/elections-and-campaigns/absentee-and early voting.aspx; Election Fraud Cases, The Heritage Found., https://www.heritage.org/voterfraud/search?state=OK (listing five instances of voter fraud, only two related to absentee voting, in past 13 years).

Cir. 2015) (asserted state interests cannot outweigh burdens where they can "be served through other means, making it unnecessary to burden the right to vote").

    **B.**    **The Election Day Receipt Deadline is unconstitutional.**

Plaintiffs also are likely to succeed on their claim that the Election Day Receipt Deadline burdens the right to vote under *Anderson-Burdick* as well as a due process analysis. "There is more to the right to vote than the right to mark a piece of paper and drop it in a box or the right to pull a lever in a voting booth. The right to vote includes *the right to have the ballot counted*." *Reynolds v. Sims*, 377 U.S. 533, 555 n.29 (1964) (citation and quotation marks omitted, emphasis added). The deadline violates the fundamental right to vote by rejecting absentee ballots cast by lawful, registered voters *prior* to Election Day, simply because the mailed ballots arrive *after*.

A federal district court in Wisconsin, faced with a surge in absentee voting and credible predictions of a breakdown in USPS service, recently extended an election-day receipt deadline by six days, saving the votes of nearly 80,000 citizens who cast valid ballots that were postmarked on or before Election Day but arrived in the days following due to delayed mail service. *See DNC v. Bostelmann*, Civ. No. 20-cv-249-wmc, 2020 WL 1638374, at *17 (W.D. Wis. Apr. 2, 2020), *stayed in part sub nom. DNC v. RNC*, Nos. 20-1538 & 20-1546, 2020 WL 3619499 (7th Cir. Apr. 3, 2020)*, stayed in part*, 140 S. Ct. 1205 (2020); *see* Ex. 8. The Seventh Circuit and Supreme Court narrowed the injunction in other respects, including by requiring that all after-received ballots must be postmarked on or before Election Day, but both not only left the six-day extension of the receipt deadline intact, but approvingly relied on it in rejecting *other* requested relief. *See* 140 S. Ct. at 1207-08 (relying on "fact that the deadline for receiving ballots was already extended . . . to ensure [voters] can cast their ballots and have their votes count" in denying additional time to vote); 2020 WL 3619499, at *2 (finding extension of ballot-receipt deadline would give quarantined voters additional time to comply with witness requirements). The Supreme Court expressed no concerns

about "afford[ing] Wisconsin voters several extra days in which to mail their absentee ballots," so long as those ballots were "postmarked by election day." 140 S. Ct. at 1206. That is precisely the sort of "postmark" rule Plaintiffs seek here.[11]

The *Anderson-Burdick* analysis is compellingly one-sided. The burdens on individual voters are evident: outright disenfranchisement. Even before the pandemic, the Deadline resulted in the rejection of thousands of Oklahoma voters' ballots. Meredith ¶ 62 (Table 5). With the expected surge in absentee voting and increasing USPS dysfunction, *see* McAfee ¶ 13, the number of rejected ballots will only increase in November. Moreover, the experience in Wisconsin and elsewhere demonstrates that modest extensions in ballot-receipt deadlines can be implemented manageably and with minimal administrative burden while avoiding widespread disenfranchisement.[12] No one has pointed to any evidence that these extensions have led to voter fraud or other systemic problems and in fact, the Secretary is confident that ballots arriving by at least the Friday after an election would be counted, eliminating any state burden. Ziriax Dep. 106:14-107:9. On top of that, turnout will be vastly larger in November, election officials are likely to be overwhelmed, and USPS will at best continue to face widespread challenges in providing timely election-mail service.

The Deadline is also, for many voters, an unexpected burden. Many other deadlines in their lives are postmark deadlines. *See, e.g.*, Okla. Stat. tit. 68, § 221.1(A) (postmark deadline for tax

---

[11] "Postmark" refers to any type of imprint applied by USPS to indicate the location and date it accepts custody of a piece of mail, including bar codes, circular stamps, or other tracking marks, and, where a ballot does not bear a postmark, requires the State to presume the ballot was mailed on or before Election Day unless the preponderance of evidence demonstrates otherwise.

[12] A least 14 other states and D.C. follow a "postmark" rule (or close variant), requiring ballots that arrive in the days following an election to be counted so long as they are timely postmarked. *See* Nat'l Conference of State Legislatures, VOPP: *Table 11: Receipt and Postmark Deadlines for Absentee Ballots*, (June 15, 2020), https://www.ncsl.org/research/elections-and-campaigns/vopp-table-11-receipt-and-postmark-deadlines-for-absentee-ballots.aspx.

returns and payments). Even when registering to vote, the cutoff for mailed applications is a postmark date. Ziriax 52:21-53:6. The Secretary is unaware of any issues or problems the State has with relying on a postmark date in this context. *Id*. at 53:15-54:2. But when it comes time to vote, voters must simply guess at the appropriate date to mail their ballot and trust the mail service will be timely. Moreover, they must guess as to the appropriate time to begin the process of *applying* for an absentee ballot, in addition to scheduling their witness or notary. Any misstep that causes the ballot to be received by local election officials after Election Day results in automatic rejection, even if the voter was not at fault for the delay in the mails. This is constitutionally intolerable. *See Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012) ("*NEOCH*") (finding likely constitutional violation after state failed to identify "precise interests" justifying "substantial burden" when ballots were rejected due to no fault of the voter).

The State has no adequate justification for discarding ballots mailed by voters by Election Day. By the Secretary's own admission, extending the Deadline would not jeopardize the State's ability to finalize election results. *See* Okla Stat. tit. 26, § 7-136. Moreover, Oklahoma law requires that absentee ballot results shall not be announced earlier than 7:00 p.m. on Election Day, and provisional ballots are not counted and added to the election results until at least the Friday following the election (a deadline that may be extended). *Id.* § 7-116.1(E). Vote-by-mail ballots that arrive after Election Day could easily be added to this total and be completed by the Friday after the election, as Secretary Ziriax has confirmed. Ziriax 106:14-107:9.[13]

There is yet another, related constitutional objection to the Deadline: as it is being applied, it violates citizens' liberty interests in their votes without due process of law. Procedural due

---

[13] In the June election, 87% of late-received ballots arrived by the Friday after the election. Meredith ¶ 64. Counting them would impose little if any administrative burden for reasons stated.

process analysis requires consideration of (1) "the private interest" affected; (2) "the risk of an erroneous deprivation" of that interest through current procedures; (3) and the "probable value . . . of additional or substitute procedur[es]," taking into account the "administrative burdens" such procedures would entail. *McDonald v. Wise*, 769 F.3d 1202, 1213 (10th Cir. 2014) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). The voters' interests, and the procedural requirements of due process extend to absentee voting.[14] We have discussed the "probable value" of a slight extension of the Receipt Deadline above and shown that the administrative burdens would be modest. That leaves "the risk of an erroneous deprivation." USPS itself has warned that Oklahoma voters are at "high risk" of not having their mailed ballots counted, and the experience in Wisconsin and other states shows the growing risks that thousands—perhaps tens of thousands—of mailed ballots may be rejected because of slow mail service and other factors that voters cannot control. Unlike Oklahoma's deadline to vote in-person, which is clear—to participate, you must join the line by 7:00 p.m.—the Receipt Deadline provides no bright-line rule to ensure an absentee ballot that is requested, cast, and mailed back will be counted. That time is a constantly moving target, changing depending on elections officials' workloads and response times in mailing out requested ballots, the vagaries of USPS, and conflicting advice and guesswork by various public officials. This is a constitutionally indefensible way to run an election.

### C. The Absentee Assistance Criminalization provisions are unconstitutional.

The Absentee Assistance Criminalization provisions impose staggering burdens on the

---

[14] *See Martin v. Kemp*, 341 F. Supp. 3d 1326, 1338 (N.D. Ga. 2018), *appeal dismissed sub nom. Martin v. Sec'y of State of Ga.*, No. 18-14503-GG, 2018 WL 7139247 (11th Cir. Dec. 11, 2018); *Saucedo v. Gardner,* 335 F. Supp. 3d 202, 217 (D.N.H. 2018); *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990); *see also Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1183 (11th Cir. 2008) ("When an election process 'reache[s] the point of patent and fundamental unfairness,' there is a due process violation.") (citation omitted).

Oklahoma voters who most need assistance by *criminalizing* the actions of good Samaritans and others who want to assist these voters. The hastily enacted provisions are rife with ambiguities that only compound the burdens and, according to the Secretary, will require individual legal analysis to be conducted by the Board. Ziriax 130:1-134:22.  Oklahoma's interests in these restrictions are minimal and pale in comparison to their burdens—particularly in the present pandemic.

**Criminalization burdens.** It is now a felony for Plaintiffs to request 10 or more absentee ballots for eligible voters who need assistance to vote by mail, and a misdemeanor to do the same for fewer than 10 absentee ballots.[15] This reduces access to vote-by-mail opportunities on which many voters and prospective voters reasonably—and now in a pandemic, necessarily—rely. It drastically shrinks, if not outright eliminates, the pool of persons and organizations who can assist a voter in requesting a ballot. That task can be particularly challenging for subsets of voters including language minorities, the disabled, those vigilantly social distancing to prevent contracting COVID-19 or spreading it to a vulnerable close contact, and those without ready access to mailboxes (including Native Americans), transportation, or the Internet. *See League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1216–17 (N.D. Fla. 2018) ("Disparate impact matters under *Anderson-Burdick*."); Meredith ¶ 96. Many organizations, including Plaintiffs, want to help voters request absentee ballots. Newman ¶¶ 9-12; Andrews ¶¶ 8-10; Habrock ¶ 18. But now they cannot do so without risking felony prosecution.

**Absentee Assistance Ban and Criminalization burdens.** The Ban prevents anyone but

---

[15] As noted earlier, there are exceptions for a physically incapacitated or emergency incapacitated voter, whose "assistant or agent" may request am absentee ballot on their behalf in person, but only at the office of the county election board. *See* Okla. Stat. tit. 26, §§ 14-101.1(A)(4), 16-104.1,16-126. Other exceptions exist for an absentee voting board member who assists a voter confined to a nursing home or veterans' center, as well as for an election official taking official action authorized by law. *See* S.B. 1779, §§ 1(A)(1)-(4), (B)(1), 12, 14.

the voter from mailing or returning his or her absentee ballot, *see* Okla. Stat. tit. 26, §§ 14-101.1(A)-(B), 14-108(A); Okla. Admin. Code § 230:30-11-1.1(a), except that a voter's spouse may return the ballot "by mail" (but apparently *not* in person). Okla. Stat. tit. 26, § 14-101.1(A)(1), (2), (B)(5).[16] The new Absentee Assistance Criminalization rule now makes it a felony for anyone to return or work with others to return 10 or more sealed and voted absentee ballots for voters requiring assistance, and a misdemeanor to do so with 10 or less ballots. *Id.* §§ 16-104.1, 16-126.

A voter who does not meet (or is unable to ascertain) the narrow definition of "physically incapacitated" and does not have a spouse is the only person that can return their ballot. Ziriax 155:3-16. Thus, most potential voters can only receive assistance returning a ballot from a spouse, and even then it must be mailed. This irrational and punitive rule subjects the ballot to the pandemic-induced delays and USPS delays, and increases the burdens on those who lack easy access to a mailbox. Meredith ¶¶ 95-97. Unmarried and widowed voters must mail or return their ballot themselves. Even single parents cannot ask their own children to mail or return their ballots for them. For voters with disabilities, who are social distancing or self-quarantining, or who lack ready access to postage or transportation, the burdens are severe and potentially prohibitive. Moreover, combined with the potential for mail delays and the disenfranchising effects of the Receipt Deadline, voters who receive their ballots close to Election Day will have no choice but to hand-deliver their ballot to the county board and present proof of identity—necessitating contact with election officials in a pandemic. *See* Okla. Stat. tit. 26, § 14-108(C). At best, this will force

---

[16] It is unclear whether a "physically incapacitated" voter may use an "agent" (other than a spouse) to return his ballot. Although Okla. Stat. tit. 26, § 14-110.1 allows an agent to assist a physically incapacitated voter in *applying* for an absentee ballot, there appears to be no comparable provision addressing an agent's *return* of a ballot unless the voter is emergency incapacitated. *Id.* § 14-115.1; *see also* S.B. 210 § 3(C) (amending definition of "physically incapacitated" for "purposes of *requesting* an absentee ballot described in" Okla. Stat. tit. 26, § 14-110.1) (emphasis added). This ambiguity enhances the burdens imposed on the most vulnerable voters.

many voters to choose between jeopardizing their health and exercising their right to vote. At worst, the rules ensure disenfranchisement.

Organizers and volunteers with political organizations and civic groups, such as Plaintiffs and CAIR-OK, are critical to fill this assistance gap. But Oklahoma now bans and criminalizes *all* that activity, restricting the pool of potential help available to absentee voters and chilling the speech and associational rights of Plaintiffs and other organizations that would otherwise engage in absentee voter drives and provide this vital assistance for accessing the franchise, but for the threat of felony prosecution. Habrock ¶ 18; Newman ¶¶ 9-12; Andrews ¶¶ 8-10; McAfee ¶ 15. The Ban makes it needlessly difficult for certain voters to receive help designed to avoid this type of disenfranchisement, including those who live alone or have no family members willing or able to deliver ballots, and minority and low-income voters, who face greater rates of disenfranchisement from the current Receipt Deadline and thus stand to benefit the most from organized assistance. Habrock ¶¶ 14-18; Newman ¶¶ 9, 11; Andrews ¶ 9. Beyond returning ballots, trained professionals can also remind voters to sign their ballots—a misstep that unintentionally disenfranchises hundreds each year, especially first-time mail voters.  Habrock ¶¶ 13-15.

**State interests.**  Because the Absentee Assistance Criminalization provisions are so severe, they "must be narrowly drawn to advance a state interest of compelling importance." *Norman*, 502 U.S. at 289. Defendants cannot come close to making such a showing. The State has an interest in ensuring that voters lawfully mark their own ballots and that the ballots are returned, not in preventing others from assisting voters in requesting a ballot or returning it once it is *sealed* and *voted* and enclosed within *three* sealed envelopes. Oklahoma has a host of laws tailored to these

specific interests, and the prevention of fraud generally.[17]

Given these numerous existing safeguards for ballot assistance, there is no justification for the burdens the challenged restrictions impose under any circumstances, much less during a pandemic. *See Yes on Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1030 (10th Cir. 2008) (holding Oklahoma's ban on non-resident petition circulators unconstitutional as insufficiently tailored to further a compelling interest where, *inter alia*, "Oklahoma could provide criminal penalties" directly targeting fraudulent activity rather than banning non-resident circulators as a class); *League of Women Voters of N.C.*, 769 F.3d at 246 ("states cannot burden the right to vote in order to address dangers that are remote and only theoretically imaginable," such as "election integrity and fraud protection," with little evidence such dangers exist) (quotation marks omitted).

**Core First Amendment activities.** The Absentee Assistance Criminalization provisions should also be enjoined because they violate Plaintiffs' speech and associational rights. Voter turnout efforts, including assisting voters in requesting and returning their sealed and voted absentee ballots, are important ways in which Plaintiffs support like-minded candidates, communicate with voters, and express their belief in the importance of electoral participation. *See* Newman ¶¶ 9-12; Andrews ¶¶ 8-10; Andrews 55:4-6, 56:9-15, 57:9-24. These are speech and associational activities going to the heart of the First Amendment. *See Meyer v. Grant*, 486 U.S. 414, 420–24 (1988); *Yes on Term Limits*, 550 F.3d at 1028 (re "interactive communication concerning political change"). As one court recently observed in enjoining much less restrictive

---

[17] These include making it a felony or misdemeanor to fill out another's ballot without consent; execute a false application for a ballot; collect ballots under a false pretense of returning them to election officials; vote a ballot issued to another person; conspire to commit fraud or perpetuate fraud; influence the vote of another by means of force or intimidation; interfere with a voter attempting to vote; or interfere with the conduct of any election. *See* Okla. Stat. tit. 26, §§ 14-101.1(A)(3), (5), 16-102, 16-102.2, 16-104.1, 16-105, 16-113, 16-126.

absentee voter assistance prohibitions than Oklahoma's, "[r]educing the number of individuals who could potentially provide assistance to potential voters, particularly those [who] a political party believes would support their candidate, diminishes the speech and associational rights of political organizations like" Plaintiffs.[18]  Because the challenged provisions criminalize political expression and association, they should be enjoined.

### D.   The Postage Requirement is unconstitutional.

The Postage Requirement imposes monetary costs and other burdens on voters, which are particularly severe this year when mail voting is likely to be the only safe method for many to exercise their right to vote. *Supra* at 3-4. These associated costs and burdens are detailed in Meredith ¶¶ 84-94. As demonstrated there, the Postage Requirement imposes significant burdens on casting a mail ballot on many voters who are elderly, disabled, live far from a post office, or have limited transportation options. *See also* McAfee ¶ 12; *see generally* Andrews 69:17-23.

Oklahoma recognizes that postage is a burden on voters. That is why Oklahoma citizens living overseas and military personnel abroad need not pay for postage to return their completed absentee ballots by mail. Ziriax 147:4-8. Political science research shows that postage can be such a burden that potential voters do not vote, and turnout increases where postage is prepaid. Meredith ¶¶ 85-86. Failing to affix return postage is more likely to disenfranchise a potential voter when

---

[18] *DSCC v. Simon*, 2020 WL 4519785 at 51 (Minn. Dist. Ct. Aug. 3, 2020). "The discussion of whether to vote absentee and to allow your ballot to be collected … inherently implicates political thought and expression" because "[u]ltimately, for political organizations, voter assistance walks hand in hand with their efforts to get individuals and groups, for whom they believe will support their candidates, to cast votes." *Id.* at 52; *see also, e.g.*, *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 720 (M.D. Tenn. 2019) ("Encouraging others to register to vote is pure speech, and, because that speech is political in nature, it is a core First Amendment activity.") (quotation marks and alterations omitted)); *Am. Ass'n of People with Disabilities v. Herrera,* 690 F. Supp. 2d 1183, 1202 (D.N.M. 2010) ("An organization's attempt to broaden the base of public participation in and support for its activities is conduct 'undeniably central to the exercise of the right of association.'").

there is uncertainty over how much postage to apply. *Id.* ¶ 89. The State Board cannot answer this

question. *Id.* Yet, prepaid postage is a feasible solution to the hurdles Oklahomans faces in voting

safely in a pandemic. The State has no adequate justification for passing the burden of postage on

to its citizens. This is purely a matter of administrative convenience, which cannot outweigh

burdens on fundamental rights. *See Taylor v. Louisiana*, 419 U.S. 522, 535 (1975). Moreover,

Congress has allocated $2.9 million for Oklahoma to use for coronavirus-related election expenses,

which can be used to cover the cost of prepaying postage. Ziriax 153:7-15.[19]

## II.     AN INJUNCTION IS REQUIRED TO AVOID IRREPARABLE HARM

The challenged provisions, individually and collectively, put Plaintiffs' members and

constituents at great risk of disenfranchisement, plainly an irreparable injury. *See, e.g.*, *League of

Women Voters of N.C.*, 769 F.3d at 247; *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir.

2012). "The denial of the opportunity to cast a vote that a person may otherwise be entitled to

cast—even once—is an irreparable harm." *Jones v. Governor*, 950 F.3d 795, 828 (11th Cir. 2020);

*see also Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1321 (11th Cir. 2019) ("[I]t is a

'basic truth that even one disenfranchised voter—let alone several thousand—is too many.'"

(citation omitted)). Once an election occurs, "there can be no do-over and no redress." *League of

Women Voters of N.C.*, 769 F.3d at 247. Moreover, "[s]erious, lasting illness or death" also

---

[19]  The Postage Requirement also violates the Twenty-Fourth Amendment, which provides that the right to vote "shall not be denied or abridged by the United States or any state by reason of failure to pay any poll tax or other tax," *see* U.S. Const. amend. XXIV, § 1; *see also Harman v. Forssenius*, 380 U.S. 528, 539 (1965); *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 666 (1966). "[V]oting cannot hinge on ability to pay . . . for it is a 'fundamental political right . . . preservative of all rights.'" *M.L.B. v. S.L.B.*, 519 U.S. 102, 124 n.14 (1996) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)). This is true regardless whether a voter is able to pay. *See Harper*, 383 U.S. at 668 (finding imposition of a fee unconstitutional "whether the citizen, otherwise qualified to vote, has $1.50 in his pocket or nothing at all"). Oklahoma does what *Harper* prohibits: it conditions casting a mail ballot on paying a fee (i.e., postage).

constitutes irreparable injury. *Thakker v. Doll*, No. 1:20-cv-480, 2020 WL 1671563, at *4 (M.D. Pa. Mar. 31, 2020) (*re* potential exposure to COVID-19 virus). The challenged provisions also bar Plaintiffs, their members, and their constituents from participating in election-related activities, also causing irreparable harm. And Plaintiffs must divert time and resources from their mission-critical advocacy work. Newman ¶¶ 5-13; Andrews ¶¶ 6-10; Andrews Dep. 44:3-9, 15-16. Once the election cycle is over, these injuries to Plaintiffs and voters alike cannot be "undone through monetary remedies." *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987).

## III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR AN INJUNCTION

Defendants have no legitimate interest in enforcing unconstitutional laws. They face, at most, administrative inconveniences. But these cannot justify practices that impinge on fundamental rights. *Taylor*, 419 U.S. at 535; *Kemp*, 347 F. Supp. 3d at 1268. Some marginal gain in electoral efficiency, or the specter of hypothetical voter fraud, cannot justify severely burdening the right to vote or outright disenfranchisement. That is especially so for those made to face the "excruciating dilemma" of choosing between "ventur[ing] into public spaces, contrary to public directives and health guidelines or stay[ing] at home and los[ing] the opportunity to vote." *Bostelmann*, 2020 WL 1320819, at *5.

The public interest is best served by injunctive relief in cases like this because "[t]he public has a 'strong interest in exercising the fundamental political right to vote.'" *League of Women Voters of N.C*, 769 F.3d at 248 (citations omitted); *Obama for Am.*, 697 F.3d at 437.

## CONCLUSION

For these reasons, and as further established in the accompanying declarations, exhibits, and deposition testimony, Plaintiffs respectfully request this Court to grant a preliminary injunction and to enter the proposed order that accompanies this brief.

DATED:   August 19, 2020

*s/ Frank W. Frasier*

Frank W. Frasier, OK# 17864
FRASIER, FRASIER & HICKMAN, LLP
1700 Southwest Boulevard
Tulsa, OK  74107
Telephone:   918.584.4724
Facsimile:   918.583.5637
FFrasier@frasierlaw.com

Marc E. Elias
John Devaney
Ariel B. Glickman
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 800
Washington, DC  20005-3960
Telephone:   202.654.6200
Facsimile:   202.654.6211
MElias@perkinscoie.com
JDevaney@perkinscoie.com
AGlickman@perkinscoie.com

Charles G. Curtis, Jr.
Sopen B. Shah
Will M. Conley
PERKINS COIE LLP
33 East Main Street, Suite 201
Madison, WI 53703-3095
Telephone:   608.663.7460
Facsimile:   608.663.7499
CCurtis@perkinscoie.com
SShah@perkinscoie.com
WConley@perkinscoie.com

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 19, 2020, I electronically transmitted Plaintiffs'
Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction to the Clerk of Court
using the ECF System for filing, which will transmit a Notice of Electronic Filing and a copy of the
document to all counsel who have entered an appearance in this case.


DATED:   August 19, 2020

*s/ Frank W. Frasier*
Frank W. Frasier, OK# 17864
FRASIER, FRASIER & HICKMAN, LLP
1700 Southwest Boulevard
Tulsa, OK  74107
Telephone:  918.584.4724
Facsimile:  918.583.5637
FFrasier@frasierlaw.com