# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

DCCC, *et al.*,

*Plaintiffs,*

v.

PAUL ZIRIAX, *in his official capacity as* SECRETARY OF THE OKLAHOMA STATE ELECTION BOARD, *et al.*,

*Defendants.*

Case No:       20-CV-211-JED-JFJ

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

TABLE OF CONTENTS

Findings of Fact ........................................................................................................................ 1

    I.      Oklahoma Election Laws ......................................................................... 1

    II.    Changes to Voting during COVID-19 .................................................... 5

          A. In-Person Voting during COVID-19 ............................................... 5

          B. Absentee Voting during COVID-19 ................................................ 6

    III.   COVID-19 and the Risks of Voting During the Pandemic. ................... 9

          A. Risks of Voting in Person during COVID-19 ............................... 11

          B. Risks of Voting Absentee during COVID-19 ............................... 14

    IV.   Voting Patterns in Oklahoma Elections during COVID-19 and Evidence Regarding Alleged Burdens of Challenged Laws ................. 15

    V.    State Interests in Preventing and Detecting Voter Fraud ..................... 22

    VI.   Role of Defendants in Enforcing Laws at Issue ................................. 27

    VII.  Election Day in November 2020 and Potential for Disruption ........... 29

Conclusions of Law ............................................................................................................... 32

    I.      Standard for Injunctive Relief ............................................................. 32

    II.    Actual Success on the Merits .............................................................. 33

          A. Standing ......................................................................................... 33

          B. Proper Parties ................................................................................ 38

          C. Venue ............................................................................................ 40

          D. In-Person Voting ........................................................................... 42

          E. Ballot Verification ......................................................................... 48

          F. Ballot Harvesting .......................................................................... 55

          G. Ballot Receipt Deadline ................................................................ 61

          H. Postage .......................................................................................... 66

i

I.  As-Applied Vs. Facial Relief ........................................................................68

III.   Balance of the Equities.............................................................................. 69

A.    Irreparable Harm to Plaintiffs ....................................................69

B. Harm to Defendants ...............................................................................70

C. The Public Interest....................................................................................72

Pursuant to this Court's Order, Doc. 51, Defendants submit the following proposed findings of fact and conclusions of law for the final judgment in this case.

FINDINGS OF FACT

## I.   OKLAHOMA ELECTION LAWS

1.     Oklahoma provides numerous ways to cast a ballot. Doc. 48, Ex. 2, Ziriax Decl. ¶¶ 6-19.

2.     Every registered voted in Oklahoma can cast a ballot in person. Doc. 48, Ex. 2, Ziriax Decl. ¶ 8. Voting in person is available from 7:00 am until 7:00 pm on Election Day. OKLA. STAT. tit. 26, § 7-114.

3.     To vote in person, an Oklahoma voter must show identification or cast a provisional ballot accompanied by a signed affidavit. Doc. 48, Ex. 2, Ziriax Decl. ¶ 8; OKLA. STAT. tit. 26, § 7-114. Acceptable identifications include any official photo identification issued by the federal, the State, or any federally-recognized tribal government, with a name and expiration date that has not lapsed, or the free ID card issued by county election boards. *Id.*

4.     Oklahomans can also vote in-person prior to Election Day. Doc. 48, Ex. 2, Ziriax Decl. ¶ 9; OKLA. STAT. tit. 26, § 14-115.4. In-person absentee voting for all elections occurs on the Thursday and Friday before Election Day from 8:00 a.m. to 6:00 p.m., and on the Saturday before Election Day from 9:00 a.m. to 2:00 p.m. if a federal or state office is on the ballot for that county. *Id.*

5.     Oklahomans can also vote by absentee ballot. Doc. 48, Ex. 2, Ziriax Decl. ¶ 10; OKLA. STAT. tit. 26, § 14-105. Unlike some other states, Oklahoma makes absentee ballots available to any registered voted without an excuse. *Id.* And unlike some other states, Oklahoma does not require signature matching, notarizations, or photo ID to apply for an absentee ballot. Doc. 48, Ex. 2, Ziriax Decl. ¶ 11; OKLA. STAT. tit. 26, § 14-106.

1

6.　　Voters can request an absentee ballot through the online voter portal, e-mail, fax, or U.S. mail. Doc. 48, Ex. 2, Ziriax Decl. ¶ 11; OKLA. STAT. tit. 26, §§ 14-103, 14-105.

7.　　Absentee ballots are mailed to voters as early as 45 days before an election. Doc. 48, Ex. 2, Ziriax Decl. ¶ 12; OKLA. STAT. tit. 26, § 14-121.1. Some counties mail absentee ballots even earlier. Doc. 48, Ex. 2, Ziriax Decl. ¶ 12.

8.　　Uniform and overseas voters who request an absentee ballot within 45 days of an election are sent a ballot within 48 hours of their request. Doc. 48, Ex. 2, Ziriax Decl. ¶ 13; OKLA. STAT. tit. 26, § 14-121.1.

9.　　Absentee ballots can be requested any time up to 5:00 p.m. on the Tuesday before the election. Doc. 48, Ex. 2, Ziriax Decl. ¶ 11; OKLA. STAT. tit. 26, § 14-103.

10.　　Absentee ballots must be received by 7:00 P.M. on Election Day. OKLA. STAT. tit. 26, § 14-104 (the "Ballot Receipt Deadline").

11.　　Voters who become incapacitated after 5:00 p.m. on the Tuesday before the election can still vote through other special procedures. Doc. 48, Ex. 2, Ziriax Decl. ¶ 11; OKLA. STAT. tit. 26, § 14-115.1.

12.　　Voters who work as first responders or emergency workers and are called to assist with a declared natural disaster or state of emergency within the ten days before an election may request an emergency absentee ballot. Doc. 48, Ex. 2, Ziriax Decl. ¶ 16; OKLA. STAT. tit. 26, § 14-115.6.

13.　　A standard absentee ballot may be returned by mail or in person by the voter. Doc. 48, Ex. 2, Ziriax Decl. ¶ 14; OKLA. STAT. tit. 26, § 14-108.

14.　　A voter's spouse can mail the voter's absentee ballot. Doc. 48, Ex. 2, Ziriax Decl. ¶ 14. Otherwise, Oklahoma law has generally not permitted third parties to submit absentee ballots or

2

absentee ballot applications on behalf of a voter. Doc. 48, Ex. 2, Ziriax Decl. ¶ 24; Doc. 47, Ex. 4, Ziriax Depo. 155:13-16.

15.     In 2020, Oklahoma clarified when third parties may assist voters with absentee ballots and when handling another person's absentee ballot is prohibited as illegal ballot harvesting. *See* OKLA. STAT. tit. 26, §§ 14-101.1, 16-104.1, 16-126 ("Ballot Harvesting Laws"). These Ballot Harvesting Laws were passed with near-unanimous bipartisan majorities, including almost all legislative members of Plaintiff Oklahoma Democratic Party. Doc. 47, Ex. 11, Andrews Depo. 49-51. Ballots generally must remain in the custody of one of three persons: with the voter, with election officials, or with the U.S. Postal Service or a commercial mail carrier. OKLA. STAT. tit. 26, §§ 14-101.1, 14-108. Oklahoma law does not prohibit as illegal ballot harvesting a voter's spouse from returning the voter's absentee ballot by mail; a spouse, relative in the first or second degree of consanguinity or affinity, or cohabitant of a voter who forwards an absentee ballot to the voter when absent from the home; or other assistance that is specifically authorized by Title 26 of the Oklahoma statutes such as authorized assistance in nursing homes or assistance provided by the caregivers of physically incapacitated voters. *Id.* And third parties are allowed to gift voters a free stamp or envelope to assist with absentee voting. *Id.* at § 16-106.

16.     Voters who are physically incapacitated or care for a physically incapacitated voter may elect to use the physically incapacitated voter's absentee ballot, which must be returned by mail. Doc. 48, Ex. 2, Ziriax Decl. ¶ 14 & n.5; OKLA. STAT. tit. 26, §§ 14-110.1, 14-113.2.

17.     Like the vast majority of states, Oklahoma conducts some method of voter verification for returned absentee ballots. Doc. 48, Ex. 2, Ziriax Decl. ¶ 14. Oklahomans have three options for verifying their absentee ballot, described below. OKLA. STAT. tit. 26, §§ 14-108, 14-113.2; Doc. 48, Ex. 2, Att. 3, S.B. 201 § 3 (collectively, the "Ballot Verification Laws"). Oklahoma has had voter verification requirements for absentee ballots since at least 1941. Doc. 48, Ex. 2, Ziriax Decl. ¶ 17.

18.     For standard absentee ballots, a voter typically must have the ballot notarized. Doc. 48, Ex. 2, Ziriax Decl. ¶ 14; OKLA. STAT. tit. 26, § 14-108(A). Under Oklahoma law, notaries cannot charge a fee for notarizing an absentee ballot. Doc. 48, Ex. 2, Ziriax Decl. ¶ 14; OKLA. STAT. tit. 26, § 14-108(A). There are over 76,000 notaries in the State and they are available in every county. Doc. 18, Am. Compl. ¶ 50; Tr. 62:13-17.[1] In addition to this, as described below, the Election Board has published a list of over a hundred institutions across the state offering free notary services, including drive-through services, during the COVID-19 pandemic. *See infra* FOF ¶ 40.

19.     For the physically incapacitated voter's absentee ballots, a voter may have the ballot signed by two witnesses. Doc. 48, Ex. 2, Ziriax Decl. ¶ 14; OKLA. STAT. tit. 26, §§ 14-113.2, 14-114, 14-115.1.

20.     When voters in a nursing home or veterans center request an absentee ballot, their ballot can be witnessed by the absentee voting board sent to deliver their ballots to them. Doc. 48, Ex. 2, Ziriax Decl. ¶ 14; OKLA. STAT. tit. 26, §§ 14-115.

21.     For emergency absentee ballots, the voter must present one of the proofs of identity acceptable for in-person voting. Doc. 48, Ex. 2, Ziriax Decl. ¶ 16; OKLA. STAT. tit. 26, § 14-115.6.

22.     In May 2020, the Oklahoma Supreme Court interpreted an existing provision in the State's Civil Procedure Code (Title 12) to allow voters to sign an affidavit under penalty of perjury in lieu of the notarization required by the Election Code (Title 26). *League of Women Voters of Oklahoma v. Ziriax*, 463 P.3d 524 (Okla. 2020). However, no election prior to this decision had ever been conducted in Oklahoma using this process for ballot verification, nor any since. Three days after the decision, the Legislature enacted S.B. 210, abrogating this decision by clarifying the law to require notarization for

---

[1] "Tr." refers to the transcript of the evidentiary hearing in this case conducted on August 26, 2020.

standard absentee ballots, but providing the ID photocopy alternative described below. Doc. 48, Ex. 2, Att. 3, S.B. 210 §§ 1-2.

23.    Aside from the new option for ballot verification during the COVID-19 pandemic discussed below (attaching a copy of a valid voter ID), Oklahoma does not have any mechanism or procedure for verifying ballots, such as by matching signatures, beyond these requirements. Doc. 48, Ex. 2, Ziriax Decl. ¶ 15. Oklahoma also does not currently have the infrastructure to facilitate and implement any mechanism or procedure for verifying signatures. *Id.*

## II.    CHANGES TO VOTING DURING COVID-19

### A.    In-Person Voting during COVID-19

24.    Oklahoma Election Board Secretary Paul Ziriax and his office have worked with the University of Oklahoma's Health Sciences Center to develop safety protocols for Oklahoma's nearly 2,000 polling places and 77 county election boards, including social distancing and sanitation procedures. Doc. 48, Ex. 2, Ziriax Decl. ¶ 7; *Id.* Att. 1.

25.    The protocols for in-person voting include:

a.    marking 6-foot social distancing guides,

b.    signage to maintain such distancing,

c.    6-foot distancing between voting booths or usage of alternating booths,

d.    distancing between election officials and voters,

e.    hourly wiping down of voting equipment with alcohol (with more frequent disinfection for commonly-touched surfaces),

f.    poll worker hand washing and sanitizing,

g.    avoidance of direct contact between poll workers and voters, and

h.    contactless voter ID checks.

Doc. 48, Ex. 2, Ziriax Decl. ¶ 7; *Id.* Att. 1.

26.     Poll workers at every polling location are supplied with disinfectant and with personal

protective equipment (PPE), including masks and gloves. Doc. 48, Ex. 2, Ziriax Decl. ¶ 7; *Id.* Att. 1.

27.     Voters are asked to be patient and to follow signage and procedures. Doc. 48, Ex. 2,

Ziriax Decl. ¶ 7; *Id.* Att. 1.

28.     Oklahoma election officials do not deny a person the right to vote because they are not

wearing a mask, but they strongly recommend that voters wear a mask to protect themselves and those

around them. Doc. 48, Ex. 2, Ziriax Decl. ¶ 7; *Id.* Att. 1. Although there is no statewide mask mandate,

some counties have implemented mask mandates. Tr. 19:18-19.

### B.     Absentee Voting during COVID-19

29.     The state made numerous adjustments to its absentee voting laws in light of the

COVID-19 pandemic.

30.     *First,* during the 2020 COVID-19 pandemic, if a state of emergency is declared within

45 days of an election, voters have an additional option to verify their absentee ballot: voters using either

the standard absentee ballot or the physically incapacitated voter's absentee ballot may return a copy of

an acceptable proof of identity for voting in lieu of the notarization or witnessing requirements. Doc.

48, Ex. 2, Ziriax Decl. ¶ 15; *Id.* Att. 3 (SB 210, 2020 Okla. Sess. Laws 10), § 3.

31.     On August 28, 2020, the Governor of Oklahoma declared a state of emergency due to

the COVID-19 pandemic that extends at least through September 27, 2020. Fourth Amended Executive

Order 2020-20, Aug. 28, 2020, https://www.sos.ok.gov/documents/executive/1956.pdf. Because this

period of declared emergency will be in effect 45 days prior to the November 3, 2020 general election,

the above-described alternative ballot verification procedures will be available to voters for the

November 3, 2020 election.

32.     *Second*, the definition of physically incapacitated was expanded to include the following categories:

a.      "The voter has tested positive for COVID-19 and is receiving medical treatment or is subject to a quarantine ordered by the voter's personal physician or the county health department;

b.      "The voter has been tested for COVID-19 and is quarantined or self-isolating while awaiting results of the test;

c.      "The voter has symptoms of COVID-19, as defined by the Centers for Disease Control and Prevention (CDC), and has been advised by the voter's personal physician or the county health department to quarantine or self-isolate.

d.      "The voter is a member of a group considered at 'higher risk of severe illness' due to age or underlying health conditions as defined by the CDC, and as such is subject to a 'stay at home' or 'safer at home' or similar order by the Governor or by an authorized municipal authority; or

e.      "The voter has received a written recommendation from the voter's personal physician that due to an underlying health condition the voter should not leave his or her home due to the COVID-19 pandemic."

Doc. 48, Ex. 2, Ziriax Decl., Att. 3 (SB 210, 2020 Okla. Sess. Laws 10), § 3(C). As a result, voters who fall within any of these categories during the 2020 general election will have the option of choosing a physically-incapacitated absentee ballot (which requires two witness signatures or a copy of ID to verify) instead of a standard absentee ballot (which requires notarization or a copy of ID to verify).

33.     *Third,* absentee voting boards may now assist incapacitated voters in nursing homes and veterans centers in completing and verifying their ballots. Doc. 48, Ex. 2, Ziriax Decl. ¶ 18 & Att. 2 (SB 1779, 2020 Okla. Sess. Laws), § 9.

34.     *Fourth*, if an absentee voting board is restricted from entering a nursing home or veterans center due to COVID-19 restrictions, county election officials may appoint employees already within the nursing home or veterans center to deliver and witness ballots in lieu of an absentee voting board. Doc. 48, Ex. 2, Ziriax Decl. ¶ 14 & n.7; *Id.* Att. 3 (SB 210, 2020 Okla. Sess. Laws 10), § 3(B).

35.     *Fifth*, the State Election Board can now spend federal and state funds to assist county election boards with increased costs during the pandemic, including for PPE, disinfecting supplies, and educational materials for social distancing. Doc. 48, Ex. 2, Ziriax Decl. ¶ 18; *Id.* Att. 2 (SB 1779, 2020 Okla. Sess. Laws), § 3.

36.     *Sixth*, the poll worker pool is increased during the pandemic because public employees can receive up to 3 days of paid leave to serve as poll workers, and the number of publicly-owned facilities that can be used as polling places was expanded. Doc. 48, Ex. 2, Ziriax Decl. ¶ 18; *Id.* Att. 2 (SB 1779, 2020 Okla. Sess. Laws), §§ 4-5.

37.     *Seventh*, some restrictions on notaries public concerning absentee ballots have been loosened. Doc. 48, Ex. 2, Ziriax Decl. ¶ 18; *Id.* Att. 2 (SB 1779, 2020 Okla. Sess. Laws), § 8.

38.     *Eighth*, new bipartisan special absentee voting boards will assist with receiving and reviewing absentee ballots. Doc. 48, Ex. 2, Ziriax Decl. ¶ 18; *Id.* Att. 2 (SB 1779, 2020 Okla. Sess. Laws), § 11.

39.     *Ninth*, new amendments to Oklahoma law clarify that third parties may gift an envelope and/or a stamp to a voter. Doc. 48, Ex. 2, Ziriax Decl. ¶ 18; *Id.* Att. 2 (SB 1779, 2020 Okla. Sess. Laws), § 13.

40.     *Tenth*, Secretary Ziriax and his office have taken numerous steps to facilitate voting during the pandemic. Doc. 48, Ex. 2, Ziriax Decl. ¶ 19. Scores of banks, credit unions, and other institutions across the state are offering free notarization and/or ID copying services. *Id.* These free notarization and/or ID copying services include drive-through services. *Id.* The list of places available for free services is available online to voters. *Id.*; https://www.ok.gov/elections/Notary_Services.html. Voters can also watch online video tutorials on absentee voting. Doc. 48, Ex. 2, Ziriax Decl. ¶ 19; https://www.ok.gov/elections/Media/Videos/index.html.

### III.    COVID-19 AND THE RISKS OF VOTING DURING THE PANDEMIC.

41.     The medical experts in this case agree that the primary way that COVID-19 is contracted is when the secretions or saliva of an infected person are projected, such as through coughing or sneezing, and come into contact with the mucous membranes of another person. Doc. 48, Ex. 1, Barie Decl. ¶ 5; Doc. 47, Ex. 1, Troisi Decl. ¶¶ 11, 18.

42.     The secondary—and significantly more rare—way that COVID-19 is contracted is by touching an infected surface ("fomites") and then touching a mucous membrane. Doc. 48, Ex. 1, Barie Decl. ¶ 6; Doc. 47, Ex. 1, Troisi Decl. ¶ 11; Tr. 27:13–28:1.

43.     There are no other known ways of contracting COVID-19. Doc. 48, Ex. 1, Barie Decl. ¶ 7; Doc. 47, Ex. 1, Troisi Decl. ¶ 11.

44.     The droplets from the primary form of transmission are relatively heavy and are distinct from lighter droplets such as "aerosols." Doc. 48, Ex. 1, Barie Decl. ¶¶ 5, 7; Doc. 47, Ex. 1, Troisi Decl. ¶ 18; Tr. 26:7-22. Current experimental studies are examining whether COVID-19 may be transmitted through aerosols—fine particles suspended in the air—or through fecal matter. Doc. 48, Ex. 1, Barie Decl. ¶ 7; Doc. 47, Ex. 1, Troisi Decl. ¶ 11. The evidence on transmission by fine particles suspended in

the air is mixed, and no studies have yet found a viable virus in air samples near infected patients. Doc. 48, Ex. 1, Barie Decl. ¶ 7; Tr. 26:23–27:12.

45.     Proper measures to avoid transmission include ensuring that close interaction with persons is for 15 minutes or less, social distancing of six feet or greater, mask wearing, regular handwashing, and sanitizing frequently touched surfaces. Doc. 48, Ex. 1, Barie Decl. ¶¶ 5-6; Doc. 47, Ex. 1, Troisi Decl. ¶¶ 17-19; Tr. 28:22–29:3. Social distancing of six feet or greater is a proven method to stop the spread of COVID-19. Doc. 48, Ex. 1, Barie Decl. ¶ 13; Doc. 47, Ex. 1, Troisi Decl. ¶ 18.

46.     Voters who are the most at-risk from contracting COVID-19 are older adults, generally more than 65 years old, and especially those who are in a nursing home or who are over 85 years old; and those who have a major underlying medical condition such as diabetes mellitus. Doc. 48, Ex. 1, Barie Decl. ¶ 8; Doc. 47, Ex. 1, Troisi Decl. ¶ 13.

47.     Voters outside those high risk categories have a much lower risk of severe infection even if they do contract COVID-19. Doc. 48, Ex. 1, Barie Decl. ¶ 9.

48.     Dr. Barie estimates the number of patients who experience no symptoms from COVID-19 ("asymptomatic") are around 40%. Doc. 48, Ex. 1, Barie Decl. ¶ 9. He also estimates of the number of patients who experience only mild to moderate symptoms from COVID-19 are around 81%. Doc. 48, Ex. 1, Barie Decl. ¶ 9. Dr. Troisi provides a slightly different measure and estimates that 40-45% of infected individuals will either never show symptoms or have mild symptoms, but does not estimate how many will only experience moderate symptoms. Doc. 47, Ex. 1, Doc. 47, Ex. 1, Troisi Decl. ¶ 15.

49.     Current estimates of the fatality rate from COVID-19 is 0.65%. Doc. 48, Ex. 1, Barie Decl. ¶ 9.

### A.     Risks of Voting in Person during COVID-19

50.     In Oklahoma, the chance of any given individual interacting with someone actively spreading COVID-19, contracting the disease, and experiencing severe symptoms is very low. Doc. 48, Ex. 1, Barie Decl. ¶ 10. The number of confirmed active cases in the state as of August 17, 2020 are only 0.19% of the population. *Id.* Current hospitalizations are around 0.014% of the population, and ICU admissions are around 0.006% of the population. *Id.*

51.     The mortality rate for infected Oklahomans who are not residents of a long-term care facility has been less than 1%, and for all Oklahomans about 1.4%. Doc. 48, Ex. 1, Barie Decl. ¶ 10; Tr. 18:21-23.

52.     Dr. Barie opined that, in general, voting in-person at a polling place in Oklahoma poses a low risk for contracting a serious case of COVID-19. Doc. 48, Ex. 1, Barie Decl. ¶ 11, 22. Dr. Troisi opined that in-person voting poses a "risk," but did not characterize that risk as either low or high, minimal or great. Doc. 47, Ex. 1, Troisi Decl. ¶¶ 2, 30; Tr. 29:19-22.

53.     In addition, Oklahoma has implemented numerous protocols to make in-person voting safer during the COVID-19 pandemic. *See supra* FOF ¶¶ 24-28. The only expert in this case to review Oklahoma's protocols for in-person voting—Dr. Barie—concluded that, if followed, "the risks of contracting a serious case of COVID-19 from in person voting will be minimal." Doc. 48, Ex. 1, Barie Decl. ¶¶ 11, 14. Dr. Troisi believes that there is a heightened danger for transmission of COVID-19 at the polling place, but she based this conclusion on the assumption that voters "cannot maintain physical distancing" at the polling place, which is inconsistent with Oklahoma's polling place protocols. *Compare* Doc. 47, Ex. 1, Troisi Decl. ¶ 20; Tr. 35:7-10 *with* Doc. 48, Ex. 2, Ziriax Decl., Att. 1. Dr. Troisi admits she has not reviewed Oklahoma's polling place protocols. Tr. 34:16–35:1. Dr. Troisi agrees that maintaining social distancing, wearing masks, and regular sanitation would decrease the probability of

transmission. Tr. 35:18–36:15. Both experts agree that measures contained in Oklahoma's protocols—such as maintaining at least six feet of social distancing—are a proven method of stopping the spread of COVID-19. Doc. 48, Ex. 1, Barie Decl. ¶ 13; Doc. 47, Ex. 1, Troisi Decl. ¶ 18.

54.     Dr. Troisi also believes there is a risk of contracting COVID-19 from touching surfaces while casting an in-person ballot, such as a polling machine screen. Doc. 47, Ex. 1, Troisi Decl. ¶¶ 20, 30; Tr. 35:7-10. But she agrees that this is not the primary route of transmission of COVID-19; that Oklahoma does not use touch-screen voting but instead uses the safer paper ballot method; that COVID-19 cannot be transmitted through the skin; and that in order for transmission to occur this way a voter would have to choose to touch his or her eyes, nose, or mouth after touching a contaminated surface but before washing or otherwise sanitizing his or her hands. Doc. 47, Ex. 1, Troisi Decl. ¶ 11; Tr. 27:13–28:1, 31:17-23, 44:22–45:10. Thus, preventing this form of transmission is entirely within the control of the voter.

55.     Scientists conducted several studies of the April 7, 2020 election in Wisconsin and its effect on the spread of COVID-19. Doc. 48, Ex. 1, Barie Decl. ¶ 15. It is undisputed that the bulk of these studies concluded that there was "[n]o clear increase in cases, hospitalizations, or deaths [] observed after the election"; "no increase in COVID-19 new case daily rates … as compared to the US[] during the post-incubation interval period"; and "no evidence to date that there was a surge of infections due to the April 7, 2020 election in Wisconsin." *Id.* It is more likely that the same will be true in Oklahoma for the November 2020 election because of increased knowledge about the virus and how to prevent its spread; specifically, the Wisconsin election took place before broad recommendations to wear masks were issued. *Id.* at ¶ 16.

56.     It is undisputed in this record that studies of recent large public events indicate that large in-person events can occur without negative public health consequences. Doc. 48, Ex. 1, Barie Decl. ¶ 17.

57.     In Oklahoma, it is undisputed that the June 30, 2020 primary was not correlated with an increase in the incidence of new COVID-19 cases. Doc. 48, Ex. 1, Barie Decl. ¶ 18. Oklahoma health data from two weeks before and two weeks after the June 30, 2020 primary election confirms that voting in person in Oklahoma was not associated with an increased incidence of new cases of COVID-19. *Id.* In fact, the increase in COVID-19 cases slowed down after the June primary. *Id.* Nor is there any evidence that any Oklahoman contracted COVID-19 from voting in-person in the June 2020 primary. *Id.*

58.     In person voting is not less safe than other activities of daily life, such as grocery shopping, eating at a restaurant, getting a haircut, going to a bank or retail store, or working in an office. Doc. 48, Ex. 1, Barie Decl. ¶ 19.

59.     Dr. Meredith believed some voters will be unwilling to vote in person based on national survey data from months ago and a few anecdotes from out-of-state, but Dr. Meredith admits these are subjective decisions and a survey respondent's "perceptions of COVID-19 risk do not always align with reality." Doc. 47, Ex. 2, Meredith Decl., ¶¶ 22-24, 28-29; *see also* Tr. 54:22–55:16, 95:3–96:20. Dr. Meredith does not offer any projection on the number of voters who will be unable to vote in-person during the November 2020 election.

60.     Although it is likely that the pandemic will persist through the November 2020 election, it cannot be known what the state of the COVID-19 pandemic in Oklahoma will be at that time. Doc. 48, Ex. 1, Barie Decl. ¶ 10 n.17; Doc. 47, Ex. 1, Troisi Decl. ¶¶ 22-29; Tr. 20:18-19. Though some have speculated that the lower humidity levels in cooler months may increase spread of the virus, this has not

been established, and the higher humidity levels in the warmer months were not associated with a decrease in spread of the virus. Tr. 42:6-18.

61.     Some countries in the southern hemisphere that have experienced their flu season during the COVID-19 pandemic have seen virtually no flu cases because of the precautions people have taken against COVID-19 such as wearing masks and social distancing. Tr. 40:16-24. Accordingly, if Oklahomans wear masks and keep social distance more than they have during previous years, it is possible that voters will be safer from the flu during 2020 than in previous years. Tr. 40:25–41:4. Given this, it may be possible that voting in 2020 may be safer than voting during previous November elections. Tr. 41:5–42:5.

### B.     Risks of Voting Absentee during COVID-19

62.     Absentee voting in Oklahoma is safe and presents low risk for contracting COVID-19. Doc. 48, Ex. 1, Barie Decl. ¶¶ 20, 22.

63.     The experts agree that notarization, witnessing, and photocopying can all occur in compliance with social distancing and other proper public health guidance. Doc. 48, Ex. 1, Barie Decl. ¶ 20; Tr. 43:2–44:11. Although Dr. Troisi believed that notarization, witnessing, or photocopying can create a risk of transmission, this conclusion was based on the assumption that these activities "necessitate[] close contact" and touching the same surfaces; she later acknowledged that they can be accomplished without close contact, while maintaining appropriate social distancing, and while preventing the surface transmission of COVID-19 by washing or sanitizing the surface or the hands before touching the eyes, nose, or mouth, and that such practices would make notarization, witnessing, or obtaining a copy of ID "pretty safe." *Compare* Doc. 47, Ex. 1, Troisi Decl. ¶¶ 2, 30, 32 *with* Tr. 43:2–44:11.

64. Plaintiffs offered the testimony of two voters and both were able to vote absentee in the June 2020 primary and to verify their ballot without close contact with another individual. Doc. 47, Ex. 5, Habrock Decl. ¶ 22 (voted absentee by photocopying ID at her office); Doc. 47, Ex. 7, McAfee Decl. ¶ 8 (describing how a friend who was a notary notarized ballot "on her porch"). Such methods of verification are consistent with the activities that Plaintiffs are still engaging in during the pandemic, such as voter registration events. Doc. 47, Ex. 11, Andrews Depo at 14-17.

65. The most at-risk voters, such as those in nursing homes, are also at low risk for contracting COVID-19 when voting absentee due to the availability of absentee voting boards or designated in-facility employees to assist them. Doc. 48, Ex. 1, Barie Decl. ¶ 21.

## IV. VOTING PATTERNS IN OKLAHOMA ELECTIONS DURING COVID-19 AND EVIDENCE REGARDING ALLEGED BURDENS OF CHALLENGED LAWS

66. Plaintiffs cannot quantify the number of voters who Plaintiffs argue will be unable to cast a ballot due to the Ballot Verification Laws. The Ballot Verification Laws do not impose significant burdens on voters and COVID-19 has not caused higher burdens to comply with the Ballot Verification Laws. This is shown by numerous pieces of evidence.

67. *First*, voter participation during Oklahoma's June 2020 primary was significantly higher than during Oklahoma's June 2016 and June 2012 primaries. Doc. 48, Ex. 2, Ziriax Decl. ¶ 34.

68. *Second*, in Oklahoma's June 2020 primary, the percentage of absentee ballots rejected for failure to comply with the notarization or witness requirement was lower than the percentage of absentee ballots rejected for the same reasons in recent general elections. Doc. 47, Ex. 2, Meredith Decl. at 25, tbl 2.

69. *Third*, in the June 2020 primary, less than 1000 votes, or about 0.14% of votes cast, were absentee ballots that were rejected for failure to satisfy the notary, witness, or ID photocopy requirements. Doc. 48, Ex. 2, Ziriax Decl. ¶¶ 34-35. This is fewer than the number of votes rejected for

failure to comply with the affidavit requirement that Plaintiffs do not challenge and seek to retain. Doc. 48, Ex. 2, Ziriax Decl., Att. 4 (showing 1,050 ballots rejected for four reasons relating to affidavit requirement compliance). Thus, the burdens imposed by the Ballot Verifications Laws that Plaintiffs challenge have been shown to be lower than the burden imposed by the verification measures that Plaintiffs seek to retain. Moreover, even for those voters whose ballots were rejected for failure to comply with the Ballot Verification Laws, Plaintiffs are unable to identify whether any of these voters were actually unable to comply with the laws or simply failed to do so out of inadvertence, lack of reasonable efforts, or attempts to cast a fraudulent ballot. It is possible that fewer voters in the November election will make the same mistakes in failing to properly verify their ballots than they did during the June 2020 primary. Tr. 110:23–111:13.

70.     *Fourth*, the rejection rate of absentee ballots in Oklahoma is not meaningfully different from states across the country, including those states that do not have notarization, witness, or copy of ID requirements. Tr. 101:19-23. Indeed, recent elections in other states that do not have such requirements have shown much higher rejection rates. *Id.* at 108:18–110:6.

71.     *Fifth*, Oklahoma has lowered any burdens on voters from the Ballot Verification Laws during the COVID-19 pandemic. As Dr. Meredith states, during the pandemic, "[m]ore potential voters should be able to claim that they are physically incapacitated," such that, if they choose, they may comply with the witness requirement instead of the notarization requirement. Doc. 47, Ex. 2, Meredith Decl. ¶ 34; *see also supra* FOF ¶ 32. Oklahomans have increasingly used the option to designate themselves as physically incapacitated for purposes of absentee voting during the COVID-19 pandemic. Between March 2020 and June 2020, the number of people that designated themselves as physically incapacitated more than doubled. Doc. 47, Ex. 2, Meredith Decl. ¶ 46; Tr. 114:1-6. Although the percentage of absentee voters who chose to designate themselves as incapacitated decreased, there is no evidence in

the record indicating why any voters did or did not designate themselves as physically incapacitated. *Cf.* Tr. 114:24–115:3. Dr. Meredith speculates that this is because voters are not informed of the notarization or witness requirements on one specific document—the absentee ballot application—but admits they have numerous other sources to obtain that information. Tr. 111:22–112:18.

72. *Sixth*, the attrition rate (number of absentee ballots requested but not returned to election officials) was lower in the June 2020 primary than it was in the June 2012 or June 2016 primary. Doc. 48, Ex. 2, Ziriax Decl. ¶ 36 & Att. 4. In other words, the percentage of people who successfully returned their absentee ballot after requesting one has increased in 2020. The attrition rate was higher in the June 2020 primary than in the recent 2016 general election in Oklahoma but about the same as the 2018 general election. Doc. 47, Ex. 2, Meredith Decl. ¶ 59. Nevertheless, the Court finds that comparing the recent June 2020 Primary to previous presidential election year Primaries is more appropriate than comparing the June 2020 Primary to previous General Elections. Although Dr. Meredith notes that Oklahoma has a higher attrition rate than other states, he admits that some of those states also have a notarization requirement (like Missouri) and that the lower attrition rate in other states could be caused by a number of other factors like whether the state requires an excuse to request an absentee ballot or whether voters are informed of the notary requirement before requesting a ballot. Tr. 64:16-25, 99:6–101:18. So at most Plaintiffs' evidence shows that Oklahoma can reduce its attrition rate by better informing voters about the notary requirement, rather than eliminating the notary requirement altogether.

73. *Seventh*, although Dr. Meredith speculates that voters who do not live with another registered voter will be unable to comply with the witness requirement, he admits that thousands of such voters were in fact able to vote during the June 2020 primary, including elderly voters. Doc. 47, Ex. 2,

Meredith Decl. ¶ 50; Tr. 116:22-25. And Dr. Meredith admits that most elderly voters do in fact live with another registered voter and so easily can satisfy the witness requirement. Tr. 115:15-24.

74.     COVID-19 and recent controversies surrounding USPS have not created increased burdens on voters to comply with the Ballot Receipt Deadline. Plaintiffs note that a greater percentage of ballots were rejected as late in the June 2020 primary as compared to the 2016, 2014, and 2012 general elections, but a lower percentage was rejected in June 2020 as compared to the most recent general election (2018). Doc. 47, Ex. 2, Meredith Decl. 39, tbl. 5; Tr. 78:18-25. Thus, the results here are at best mixed and do not justify the conclusion that COVID-19 or recent occurrences at USPS have created greater burdens on voters to comply with the Ballot Receipt Deadline.

75.     Plaintiffs are unable to show how many voters are unable to comply with the Ballot Receipt Deadline. At most, Plaintiffs point to how many voters in fact did not comply with the Deadline, but cannot give the reasons for doing so, whether it was because they were unable to comply or instead because they did not take reasonable efforts to comply or chose to wait too long to request or return their absentee ballot.

76.     Plaintiffs point to alleged conflicts between the deadline to request an absentee ballot, USPS delivery time policies, and the Ballot Receipt Deadline, but the option to request a ballot up to seven days before the election does not impose a burden on voters—it gives them options in addition to requesting a ballot much earlier. If timely requested, voters can be sent their ballot 45 days before the election, or even earlier. *See supra* FOF ¶ 7. There is no evidence that a voter who requests a ballot 45 days before an election will be unable to return their ballot by the Ballot Receipt Deadline, or will face any barriers to doing so.

77.    Oklahoma election officials do not manage the U.S. Postal Service (USPS). Oklahoma sends all ballots by First Class mail, not marketing mail. Doc. 47, Ex. 4, Ziriax Depo. at 18. Ballot sent by voters are treated as First Class mail. Tr. 155:3-5.

78.    Oklahoma election officials have taken steps to facilitate USPS's processing of ballots. Doc. 48, Ex. 2, Ziriax Decl. ¶ 39. In coordination with the USPS Office of Inspector General, Oklahoma changed the color of the outer return envelope to green to allow USPS workers to more easily identify election mail among other mail. Doc. 48, Ex. 2, Ziriax Decl. ¶ 39. The new envelope still had the other markings required by USPS. *See* Doc. 48, Ex. 2, Ziriax Decl., Att. 7. There is no evidence that problems experienced by other states with USPS during 2020 elections were experienced in Oklahoma during the June 2020 primary. *See* Doc. 47, Ex. 2, Meredith Decl. ¶ 71.

79.    The USPS Office of Inspector General has identified a list of states that do not have sufficiently early deadlines for voters to request absentee ballots in time to have them reliably returned by election day. Doc. 47, Ex. 2, Stroman Decl. at 6. But the USPS Office of Inspector General only expressed concern about states that had "Deadlines Less Than Seven Days Before Election Day." *Id.* Although the USPS Office of Inspector General criticized Oklahoma's deadline based on its finding that Oklahoma allowed ballot requests six days before election, the USPS Office of Inspector General erred in its listing of Oklahoma's deadline because Oklahoma's deadline is seven days before election day, not six days. *Compare id.* at 6 *with id.* at ¶¶ 7, 12; *see also* Tr. 154:15-21. The USPS Office of Inspector General expressed no concern about states with deadlines of seven days. *See* Doc. 47, Ex. 2, Stroman Decl. at 6.

80.    The USPS's recent statement that voters need to submit their absentee ballot requests 15 days before Election Day at a minimum is not a new message from USPS driven by recent changes. Tr. 147:19-23, Tr. 152:17-24. USPS has long used the messaging that voters need to submit their

absentee ballot requests 15 days before Election Day at a minimum. *Id.* This message has been used for years, preceding COVID-19 and preceding any recent policy changes. *Id.*

81.     The volume of mail has declined about 25% between March 2019 and March 2020. Doc. 47, Ex. 2, Stroman Decl. ¶ 17. As a result, USPS in Oklahoma has excess capacity to handle mail due to the decline in mail volume. Tr. 164:21-166:3. There is no evidence in the record about what changes to USPS policy or infrastructure have been in Oklahoma, or what effect such changes have had to USPS's capacity in Oklahoma. *Id.* There is no evidence in the record about how many absentee ballots the USPS could handle in Oklahoma. Tr. 166:4-11. There is no evidence in the record about how many USPS employees, if any, are unavailable in Oklahoma due to COVID. Tr. 166:18-21.

82.     Data from Oklahoma demonstrates the falsehood of Plaintiffs' expert testimony that "[i]t is nearly impossible for an Oklahoma voter who lawfully requests an absentee ballot within one week of the November election to receive the ballot in the mail, complete it, and have that ballot delivered by a mail carrier to a county board by Election Day." Doc. 47, Ex. 2, Stroman Decl. ¶ 12. The majority of voters who were sent an absentee ballot on the last possible day to request such a ballot for the June primary (June 23) successfully returned their ballot to election officials by June 30. Doc. 47, Ex. 2, Meredith Decl. at 51, fig. 2; *id.* ¶ 82. Of those voters that were sent an absentee ballot on the last possible day to request such a ballot for the June primary (June 23) and who chose to return their ballot, only 5.6% had their ballot arrive after election day (June 30). *Id.* at ¶ 82. In other words, of those voters who were sent their ballots on the request deadline and choose to return their ballot by mail, over 94% of them successfully returned their ballot by the Ballot Receipt Deadline. In general, about 65% of voters who requested a ballot within two weeks of the June 2020 primary election day and returned their ballot to their county election board had their ballots sent and received (round trip) within seven days—and sometimes less than three days. Doc. 47, Ex. 2, Meredith Decl. at 51, fig. 2; Tr. 122:18–124:14.

83.     As the request deadline approaches, county election boards work hard to send out an absentee ballot the same day it is requested. Doc. 47, Ex. 4, Ziriax Depo. 32:12-16. Although in theory USPS may take up to two weeks to deliver and return an absentee ballot, the data discussed above and the testimony in this case does not show that is the typical experience in Oklahoma. *Id.* at 33-36.

84.     Plaintiffs offer no evidence for the number of voters that will be unable to vote in Oklahoma because the state does not provide free postage for returning absentee ballots. Nor do Plaintiffs offer any data to estimate such a number. Plaintiffs' expert only points to three studies on voter turnout when free postage is provided: one showed increased turnout but Plaintiffs' expert admits its methodological flaws because it did not include a control group; one study in the United States that did include a control group did not show any increased turnout; and one study from Switzerland showed a 4% increase in turnout. Doc. 47, Ex. 2, Meredith Decl. ¶¶ 86-87.

85.     USPS—not the State of Oklahoma—determines whether postage is required for absentee ballots and the cost of that postage. Doc. 48, Ex. 2, Ziriax Decl. ¶ 33. Mandating that the state or county election boards pay for such postage would disrupt election board budgets and direct resources away from other election activities. *Id.*

86.     The USPS has a policy of delivering election mail even if it has insufficient postage. Tr. 167:16-25; Doc. 47, Ex. 4, Ziriax Depo. 150:11-19.

87.     The USPS's recent problems with postmarking ballots in New York occurred due to the combination of a postmark requirement and the use of prepaid envelopes (known as "business reply envelopes"). Tr. 168:15–169:16. The USPS has a policy of not postmarking business reply envelopes unless they are election mail. *Id.*

88.     Plaintiffs offer no evidence on the number of voters who will be unable to vote because of the Ballot Harvesting Laws.

89.    Plaintiffs' desire to engage in ballot harvesting may actually increase the spread of COVID-19 because it involves requiring interactions between harvesters and voters and because Plaintiffs and others intend on engaging in harvesting through hosting or attending gatherings of people. *See* Doc. 47, Ex. 5, Habrock Decl. ¶ 8 (desiring ballot collection to occur at "a rotary meeting or a community center"); Doc. 47, Ex. 11, Andrews Depo. 55-58 (describing ideas to host "vote from home parties" and events that would take place in "churches and assisted living facilities and elder daycare centers and places where the elderly gather").

90.    Plaintiffs have offered no evidence of any particular voter, or member of their organization, that was unable to vote during the June 2020 primary because of the challenged laws. Doc. 47, Ex. 11, Andrews Depo. 21, 33, 68-72. Nor have Plaintiffs offered any evidence of any particular voter or member of their organization that will be unable to vote during the November 2020 general election because of the challenged laws. *Id.* Plaintiff Oklahoma Democratic Party is unaware of any such individual voters. *Id.* The only voters that Plaintiffs offered for testimony in this suit—who did not testify they were members of Plaintiff organizations—were able to successfully vote absentee during the June 2020 primary. Doc. 47, Ex. 5, Habrock Decl. ¶¶ 21-22; Doc. 47, Ex. 7, McAfee Decl. ¶ 8.

## V.    STATE INTERESTS IN PREVENTING AND DETECTING VOTER FRAUD

91.    Absentee ballots are the largest source of potential fraud. Doc. 48, Ex. 5, Strach Decl. ¶¶ 43-47; *see also* Commission on Federal Election Reform, *Building Confidence in U.S. Elections* at 47 (Sept. 2005) ("Absentee ballots remain the largest source of potential voter fraud.").[2]

92.    The Ballot Verification Laws and the Ballot Harvesting Laws are important to help prevent and detect fraud and its extent, which has a long history in both the United States in general and in Oklahoma specifically. Doc. 48, Ex. 2, Ziriax Decl. ¶ 20; Doc. 48, Ex. 5, Strach Decl. ¶ 28. The Ballot

---

[2] https://www.legislationline.org/download/id/1472/file/3b50795b2d0374cbef5c29766256.pdf

Verification Laws also help promote voter confidence in the integrity and outcomes of elections. Doc. 48, Ex. 2, Ziriax Decl. ¶ 20.

93.     Notary or witness signatures help protect the most vulnerable voters by ensuring a known neutral observer prevented them from being coerced. Doc. 48, Ex. 2, Ziriax Decl. ¶¶ 26-27; Doc. 48, Ex. 5, Strach Decl. ¶¶ 36, 48-55. The Ballot Verification Laws, including the copy of ID alternative, also make it harder to commit voter fraud. Doc. 48, Ex. 2, Ziriax Decl. ¶¶ 26-28.

94.     The notarization and witness requirements make it easier to detect fraud and to determine the extent of fraud once detected because notaries or witnesses can work with election officials investigating fraud, and the presence of a notary or witness signature on one fraudulent ballot can lead to the discovery of other fraudulent ballots. Witness requirements have thus been "critical" to past absentee ballot fraud investigations and without such verification measures it would have been "impossible" to discover the extent of the fraud. Doc. 48, Ex. 2, Ziriax Decl. ¶¶ 26-27; Doc. 48, Ex. 5, Strach Decl. ¶¶ 28-30, 35. Plaintiffs do not present any evidence contesting this; rather, Plaintiffs' expert concedes that the witness requirement in North Carolina "was helpful in the prosecution of that case" of voter fraud. Tr. 88:18-20.

95.     Conversely, removing these Ballot Verification Laws and allowing an absentee ballot to be cast with only a signed affidavit, with no measure to verify that signature, would make it easier to commit voter fraud and harder to detect when voter fraud is committed. Doc. 48, Ex. 2, Ziriax Decl. ¶¶ 26, 28.

96.     Defendants have documented over a hundred cases of absentee fraud throughout the nation, including Oklahoma. *See* Doc. 48, Exs. 6-7, Cleveland Decl. Exs. 1-124; Doc. 48, Ex. 5, Strach Decl. ¶¶ 8-30; Doc. 48, Ex. 2, Ziriax Decl., ¶¶ 21-23. This covers only cases of *discovered* fraud, not the fraud that goes undetected, especially in states without as robust measures as Oklahoma's.

97.     Historical examples in Oklahoma include the 1983 absentee voter fraud scandal that led to the indictment of the state Speaker of the House and the House Floor Leader. Doc. 48, Ex. 2, Ziriax Decl. ¶ 22; *see also* Doc. 47, Ex. 4, Ziriax Depo. 103-05 (discussing more examples). More recent examples include the conviction of Darryl Cates in 2012 for forging signatures on absentee ballots that he notarized. Doc. 48, Ex. 2, Ziriax Decl. ¶ 22. And in 2018, Ronald Henry was convicted of forging signatures on absentee ballots of family members. *Id.* Nonetheless, with Oklahoma having robust measures to prevent absentee ballot fraud—like the Ballot Verification Laws—such fraud remains uncommon in Oklahoma. *Id.*; Doc. 47, Ex. 4, Ziriax Depo. 108.

98.     Other cases of absentee ballot fraud show that witness signatures are useful for discovering fraud as well as exploring its extent. *See* Doc. 48, Ex. 6, Cleveland Decl., Exs. 18-19. In Minnesota in 2017, Michelle Marie Landsteiner pled guilty to a charge stemming from her role in forging a mail-in ballot mailed to a former resident of her household. *See id.* A detective suspected the forgery because the signature on the forged ballot was similar to the witness's signature. *See id.*

99.     If ballot verification requirements are not in place, signature matching alone does not adequately deter fraud. For example, in Colorado, there have been multiple convictions for signature forging in just the last few years. *See* Doc. 48, Exs. 6-7, Cleveland Decl. Exs. 16, 17, 36. Similarly, in New Mexico, political activists have forged signatures on ballots to help a candidate win by just 2 votes. *See id.* Exs. 1-3.

100.    Some cases show that ballot harvesting is often used by politicians to influence how voters will vote. See Doc. 48, Exs. 6-7, Cleveland Decl., Ex. 100. In 2011, former Muncie City Councilman Monte Murphy was convicted on charges relating to his actions in the 2007 Muncie Municipal Election. *See id.* Murphy provided a couple with absentee ballots applications, took their

completed applications, illegally assisted the couple in filling out their ballots (telling them how to vote straight Democratic), left with the sealed ballots, and then mailed them. *See id.*

101.     Ballot harvesting can be also be used to commit fraud with sealed ballots. *See* Doc. 48, Exs. 6-7, Cleveland Decl., Ex. 93. In California in 2012, Cudahy city official Angel Perales pled guilty to charges stemming from fraudulent activities in the 2007 and 2009 city elections. *See id.* He learned how to open ballot envelopes without defacing them, discarded ballots favoring challengers, and retained ballots in favor of the incumbents. *See id.*

102.     The recent Ballot Harvesting Laws in Oklahoma clarifying the activities prohibited as illegal ballot harvesting were in part a reaction to absentee voter fraud and ballot harvesting that led to the overturning of a U.S. Congressional election in North Carolina. Doc. 48, Ex. 2, Ziriax Decl. ¶¶ 23-24; Doc. 47, Ex. 4, Doc. 47, Ex. 4, Ziriax Depo. 121-22.

103.     In North Carolina in 2016, election officials learned about a ballot harvesting scheme that stole ballots or played on the sympathies of voters to turn over their ballots to political operatives, fraudulently voting the ballots, and fraudulently witnessing them. Doc. 48, Ex. 5, Strach Decl. ¶¶ 11-12. These harvesters were getting paid by the ballot and the extent of their fraud was only discovered because investigators were able to discover other ballots they had witnessed. *Id.*

104.     In North Carolina in 2018, a similar scheme was discovered—and the extent of its fraud determined through the witness requirement—that led to the overturning of an entire U.S. Congressional election. Doc. 48, Ex. 5, Strach Decl. ¶¶ 14-27. Part of this scheme including paying workers to collect absentee ballot applications so that they can return to harvest the ballots when delivered. *Id.* at ¶ 22.

105.     Just this year, illegal ballot harvesting was discovered in an election in Patterson, N.J., that led to indictments, Doc. 48, Ex. 5, Strach Decl. ¶ 38, and the overturning of the mayoral election

there, Tr. 128:8-12; *see also* https://www.cnn.com/2020/08/20/politics/paterson-new-jersey-city-council-voter-fraud/index.html.

106.    These schemes are also not new. *See* Doc. 48, Ex. 7, Cleveland Decl. Ex. 121. In 2010 in Georgia, a city council candidate filled out both absentee ballot applications and absentee ballots in a race he won by 27 votes. *See id.* After the fraud was uncovered, he pled guilty to the fraud and vacated his city council seat. *See id.*

107.    Thus, this fraud is also not inconsequential: it sometimes leads to the results of the election being overturned. *See* Doc. 48, Exs. 6-7, Cleveland Decl. Exs. 112-124; Doc. 48, Ex. 5, Strach Decl. ¶¶ 18, 27.

108.    Ballot harvesting also risks voter fraud because it adds additional unknown people into the chain of custody. Doc. 48, Ex. 5, Strach Decl. ¶ 42. Combined with eliminating the Ballot Verification Laws, allowing Ballot Harvesting makes it easier to commit voter fraud on a mass scale by coercing or unduly influencing voters, collecting blank ballots and illegitimately filling them out, engaging in vote buying, tampering with collected ballots, or failing to deliver or destroying collected ballots intentionally or unintentionally. Doc. 48, Ex. 2, Ziriax Decl. ¶¶ 30-31; Doc. 48, Ex. 5, Strach Decl. ¶¶ 37-39, 42, 45. If ballot harvesting were legal, voters would be more willing to hand over their ballot to third-parties and would have little reason to contact authorities when being solicited, making it even harder to prevent and detect fraud. Doc. 48, Ex. 5, Strach Decl. ¶ 42.

109.    Ballot harvesting is especially likely to lead to voter fraud in rural areas or areas with high unemployment because recent economic suffering in those areas has demonstrably led to people accepting money in exchange for their ballot or accepting money to go collect others' ballots. Doc. 48, Ex. 5, Strach Decl. ¶¶ 52-55. As the Carter-Baker Commission concluded, it is also especially dangerous when candidates or political parties are allowed to handle absentee ballots. Strach Dec. ¶¶ 43-44 (quoting

Report of the 2005 Commission on Federal Election Reform, Building Confidence in U.S. Elections, September 2005, https://www.legislationline.org/download/id/1472/file/3b50795b2d0374cbef5c29766256.pdf (hereinafter "Carter-Baker Commission")). This is precisely what Plaintiffs seek to do: they are political entities and they seek to collect voters' ballots, targeting the elderly, including by paying workers according to the number of ballots collected. Doc. 47, Ex. 11, Andrews Depo. 58-59, 63.

110.    The only experienced voter fraud investigator to testify in this case concluded that the notary and witness requirements are "important to the integrity of the election" because they are "an invaluable tool in investigating fraud" regardless of the effect they have on deterring fraud. Doc. 48, Ex. 5, Strach Decl. ¶¶ 56-57.

111.    The only experienced voter fraud investigator to testify in this case concluded that "allowing groups associated with candidates or parties to collect or harvest voter absentee ballots is more of an opportunity for bad actors than a solution to assist voters return their absentee ballots." Doc. 48, Ex. 5, Strach Decl. ¶ 58.

112.    Laws that create chain of custody and limit the number of individuals that have access to the voter's ballot are necessary safeguards to protect the voter's ballot and compromising those safeguards compromises the security of the voter's ballot. Doc. 48, Ex. 5, Strach Decl. ¶ 59.

113.    During COVID-19, protection against absentee voter fraud is more important than in the typical election because the increased absentee turnout will cause an increased focus on absentee ballots by campaigns and by bad actors alike. Doc. 48, Ex. 5, Strach Decl. ¶ 63.

VI.    ROLE OF DEFENDANTS IN ENFORCING LAWS AT ISSUE

114.    The term "State Election Board" can refer to either the five-member Board or to the agency managed by the Secretary. Doc. 48, Ex. 2, Ziriax Decl. ¶ 3.

27

115.	The Secretary is not a member of the five-member Board. Doc. 47, Ex. 4, Ziriax Depo. at 11:1-9.

116.	All of the laws at issue in this case are the responsibility of the Secretary and not the Board Member Defendants.[3] Doc. 48, Ex. 2, Ziriax Decl. ¶¶ 2-3; Doc. 48, Ex. 3, Buchanan Decl. ¶¶ 4-6.

117.	The Secretary has supervisory authority over the state agency's staff and over county election boards. Doc. 48, Ex. 2, Ziriax Decl. ¶ 2.

118.	The Board Member Defendants do not have supervisory authority over the Secretary or the county election boards. Doc. 48, Ex. 3, Buchanan Decl. ¶¶ 5-7.

119.	The Board Member Defendants have no involvement in the process of ballot generation, ballot testing, ballot printing, or delivery of ballots to county election boards. Doc. 48, Ex. 3, Buchanan Decl. ¶ 5.

120.	The Secretary exercises his enforcement authority through rules promulgated under the Oklahoma Administrative Procedures Act and through procedure documents provided to the county election board secretaries. Doc. 47, Ex. 4, Ziriax Depo. at 14:12-17:11.

121.	The Secretary and the agency staff he supervises provide election supplies to the counties. Doc. 47, Ex. 4, Ziriax Depo. at 13:14-14:3.

122.	All meetings of the five-member Board occur in Oklahoma City, OK. Doc. 48, Ex. 3, Buchanan Decl. ¶ 8.

---

[3] The "Board Member Defendants" are Tom Montgomery, Dr. Tim Mauldin, Heather Mahieu Cline, Jerry Buchanan, and Debi Thompson.

123.     All agency rules relevant to this case were promulgated by the Secretary (or predecessors in that office) from the office of the State Election Board in Oklahoma City. Doc. 48, Ex. 2, Ziriax Decl. ¶ 4.

124.     All Defendants officially reside in Oklahoma City. *See* OKLA. STAT. tit. 26, § 2-108 (official residence is "the seat of government"); *id.* tit. 73, § 1 (seat of government is "Oklahoma City").

125.     Defendant Ziriax personally resides in Edmond, OK. *See State Election Board Secretary and Members*, OKLA. STATE ELECTION BOARD, https://www.ok.gov/elections/About_Us/ Secretary_and_Board/index.html (listing his city of personal residence as Edmond).

126.     Defendant Buchanan is the only Defendant with a personal residence in the Northern District of Oklahoma *See State Election Board Secretary and Members*, OKLA. STATE ELECTION BOARD, https://www.ok.gov/elections/About_Us/Secretary_and_Board/index.html (listing his city of personal residence as Tulsa).

127.     The Secretary has never issued a rule or order in any location in the Northern District of Oklahoma. Doc. 48, Ex. 2, Ziriax Decl. ¶ 4.

128.     County secretaries, and not Secretary Ziriax, train inspectors, judges, clerks, and other precinct officials in each county. O.A.C. § 230:10-5-12.

**VII.     ELECTION DAY IN NOVEMBER 2020 AND POTENTIAL FOR DISRUPTION**

129.     As of August 19, 2020, over 166,700 absentee ballots had been requested for the November election. Doc. 48, Ex. 2, Ziriax Decl. ¶ 11.

130.     The Secretary and his staff began preparing the design and printing of November absentee ballot packets in early July 2020. Doc. 48, Ex. 2, Ziriax Decl. ¶ 39. The absentee materials were sent to the printer on July 27, 2020. *Id.* As of August 19, 2020, the printer had not yet completed the

print job for absentee ballot packet materials for the November election. *Id.* This print job started on July 27, 2020 is expected to be finished by August 31, 2020. *Id.*

131.    Once printed items are delivered, counties must manually assemble the election packets, affix labels, and insert the appropriate absentee ballots into corresponding packets. Doc. 48, Ex. 2, Ziriax Decl. ¶ 40; Doc. 47, Ex. 4, Ziriax Depo. 99-100. The absentee ballot packets include, in addition to the ballot itself, the ballot secrecy envelope, the affidavit envelope, the return envelope, the mailing envelope, the absentee ballot instructions, absentee ballot warnings, and the COVID-19 supplemental instructions. Doc. 48, Ex. 2, Ziriax Decl. ¶¶ 39-40 & Att. 5–12. It can take over a month for officials in the four largest counties in Oklahoma (Oklahoma, Tulsa, Cleveland, and Canadian Counties) to prepare absentee packets for timely mailing of ballots. Doc. 48, Ex. 2, Ziriax Decl. ¶ 40.

132.    Changing the challenged laws at this point of the election cycle (late August 2020, with absentee voting starting in mid-September) would create chaos and confusion among voters. Doc. 48, Ex. 2, Ziriax Decl. ¶ 29. It would require a massive public education project that is not within the time and budget of state and county election boards and it would possibly necessitate having to reprint absentee ballot materials and redo absentee ballot packets. *Id.* Hundreds of thousands of new affidavit envelopes and/or instructions would have to be reprinted if the court grants the relief sought by Plaintiffs. Doc. 48, Ex. 2, Ziriax Decl. ¶ 41.

133.    If any of the challenged laws are enjoined or altered, so as not to confuse voters, hundreds of thousands of materials included as part of the absentee ballot packet may have to be reprinted, which could take weeks. Doc. 48, Ex. 2, Ziriax Decl. ¶ 41. Specifically, six changes might need to be made, depending on the specifics of any court order: (1) The standard affidavit envelope has a place for a notary signature and a black box WARNING that says the voter's signature must be verified. Doc. 48, Ex. 2, Ziriax Decl., Att. 5. (2) The same is true for the incapacitated affidavit envelope, which

30

contains a place for witness signatures. *Id.* at Att. 6. (3) For both of these envelopes, although they contain a place for an affidavit, Plaintiffs ask for a requirement that this be signed "under penalty of perjury" (Doc. 18 at 42, ¶ C; *see also* OKLA. STAT. tit. 12, § 426), but the current affidavit envelopes do not state that signature is under penalty of perjury. Doc. 48, Ex. 2, Ziriax Decl. Att. 5-6. (4) The return envelope says "First-Class Postage required," which may have to be revised if Plaintiffs prevail. *Id.* at Att. 7. (5) The instruction materials with the packet inform voters they need to obtain notarization or witnessing, or comply with the special COVID-19 alternative of including a photocopy of ID. Att. 8, 9, & 12. They also tell voters that the ballot must be received by 7 P.M. on election day and that a postmark will not suffice, that voters must return their own ballots, and that they must affix first-class postage. *Id.* (6) The warning pamphlets warn about illegal activities, including warnings against ballot harvesting. *Id.* at Att. 10.

134.    Counties would also have to re-prepare hundreds of thousands of absentee packets before they could send absentee ballots to voters. Doc. 48, Ex. 2, Ziriax Decl. ¶¶ 40-41. All of this would have to be done amidst other county election board duties, including processing voter registration, sending free voter ID cards, processing absentee ballot requests, processing returned absentee ballots, and conducting precinct official trainings. *Id.* ¶ 40. In addition, if the Court were to require Oklahoma to provide free postage, the return envelopes would either have to be reprinted with prepaid postage or county election officials would have to manually affix postage to each envelope, either of which could take weeks. *Id.* ¶ 41. Any ruling affecting laws for the November 2020 election issued at this late date will set state and county election officials back weeks and delay or impede absentee voters from receiving their ballots. *Id.* ¶ 41.

135.    In the opinion of Secretary Ziriax, which has not been contradicted by any evidence, "we are past the point of no return to make changes to election law of this magnitude in order to implement them in an orderly fashion for the General Election." Doc. 48, Ex. 2, Ziriax Decl., ¶ 41.

136.    Changing the Ballot Receipt Deadline also has the potential for electoral disruption. Doc. 48, Ex. 2, Ziriax Decl. ¶ 32. County election boards must certify election results by the Friday after the Tuesday Election Day (including accurately counting all ballots and resolving challenges to results), OKLA. STAT. tit. 26, § 7-136, and the State Election Board must certify the statewide results of the election the Tuesday after Election Day, *id.* These deadlines could not be met under the Plaintiffs' requested relief of allowing absentee ballots to continue to be received up to a week after Election Day. Doc. 18 at 42, ¶ G. Plaintiffs therefore also request the Court to order these certification deadlines be postponed by a week, *id.* at 43 ¶ H, but this would mean that the State certification and issuance of certificates of election would occur a mere 24 hours before the new members of the State House of Representatives are seated, OKLA. STAT. tit. 14, § 137 (providing that terms for the member of the House expire fifteen days after the November General Election). *See* Doc. 48, Ex. 2, Ziriax Decl. ¶ 32. Thus, delay of election results could seriously upset the operation of the legislative branch of state government.

137.    Delaying the results of the election could also undermine public confidence in the election, as it has in other jurisdictions where the recent elections had remained disputed for weeks. Doc. 48, Ex. 2, Ziriax Decl. ¶ 37. This is because the longer results are outstanding, the lower the chances that candidates and voters are likely to accept the results of the election. *Id.*

## CONCLUSIONS OF LAW

### I.    STANDARD FOR INJUNCTIVE RELIEF

138.    "For a party to obtain a permanent injunction, it must prove: (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm

that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1191 (10th Cir. 2009).

139.    Where a movant seeks injunctive relief (1) "that alter[s] the status quo," (2) that includes a "mandatory preliminary injunction[]," or (3) "that afford[s] the movant all the relief that it could recover at the conclusion of a full trial on the merits," it seeks a disfavored injunction and must satisfy a heightened standard. *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016) (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012)). Here, Plaintiff seeks all three types of disfavored injunctions: they seek to change the status quo by altering or enjoining election laws already in effect; they seek a mandatory injunctions by forcing Defendants to pay for postage and to count ballots that do not comply with the Ballot Verification Laws and the Election Day Receipt Deadline, instead using new procedures and deadlines fashioned by the Court; and they seek preliminary relief that is the same as permanent relief: changing the election laws in advance of the November 2020 election. Accordingly, Plaintiffs must satisfy a heightened standard.

## II.    ACTUAL SUCCESS ON THE MERITS

### A.    Standing

140.    Plaintiffs lack standing for any of the claims in this case.

#### 1.    Associational Standing on Behalf of Members

141.    There are no individual Plaintiffs in this case. *See generally* Doc. 18, Am. Compl.

142.    To claim standing based on their members, the organization Plaintiffs must at the threshold show that their "members would otherwise have standing to sue in their own right." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

143.    To show such standing of their members, Plaintiffs must demonstrate that their members suffer an "injury in fact" that is "concrete and particularized" and "actual or imminent." *Lujan*

*v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). In other words, the injury must be "*certainly* impending." *Id.* at 564 n.2 (emphasis in original). Showing particularized injury "requires an associational plaintiff to **specifically identify** at least one member harmed by the defendant's conduct." *Osage Producers Ass'n v. Jewell*, 191 F. Supp. 3d 1243, 1250 (N.D. Okla. 2016) (emphasis added) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 498-99 (2009)).

144.     In the context of challenging laws that allegedly burden the right to vote, Plaintiffs must demonstrate that their members will certainly be prevented from voting. *See Texas Democratic Party v. Abbott*, 961 F.3d 389, 403-04 (5th Cir. 2020) (quoting *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802, 807-08 & n.7 (1969)). Assertions that unidentified members could be confused or might not comply with voting regulations are "[a]llegations of *possible* future injury" that fail to demonstrate standing. *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (emphasis added).

145.     Plaintiff DCCC has only one apparent member in Oklahoma: Congresswoman Kendra Horn. https://dccc.org/frontline/ (one incumbent member in Oklahoma); https://redtoblue.dccc.org/ (no challenger members in Oklahoma). Plaintiff DCCC has failed to offer any evidence that Congresswoman Horn, its sole Oklahoma member, is harmed by any of the challenged laws.

146.     Plaintiff Oklahoma Democratic Party ("ODP") claims all registered Democrats in Oklahoma as members. Doc. 47, Ex. 11, Andrews Depo at 6:20-7:3.

147.     Plaintiff ODP has failed to identify any particular members that are unable to vote because of the challenged laws. *See supra* FOF ¶¶ 66, 75, 84, 88, 90.

148.     In *Clark v. Edwards*, the Middle District of Louisiana carefully examined the standing of plaintiffs to challenge, *inter alia*, Louisiana's absentee ballot witness requirement. 20CV283, 2020 WL 3415376, *6-11 (M.D. La. June 22, 2020). Plaintiffs there put forward an individual voter allegedly harmed by the witness requirement because she was at high-risk for COVID-19, but the court concluded

34

she lacked standing: the voter was able to interact with others during the pandemic for other reasons and "[p]resumably, the same 'best practices' that Chandler employed during her limited outings could be used to ensure her safety during the brief interaction necessary to obtain a witness signature on her ballot." *Id.* at *6. It quoted the Western District of Wisconsin for "various ways in which a witness signature could be obtained while maintaining social distancing: ... a friend or neighbor may watch the voter mark their ballot through a window, open door or other physical barrier, and even may do so by video chat, like Skype or Facetime, with the voter then placing the ballot outside for the witness to sign and mail ... [or] the voter could ask an individual delivering groceries or food to witness the ballot." *Id.* In fact, the voter had already "arranged to have her groceries and other necessities dropped off" and "can get a witness signature on her absentee ballot without violating those guidelines by taking the same precautions she takes when leaving her home for doctor's appointments and other 'limited purposes.'" *Id.* The court also concluded that an injury to this plaintiff would require a speculative chain of events:

> First, she would have to choose a method of obtaining a signature that involved in-person contact, which, as described above, is not necessary. Second, if in-person contact did occur, she would have to take no precautions in the form of maintaining social distance, using personal protective equipment, hand sanitizer, and so on. Chandler admits that she "has maintained social distancing best practices while out," and has not asserted that she would be unable to do so while obtaining a witness signature. Third, the person that Chandler selected to witness her ballot would actually have to be carrying the Virus. The risk is not zero, but it is highly speculative. Ultimately, Chandler would have to comply with the Witness Requirement to vote by mail whether the Virus existed or not. Thus, the gravamen of her asserted injury is fear of exposure to the Virus. Such fear is simply not enough to give rise to a "certainly impending" injury.

*Id.* at *7.

149.    The court in *Clark v. Edwards* conducted a similar analysis for all the plaintiffs and found none to have standing. *Id.* at *7-11. Here, by contrast Plaintiffs have failed to produce even a single particular voter who has alleged injury and the inability to vote due to the challenged laws, so neither

Defendants nor the Court can evaluate whether there is any actual injury to any of Plaintiffs' members in this case.

150.     Because Plaintiffs cannot show that any particular member with certainty will be unable to vote due to any of the challenged laws, Plaintiffs lack associational standing to sue on behalf of their members.

## 2.     Direct Standing

151.     Plaintiffs also cannot show direct standing for the challenged laws. Plaintiffs claim they have standing because they have allegedly diverted resources as a result of the challenged laws, but this fails for multiple reasons.

152.     *First*, Plaintiffs fail to prove such diversion of resources with any specificity or evidence beyond bare allegations. Standing must be proven "at every stage of the proceeding," *Citizens Concerned for Separation of Church & State v. City & Cty. of Denver*, 628 F.2d 1289, 1301 (10th Cir. 1980), and here, where a preliminary injunction request has been merged with a final trial on the merits, standing must be proven with specific evidence, not mere allegations that would suffice at the pleading stage. Plaintiffs do not provide any evidence of actual costs, in either dollars or employee time, that is a result of resources spent because of the challenged laws or diverted away from other activities.

153.     *Second*, even if Plaintiffs could show diversion of resources, Plaintiffs "cannot manufacture standing by choosing to make expenditures based on hypothetical future harm." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013). If Plaintiffs' members lack injury to their voting rights, Plaintiffs cannot spend their way to standing by budgeting to address hypothetical voting right harms. *See id.* Because Plaintiffs' members lack an injury-in-fact to their voting rights from the ballot harvesting laws, *see supra* COL ¶¶ 141-150, Plaintiffs cannot claim direct standing through diversion of resources.

154.     *Third*, Plaintiffs fail to show injury because if Plaintiffs already spend their funds on voter outreach, changing what the Plaintiffs say to voters is not a diversion since they would have spent the funds on voter outreach either way. For example, in *Clark v. Edwards*, the court found a civic organization lacked standing to challenge Louisiana's absentee ballot laws because the organization already had "a strong voting-related mission, including offering rides to the polls and voter support," so "[t]he fact that they anticipate demand for those services does not strike the Court as an injury, nor does the fact that they undertook to monitor developments in Louisiana election law; that activity seems consistent with their general activities and mission." 2020 WL 3415376, *11-12. "The Court simply does not see how Power Coalition has 'gone out of its way' in response to the actions of Defendants. This is especially true because the Challenged Provisions were already part of Louisiana law and thus, the organization cannot claim to be expending resources to research, understand, and educate the public on new laws." *Id.* That court also found other organizations similarly lacked standing in that case. *Id.* at *12-15. And other courts have engaged in similar analyses. *See Shelby Advocates for Valid Elections v. Hargett*, 947 F.3d 977, 982 (6th Cir. 2020); *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010); *ACORN v. Fowler*, 178 F.3d 350, 359 (5th Cir. 1999); *Democracy N. Carolina v. N. Carolina State Bd. of Elections*, No. 1:20CV457, 2020 WL 4484063, at *12-18 (M.D.N.C. Aug. 4, 2020). For similar reasons, Plaintiffs lack standing here.

155.     *Fourth*, even if Plaintiffs could show injury to their organizations, with the exception of their First Amendment Ballot Harvesting Laws, they do not allege that their right to vote is affected; rather, they are seeking to advance the right to vote of third parties. Thus, in order to show standing for all the other challenges, Plaintiffs must demonstrate they have "a 'close' relationship with the person who possesses the right" and that "there is a 'hindrance' to the possessor's ability to protect his own interests." *Aid for Women v. Foulston*, 441 F.3d 1101, 1111-12 (10th Cir. 2006) (quoting *Kowalski v. Tesmer*,

543 U.S. 125, 130 (2004)). Here, Plaintiffs have failed to put forward evidence that satisfies either requirement. As two courts have already found in challenges to voting laws during the pandemic, allegations of voter education efforts are insufficient to show a "close relationship," and there is zero evidence of any "hindrance" to individual voters bringing suit in this Court. *Democracy N. Carolina*, 2020 WL 4484063, at *19-20 (citing *Priorities USA v. Nessel*, 19-13341, 2020 WL 2615766, at *9 (E.D. Mich. May 22, 2020)).

156.     For all these reasons, Plaintiffs lack standing to bring this suit.

### B.     Proper Parties

157.     Only state officials who enforce the law at issue in a complaint are proper parties under 42 U.S.C. § 1983. *See Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191 (1988).

158.     If a state official does not enforce the law at issue, he is immune from suit because sovereign immunity protects state officials that have no role in enforcement of the relevant law. *See Ex parte Young*, 209 U.S. 123, 157 (1908) ("[I]t is plain that [a state] officer must have some connection with the enforcement of the act, or else [the suit] is merely making him a party as a representative of the state, and thereby attempting to make the state a party.").

159.     A complaint that does not involve adverse actions by named Defendants fails to state a plausible claim against those Defendants. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008); Fed. R. Civ. P. 12(b)(6).

160.     A court lacks subject matter jurisdiction over Defendants who are not responsible for the actions alleged in the active complaint. *See Smith v. United States*, 561 F.3d 1090, 1097-99 (10th Cir. 2009).

161.     Named Defendants who did not perform any of the actions at issue in a complaint are misjoined to the complaint. Fed. R. Civ. P. 21.

162.     Plaintiffs' claims entirely address absentee ballots: (1) the requirements for absentee ballots, (2) the process of returning absentee ballots, (3) the time for returning absentee ballots, and (4) the rules regarding ballot harvesting and absentee ballots.

163.     The undisputed evidence in this case shows that the Board Member Defendants are not responsible for any of the absentee ballot laws in this case.

164.     The Secretary in his official capacity (whether Defendant Paul Ziriax or a predecessor in the office) promulgated the rules at issue in this case. Doc. 47, Ex. 4, Ziriax Depo. at 14:12-15:3; *see* 36 Ok. Reg. 1545 (latest version of Okla. Admin. Code. § 230:30-11-1.1 promulgated under Secretary's authority); 34 Ok. Reg. 1122 (latest version of Okla. Admin. Code. § 230:30-11-5 promulgated under Secretary's authority); 28 Ok. Reg. 1154 (latest version of Okla. Admin. Code. § 230:30-9-6 promulgated under Secretary's authority). He also enforces the notarization requirement for absentee ballots. *See* 20 Ok. Reg. 1097 (latest version of Okla. Admin. Code. § 230:30-23-1 promulgated under Secretary's authority).

165.     The Secretary is not under the supervision of the Board Members because he is appointed by the Legislature. *See* OKLA. STAT. tit. 26, § 2-101.6; Okla. Senate Rule 2-2.

166.     The Secretary manages the agency staff, including their maintenance of the agency website and databases. *See supra* FOF ¶¶ 116-119.

167.     The Secretary also controls how election results are transmitted from counties to the Board Member Defendants. *See* 33 Ok Reg 1417 (citing OKLA. STAT. tit. 26, § 7-136 ("as prescribed by the Secretary")).

168.     Plaintiffs have failed to state any claim against the Board Member Defendants, whether that such Defendants would certify a zero vote election in the absence of county election returns or would otherwise act regarding these roles committed to the Secretary.

169.     Because the Board Member Defendants have no connection to the laws at issue beyond being State officials broadly affiliated with elections, they are improperly sued in this *Ex Parte Young* action and are immune from suit.

170.     Because the Board Member Defendants have no connection to the laws at issue beyond being State officials broadly affiliated with elections, this court lacks subject matter jurisdiction over them.

171.     Because the Board Member Defendants have no connection to the laws at issue beyond being State officials broadly affiliated with elections, they are misjoined to this lawsuit.

172.     Secretary Ziriax is capable of granting all of the relief requested by Plaintiffs.

### C.     Venue

173.     Plaintiffs have asserted venue under 28 U.S.C. § 1391(b)(1), which states that venue lies in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located." Doc. 18, Am. Compl. ¶ 11.

174.     The statute further defines residency as "*the* judicial district in which that person is domiciled." 28 U.S.C. § 1391(c)(1) (emphasis added).

175.     Congress added this definition of residence to the venue statute in 2011. Federal Courts Jurisdiction and Venue Clarification Act of 2011, P.L. 112-63, 125 Stat 758, 764 (Dec. 7, 2011).

176.     Because the statute specifies *the* judicial district, it does not allow for venue in both the official and personal residence. *See* 28 U.S.C. § 1391(c)(1).

177.     The capacity in which the official is sued determines the residence for purposes of venue. CHARLES A. WRIGHT & ARTHUR R. MILLER, ET AL., 14D FED. PRAC. & PROC. § 3805.

178.     Plaintiffs are suing Defendants in their official capacity. *See generally* Doc. 18, Am. Compl.

179.     Thus, residence venue does not exist in the Northern District of Oklahoma because Defendants' official residence in Oklahoma City.

180.     Plaintiffs have also asserted venue under 28 U.S.C. § 1391(b)(2), which states that venue lies in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." Doc. 18, Am. Compl. ¶ 11.

181.     This test is not the same as the minimum contacts test used in personal jurisdiction inquiries. *See, e.g., Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 357 (2d Cir. 2005) ("It would be error, for instance, to treat the venue statute's 'substantial part' test as mirroring the minimum contacts test employed in personal jurisdiction inquiries.").

182.     This provision focuses on the events or omissions of the *Defendant*—the complained-of actions that caused the alleged harm—not where the effects of those events or omissions happen to be felt. *See Goff v. Hackett Stone Co.*, 185 F.3d 874, 1999 WL 397409, at *1 (10th Cir. 1999); *see also Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 432 (2d Cir. 2005); *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371-72 (11th Cir. 2003); *Woodke v. Dahm*, 70 F.3d 983, 985 (8th Cir. 1995); *Ne. Landscape & Masonry Assocs., Inc. v. State of Connecticut Dep't of Labor*, No. 14CV9104, 2015 WL 8492755, at *4 (S.D.N.Y. Dec. 10, 2015) ([T]he Second Circuit has made clear that the venue analysis must focus on where the *defendant's* acts or omissions occurred.").

183.     Venue is a personal privilege of Defendants, not Plaintiffs, because it allows Defendants to alter Plaintiffs' choice of forum. *See Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006); *Leroy v. Great W. United Corp.*, 443 U.S. 173, 183-84 (1979); WRIGHT & MILLER § 3801 ("Venue laws give added protection to *defendants* . . . ." (emphasis added)).

184.     The venue statute, 28 U.S.C. § 1391, is not a pure convenience balancing test like 28 U.S.C. § 1404(a), but is instead a statutory definition that protects defendants regardless of whether the

two forums at issue are two hours apart or twenty minutes. *See Transp. Funding, LLC v. HVH Transp., Inc.*, No. 2:17CV2106, 2017 WL 4223126, at *4 & n.58 (D. Kan. Sept. 22, 2017) (Kansas City, KS is improper venue for case concerning Kansas City, MO).

185.    Venue is a waivable privilege of Defendants, and cases where venue was not contested are unpersuasive in determining the relevant venue rules.

186.    "Once an issue as to venue has been raised, the plaintiff bears the burden to show that venue is proper." *ConocoPhillips Co. v. Jump Oil Co., Inc.*, 948 F.Supp.2d 1272, 1277 (N.D. Okla. 2013).

187.    State officials are not subject to venue outside the state capitol unless their relevant actions occurred outside the state capitol. *Compare Fla. Hometown Democracy, Inc. v. Browning*, No. 08CV80636, 2008 WL 3540607, at *3 (S.D. Fla. Aug. 12, 2008), *with Bay Cty. Democratic Party v. Land*, 340 F. Supp. 2d 802, 808 (E.D. Mich. 2004).

188.    Plaintiffs have introduced no evidence that Defendants' relevant acts or omissions occurred outside the state capitol or occurred in the Northern District of Oklahoma.

189.    Because the undisputed testimony from Secretary Ziriax and Board Member Buchanan shows that the relevant acts or omissions occurred in Oklahoma City, Plaintiffs have failed to meet their burden and venue is improper in this District.

### D.    In-Person Voting

190.    In Count I, Plaintiffs challenge the laws at issue in this suit on the grounds that they unlawfully burden the right to vote under the First and Fourteenth Amendments.

191.    The Constitution empowers states to prescribe "the Times, Places and Manner of holding Elections." U.S. CONST. art. I, section 4. Accordingly, states have "broad powers to determine the conditions under which the right of suffrage may be exercised." *Shelby Cnty. v. Holder*, 570 U.S. 529, 543 (2013). States can engage in "substantial regulation of elections." *Burdick v. Takashi*, 504 U.S. 428,

432 (1992). States have "significant flexibility in implementing their own voting systems." *John Doe No. 1 v. Reed*, 561 U.S. 186, 195 (2010).

192.     Challenges to voting laws under the First and Fourteenth Amendment are evaluated under the *Anderson-Burdick* framework:

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Fish v. Schwab*, 957 F.3d 1105, 1122 (10th Cir. 2020) (quoting *Burdick*, 504 U.S. at 434); *see also Anderson v. Celebrezze*, 420 U.S. 780 (1983).

193.     Every election law "is going to exclude, either de jure or de facto, some people from voting." *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004).

194.     The severity of the burden on the right to vote determines the level of scrutiny of the state's interests. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 190 (2008) (plurality op. of Stevens, J.); *Am. Civil Liberties Union of New Mexico v. Santillanes*, 546 F.3d 1313, 1321 (10th Cir. 2008).

195.     "[W]hen a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick*, 504 U.S. at 434; *see also Crawford*, 553 U.S. at 190.

196.     A regulation is reasonable if it does not impose a substantial burden beyond "the usual burdens of voting." *Crawford*, 553 U.S. at 198.

197.     The laws at issue in this case are nondiscriminatory. Every voter must verify their ballot, every voter must follow the deadline, every voter must determine how to send their absentee ballot (including by paying for postage), and every voter is free from ballot harvesting by political entities.

43

*Crawford*, 553 U.S. at 203 (referring to a voter ID law as "neutral, nondiscriminatory"); *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 452 (2008) (referring to nondiscriminatory laws as "politically neutral regulations").

198.    Under the *Anderson-Burdick* balancing test, the character and magnitude of the injury to the Plaintiffs must be assessed in light of "the state's election code *as a whole*," *Luft v. Evers*, 963 F.3d 665, 671 (7th Cir. 2020), and "consider[] all voting opportunities that the Plaintiffs *could have* taken advantage of," *Mays v. LaRose*, 951 F.3d 775, 786 (6th Cir. 2020); *see also Burdick*, 504 U.S. at 438-39 (burden of regulation small in light of alternative options to access electoral rights); *Crawford*, 553 U.S. at 197-99 (same).

199.    Oklahoma's election laws as a whole provide numerous easy routes for a voter to cast a ballot, so even if one form of voting is unavailable a voter has many other options. *See supra* FOF ¶¶ 1-40.

200.    In order for Plaintiffs to succeed under *Anderson-Burdick* in their challenge to any of the absentee ballot laws, they must first show that in-person voting in Oklahoma is unduly burdensome. But Plaintiffs do not challenge any Oklahoma in-person voting laws as unduly burdensome. Accordingly, Count I must fail with respect to all of the challenged laws since in-person voting remains an option for voters to exercise their right to vote.

201.    This is also true because there is no constitutional right to an absentee ballot. *Mays v. LaRose*, 951 F.3d 775, 792 (6th Cir. 2020); *see also McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 807 (1969) (the "claimed right to receive absentee ballots" is not "the right to vote"); *Crawford*, 553 U.S. at 209 (Scalia, J., concurring in the judgment) ("[T]he casting of absentee or provisional ballots, is an indulgence—not a constitutional imperative."); *Texas Democratic Party v. Abbott*, 961 F.3d 389, 403-04 (5th Cir. 2020) (in challenge to absentee voting laws, "the right to vote is not 'at stake'"); *Griffin v. Roupas*,

44

385 F.3d 1128, 1130 (7th Cir. 2004) (rejecting "a blanket right of registered voters to vote by absentee ballot"); *Tully v. Okeson*, No. 1:20CV1271, 2020 WL 4926439, at *3-4 (S.D. Ind. Aug. 21, 2020) ("Plaintiffs correctly 'acknowledge that [Indiana] could likely eliminate all absentee voting if it wished'" and "[t]hat's because unless a restriction on absentee voting 'absolutely prohibit[s]' someone from voting, the right to vote is not at stake." (quoting *McDonald*, 394 U.S. at 807)).

202.     While absentee voting laws may nonetheless be subject to constraints of equal protection and procedural due process, Plaintiffs do not bring any equal protection claims and only bring a procedural due process claim with respect to the Election Receipt Deadline in Count III. Doc. 18, Am. Compl. ¶¶ 157-166.

203.     In-person voting is still available and safe during COVID-19. *See supra* FOF ¶¶ 24-28, 50-61. The weight of the scientific evidence shows that in-person elections in 2020 have not been associated with increased cases of COVID-19 (including in Oklahoma), the risk of contracting COVID-19 while voting in-person is not high or significant, that risk is not greater than other activities voters engage in during daily life in Oklahoma, and voting in-person can be done in a manner that minimizes any risk by complying with Oklahoma's in-person voting protocols. *Id.*

204.     Even if COVID-19 did impose an undue burden on in-person voting, Oklahoma is not responsible for any additional burdens imposed by COVID-19. *See Thompson v. Dewine*, 959 F.3d 804, 810 (6th Cir. 2020) ("First Amendment violations require state action … [s]o we cannot hold private citizens' decisions to stay home for their own safety against the State."); *Texas Democratic Party v. Abbott*, 961 F.3d 389, 405 (5th Cir. 2020) (burdens caused "because of circumstances beyond the state's control, such as the presence of the Virus"); *id.* at 415-16 (Ho, J., concurring); *Mays v. Thurston*, No. 4:20CV341, 2020 WL 1531359, at *2 (E.D. Ark. Mar. 30, 2020); *Coalition for Good Governance v. Raffensperger*, No.

1:20CV1677, 2020 WL 2509092, at *3 n.2. (N.D. Ga. May 14, 2020); *Clark*, 2020 WL 3415376, at *10-11. Accordingly, COVID-19 cannot be a basis to invalidate Oklahoma's voting laws.

205.    At most, COVID-19 is now part of the "usual burden on voting" that arises "arising out of life's vagaries," and thus not a burden that renders a state law unconstitutional. *Crawford*, 553 U.S. at 197-98.

206.    Even if there is a dispute about the state's decisions regarding safe in-person voting during the pandemic, this Court is required to defer to the state's decisions on how best to address the pandemic. As Chief Justice Roberts explains, a State's decision on how to address the coronavirus is a "dynamic and fact-intensive matter subject to reasonable disagreement," so when state "officials 'undertake[ ] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad,'" and "they should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *South Bay United Pentecostal Church v. Newsom*, No. 19A1044 at 2 (May 29, 2020) (Roberts, C.J., concurring) (citing *Jacobson v. Massachusetts*, 197 U. S. 11, 38 (1905)).

207.    Thus, the COVID-19 pandemic requires that courts give more weight, not less, to state judgments about how best to preserve the right to vote and election integrity during the pandemic. *See, e.g.*, *Democratic Nat'l Comm. v. Bostelmann*, Nos. 20-1538 *et al.*, 2020 WL 3619499, at *2; *Williams v. DeSantis*, No. 1:20CV67, Doc. 12 (N.D. Fla. Mar. 17, 2020); *Sinner v. Jaeger*, No. 3:20CV76, 2020 WL 3244143, at *6 (D.N.D. June 15, 2020); *Bethea v. Deal*, No. 2:16CV140, 2016 WL 6123241, at *2-3 (S.D. Ga. Oct. 19, 2016).

208.    The Supreme Court has repeatedly refused to upset the judgment of state officials on how best to address COVID-19. For example, the Supreme Court stayed a district court preliminary injunction that, *inter alia*, halted Alabama's absentee ballot verification laws, which are stricter than

Oklahoma's because they require voters to both include a photocopy of their ID and have it notarized or witnessed. *Merrill v. People First of Alabama*, No. 19A1063, 2020 WL 3604049, at *1  (July 2, 2020).

209.    In other cases as well, the Supreme Court and appellate courts have refused to upset the judgment of state officials on voting during a pandemic. *See Republican Nat'l Comm. v. Common Cause RI*, No. 20A28, 2020 WL 4680151, at *1 (Aug. 13, 2020) (declining to stay decision of "state election officials [to] support the challenged decree"); *Little v. Reclaim Idaho*, No. 20A18, 2020 WL 4360897 (July 30, 2020) (initiative petitions); *id.* at *1-2 (Roberts, C.J., concurring) (faulting district court for granting "sufficient weight to the State's discretionary judgments about how to prioritize limited state resources across the election system as a whole" during the pandemic); *Texas Democratic Party v. Abbot*, No. 19A1055, 140 S. Ct. 2015 (June 26, 2020) (declining to vacate stay imposed by the Fifth Circuit on district court ruling that enjoined state absentee ballot laws); *Republican Nat'l Committee v. Democratic Nat'l Committee*, 140 S. Ct. 1207, 1207 (April 6, 2020) (per curiam) (staying district court preliminary injunction that required state to count absentee ballots postmarked after election day, declining to opine on the "wisdom" of the state's election choices or "whether other reforms or modifications in election procedures in light of COVID-19 are appropriate"); *see also Barnes v. Ahlman*, No. 20A19, 2020 WL 4499350 (Aug. 5, 2020) (jails); *Calvary Chapel Dayton Valley v. Sisolak*, No. 19A1070, 2020 WL 4251360 (July 24, 2020) (religious services); *Peterson v. Barr*, No, 20A6 (July 14, 2020) (execution); *Dep't of Homeland Sec. v. New York*, No. 19A785, 2020 WL 3964236 (April 24, 2020) (immigration).

210.    Because Plaintiffs' challenges only relate to absentee voting and the Oklahoma election code as a whole provides multiple opportunities to exercise the right to vote (including to vote in-person), Plaintiffs claim in Count I must fail with respect to all the challenged laws. In any event, Plaintiffs' claims are only subject to rational basis review.

### E.      Ballot Verification

211.      Assuming the right to vote were at issue, Plaintiffs challenge to the Ballot Verification Laws fails. The compelling state interests in the Ballot Verification Laws outweigh the minimum, unquantified burdens on voters Plaintiffs allege.

212.      The Ballot Verification laws impose a minimal burden on voters. *See supra* FOF ¶¶ 29-34, 37, 62-73. Plaintiffs bear the responsibility to quantify the magnitude of the burden with reliable evidence, and they have not done so here. *Crawford*, 553 U.S. at 200; *Democratic Party of Hawaii v. Nago*, 833 F.3d 1119, 1124 (9th Cir. 2016); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1354 (11th Cir. 2009).

213.      Voters have multiple different ways that they can verify their absentee ballot to vote in the November election. *See supra* FOF ¶¶ 5-23, 29-34.

214.      The free notary and ID photocopying services, including drive-through services, offered throughout the state greatly minimize any burden on voters. *See supra* FOF ¶¶ 18, 40. Notary services are free throughout the state. OKLA. STAT. tit. 26 § 14-108(A). And there are thousands of notaries across the state, present in every county. *See supra* FOF ¶ 18.

215.      Voters who qualify as physically incapacitated have another option for voting without a notary: they can obtain the signature of two witnesses. *See supra* FOF ¶ 19. Oklahoma has eased the burden of voting absentee by expanding the categories of voters who qualify as physically incapacitated. *See supra* FOF ¶ 32. Oklahoma has reduced the risk of voting during COVID-19 by providing extra officials to assist the most vulnerable voters—those in nursing homes and veterans' centers. *See supra* FOF ¶ 34. And most Oklahoma voters, including elderly voters, live with at least one other registered voter who can witness their ballot. *See supra* FOF ¶ 73.

216.     Oklahoma has also allowed all voters to use a photocopy of their ID, which can be obtained safely at home. *See supra* FOF ¶¶ 30-31. This can be the free voter ID provided by the state, or any other state, federal, or tribal ID that complies with the requirements of state law. *Id.* This is available to all voters during the November 2020 general election. Voters have many months to obtain a photocopy, or even a new copy of their free Voter ID, between May and election day in November. Obtaining a copy of ID does not necessarily require interaction with any other person, as it can be done at home, at an office, or via mail. The Supreme Court has already held that in-person voter ID "imposes only a limited burden on voters' rights," *Crawford*, 553 U.S. at 202-03, and absentee ID poses no much greater burden—especially when there are two other options for ballot verification (notarization and witnessing).

217.     The Ballot Verification Laws all provide safe options for voting during COVID-19 because they can be done while maintaining social distancing, mask wearing, and proper sanitation. *See supra* FOF ¶¶ 63-64. As other courts have noted in upholding witnessing requirements during the pandemic, it can be done by a friend, neighbor, postal worker, package or food delivery person, and can be done outdoors, wearing masks, and well-more than six feet apart. *See Thompson*, 959 F.3d at 810 (endorsing "witnessing the signatures from a safe distance"); *Democracy N. Carolina*, 2020 WL 4484063 at *27, *33 (witnessing ballots with such precautions not "a serious risk to voters"); *Clark*, 2020 WL 3415376, at *6-7; *Bostelmann*, 2020 WL 3619499, at *2. Voters who truly want to remain shut-in can have the witness observe through video chat or through a window, and then sign the ballot when it is passed underneath the front door or left outside in the mailbox. *See id.* Voters in nursing homes can also request assistance in filling out and witnessing their ballots by bipartisan absentee voter boards, with no further requirements for verification. OKLA. STAT. tit. 26, § 14-115. And the Legislature also created new

49

alternate procedures for those in nursing homes if those boards cannot enter the facility due to COVID-19. *See supra* FOF ¶ 33.

218.     While voters do need to take some steps to comply with these laws, the "[b]urdens of that sort arising from life's vagaries, however, are neither so serious nor so frequent as to raise any question about [] constitutionality" and they "surely do[] not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." *Crawford*, 553 U.S. at 197-98. They are no greater than the burdens during in-person voting in other years where voters have the time and expense of transporting themselves to their polling place in a timely manner, potentially waiting in line, and showing ID to cast a ballot. And they are even lighter given the many options for verifying an absentee ballot *and* the option to cast a ballot in-person or early which remains a safe way to vote in Oklahoma. *See Democracy N. Carolina*, 2020 WL 4484063 at *34.

219.     Plaintiffs point to statistical data about absentee voting in Oklahoma during the pandemic, but none of this data shows how many voters are <u>unable</u> to comply with the Ballot Verification Laws; at most it only shows how many voters <u>failed</u> to comply with the Ballot Verification Laws, perhaps out of inadvertence, lack of reasonable efforts, or attempts to cast a fraudulent ballot. It is not enough to show that a voter is unwilling to comply with a challenged law; in order to demonstrate a burden on the right to vote, Plaintiffs must show that voters are <u>unable</u> to comply with the law despite reasonable efforts. *See Crawford*, 553 U.S. at 198; *Frank v. Walker*, 819 F.3d 384, 386-87 (7th Cir. 2016).

220.     In any event, the data demonstrates that Oklahoma's laws are not imposing significant burdens because, among other things, (1) voter participation increased during the recent primary; (2) rejection rates for failure to comply with the Ballot Verification Laws decreased as compared to recent general elections; (3) very few votes (about 0.14% of all votes) were rejected for failure to comply with the Ballot Verification Laws and this was fewer than those that failed to satisfy the affidavit requirement

that Plaintiffs do not challenge as overly burdensome; (4) rejection rates for failure to verify are not

higher in Oklahoma than in other states and are in fact much lower than some states that require only

signature matches. *See supra* FOF ¶¶ 66-73.

221.    Many courts have recognized that similar ballot verification laws do not impose an

undue burden, including during the pandemic, and have upheld such laws. *See Thompson*, 959 F.3d at 810

(endorsing "witnessing the signatures from a safe distance"); *Democracy N. Carolina*, 2020 WL 4484063

at *27, *33 (witnessing ballots with proper precautions not "a serious risk to voters" and not

unconstitutional to be required); *Clark*, 2020 WL 3415376, at *6-7; *Bostelmann*, 2020 WL 3619499, at *2;

*see also Merrill*, 2020 WL 3604049, at *1 (staying lower court decision that enjoined Alabama's verification

requirement of both a photocopy of ID and either witness signature or notarization).

222.    Cases where courts have adjusted absentee ballot verification requirements all involve

deference to state officials who consented to such adjustments during the pandemic. *Common Cause Rhode*

*Island v. Gorbea*, No. 20-1753, 2020 WL 4579367, at *2 (1st Cir. Aug. 7, 2020) ("Rhode Island officials

charged with the conduct of fair elections apparently view the regulation's possible benefits as far

outweighed by its burdens in this unusual circumstance"); *League of Women Voters of Virginia v. Virginia*

*State Bd. of Elections*, No. 6:20CV24, 2020 WL 2158249, at *14 (W.D. Va. May 5, 2020) (accepting parties'

settlement and consent decree to waive witness requirement); *Libertarian Party of Illinois v. Pritzker*,

20CV2112, No. 2020 WL 1951687, at *5 (N.D. Ill. Apr. 23, 2020) (entering parties' agreed order to relax

signature requirement to get on ballot). Here, state officials have made the judgment that the Ballot

Verification Laws, as revised during the COVID-19 pandemic, properly balance voter access and safety

with election integrity and voter confidence. Accordingly, the Court will not upset that judgment.

223.    Similarly, in *Thomas v. Andino*, No. 3:20CV1552, 2020 WL 2617329, at *19-21 (D.S.C.

May 25, 2020), the court enjoined a witness requirement, but only because the state failed to show any

evidence of the existence of voter fraud and conceded that the witness requirement there did not serve any state interests. *But see Democracy N. Carolina*, 2020 WL 4484063, at \*25, \*36 (distinguishing *Andino*). Here, like in *Democracy North Carolina* and unlike in *Andino*, the state has produced copious evidence on the existence of voter fraud and has put forward numerous state interests justifying the Ballot Verification Laws. *See supra* FOF ¶¶ 91-113; *infra* COL ¶¶ 224-231.

224.    The State has several interests that justify its ballot verification laws.

225.    First, "[t]here is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters." *Crawford*, 553 U.S. at 196 (plurality op.). The "propriety" of "preventing election fraud" is "perfectly clear." *Id.* The State's prevention of voter fraud promotes the right to vote because reducing protections against fraud decreases the value of all legitimate votes: "The right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)). Oklahoma's laws fulfill this interest because obtaining a photocopy of someone else's ID or finding a notary or multiple witnesses willing to participate in forgery are each far more difficult than faking a signature, and therefore help prevent the commission of voter fraud.

226.    Second, the state has an interest beyond preventing fraud in *detecting* fraud. Reducing the requirement for ballot verification to a mere signature requirement "gives no effect to the state's substantial interest in combatting voter fraud." *Democratic Nat'l Cmte v. Bostelmann*, Nos. 20-1538 *et al.*, 2020 WL 3619499, at \*2 (7th Cir. Apr. 3, 2020) (staying district court order that "categorically eliminates the witness requirement applicable to absentee ballots"); *see also Democracy N. Carolina*, 2020 WL 4484063 at \*35-36. Oklahoma's laws fulfill this interest because the notary or witness who verifies a ballot can be questioned, and finding a notary's or witness's name on one false affidavit can help in detecting other

fraudulent ballots by finding other places that notary or witness signed. *See supra* FOF ¶¶ 94, 98, 103-104.

227.    Third, the state has an interest in safeguarding voter confidence. "[P]ublic confidence in the integrity of the electoral process. . . encourages citizen participation in the democratic process. *Crawford*, 553 U.S. at 197 (plurality op.). Oklahoma's laws fulfill this interest by increasing voter confidence in the outcome of the election. *See supra* FOF ¶ 92.

228.    These interests are a "legislative fact" that the state need not prove with evidence. *See Frank v. Walker*, 768 F.3d 744, 750-51 (7th Cir. 2014); *Crawford*, 553 U.S. at 194-195; *see also Utah Republican Party v. Cox*, 892 F.3d 1066, 1113 (10th Cir. 2018) (Tymkovich, J. concurring in part and dissenting in part); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009); *ACLU of N.M. v. Santillanes*, 546 F.3d 1313, 1323 (10th Cir. 2008); *Democracy N. Carolina*, 2020 WL 4484063 at *36. States can prophylactically address fraud even without evidence of that fraud currently occurring. *Santillanes*, 546 F.3d at 1323; *see also Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986).

229.    Plaintiffs note the heightened evidentiary burden used in *Fish v. Schwab*, 957 F.3d 1105, 1126 (10th Cir. 2020), *cert. pet. pending* No. 20-109. But the Tenth Circuit imposed this evidentiary burden in that case because of the "substantial" burden on voters proven by evidence in that case—31,089 voters who would be completely unable to vote—including specific proof from individual plaintiffs showing inability to satisfy the challenged requirement despite reasonable efforts. *Id.* at 1126-32. Here, however, there is "limited evidence of a burden on the right to vote" so "the state need not present concrete evidence to justify its assertion of legitimate or important generalized interests." *Id.* at 1126. Plaintiffs have not shown either through the testimony of individual voters or through voter data a complete inability of voters to cast a ballot, nor a magnitude of harm anywhere near the evidence in *Fish*. *See supra* FOF ¶¶ 66-73, 90.

230. Nevertheless, if Defendants were required to prove that absentee voter fraud exists, they have met that requirement, showing over a hundred instances of voter fraud across the country, including in Oklahoma and including instances that changed the results of elections. *See supra* FOF ¶¶ 91-113. And Defendants have also proven how ballot verification requirements have helped election officials detect fraud and detect the extent of fraud. *See supra* FOF ¶¶ 94, 98, 103-104.

231. Plaintiffs note that voter fraud is relatively rare in Oklahoma, but that describes the state of affairs with Oklahoma's Ballot Verification Laws in place—the very laws designed to ensure voter fraud remains rare. *See supra* FOF ¶ 97. Plaintiffs also point to other states that don't have the same ballot verification measures and use other measures, but while "the most effective method of preventing election fraud may well be debatable," it is up to states, not courts, to choose among those methods. *Crawford*, 553 U.S. at 196; *see also Ohio Dem. Party v. Husted*, 834 F.3d 620, 622 (6th Cir. 2016) (courts should not become "entangled, as overseers and micromanagers, in the minutiae of state election processes"); *Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir. 2004) ("[T]he striking of the balance between discouraging fraud and other abuses and encouraging turnout is quintessentially a legislative judgment"). States have "significant flexibility in implementing their own voting systems." *Reed*, 561 U.S. at 195. Indeed, there is evidence in the record showing that states that have other verification methods—such as signature matching—have experienced *higher* rates of ballot rejection, thereby imposing higher burdens on voters. *See supra* FOF ¶ 70.

232. Plaintiffs also point out that the state allows voters under the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") to self-authenticate their absentee ballot, but this is required by federal law and does not undermine the state's decision to require verification for other ballots. *See* Doc. 47, Ex. 4, Ziriax Depo. 109-110; 52 U.S.C. § 20303(f).

233.    The Supreme Court in *Crawford* upheld an in-person voter ID law based on the well-evidenced history of absentee voter fraud. 553 U.S. at 194-96. If in-person voter ID is valid because of the history of absentee fraud, then absentee voter ID must be valid based on that same history, especially with two more options to verify a ballot (witnessing or notarization).

234.    The State's exceedingly strong interests here outweigh the usual burdens of voting imposed by the Ballot Verification Laws. Accordingly, Plaintiffs cannot succeed on the merits in their challenge to the Ballot Verification Laws.

F.    **Ballot Harvesting**

1.    **Ballot Harvesting Laws under *Anderson-Burdick***

235.    Assuming the right to vote were at issue, Plaintiffs challenge to the Ballot Harvesting Laws fails.

236.    Laws prohibiting third parties from harvesting absentee ballots or absentee ballot applications, or "assisting" voters with absentee ballots, necessarily only require an individual voter to be subject to the "usual burdens on voting," *Crawford*, 553 U.S. at 197-98—that is, voting without assistance—and therefore do not amount to more than a minimal burden. The Ballot Harvesting Laws do not impose any requirements on any voter to cast a vote; it merely prohibits outside groups from harvesting their ballot.

237.    In any event, Oklahoma also does not completely prohibit assistance, as it allows family and even roommates to offer assistance. Oklahoma also provides or allows for assistance to particularly vulnerable voters, such as those in nursing homes. And Plaintiffs and others can gift voters free stamps to assist with mailing an absentee ballot. *See supra* FOF ¶¶ 15, 39.

238.    Plaintiffs have not identified a single voter who is unable to vote because of the Ballot Harvesting Laws, nor do Plaintiffs provide any data or statistical evidence showing the number of such voters or the magnitude of any burden imposed by the Ballot Harvesting Laws. *See supra* FOF ¶¶ 88, 90.

239.    Rather, Plaintiffs proposed ballot harvesting activities may actually increase the burdens on the public because they risk spreading COVID-19. *See supra* FOF ¶ 89.

240.    Accordingly, Plaintiffs have not shown that the Ballot Harvesting Laws impose more than a minimal burden on the right to vote.

241.    As other courts have recognized, Oklahoma has an interest in protecting the chain of custody between the voter and election officials in order to reduce opportunities for fraud. *See Qualkinbush v. Skubisz*, 826 N.E.2d 1181, 1204 (Ill. App. 2004).

242.    Oklahoma has an interest in protecting the voters like the elderly who are most vulnerable to undue influence, intimidation, or coercion by political groups from being contacted by political groups like Plaintiffs, who intend on targeting elderly voters. *See Qualkinbush v. Skubisz*, 826 N.E.2d 1181, 1187-88, 1190-91, 1206 (Ill. App. 2004); *see supra* FOF ¶¶ 89, 109.

243.    This state interest in preventing ballot harvesting is not just theoretical, but has been recognized by courts around the country. *See Pabey v. Pastrick*, 816 N.E.2d 1138, 1144-47, 1154 (Ind. 2004) (ordering a special election due to ballot harvesting fraud); *Qualkinbush*, 826 N.E.2d at 1195-96 (in addition to Illinois, pointing to cases in New Jersey and California); *Matter of Protest Election Returns & Absentee Ballots in November 4, 1997 Election for City of Miami, Fla.*, 707 So. 2d 1170 (Fla. Dist. Ct. App. 1998) (declaring new winner of election for Miami mayor after "massive fraud in the absentee ballots," including the use of "so-called 'ballot brokers'").

244.    The problem of coercion is inherent in mail-in voting, but it's only made worse by ballot harvesting schemes. *Qualkinbush*, 826 N.E.2d at 1197; Carter-Baker Commission at 47 ("Absentee

balloting is vulnerable to abuse in several ways," including that "[c]itizens who vote at home, at nursing homes, as the workplace, or in church are more susceptible to pressure, overt and subtle, or to intimidation."); *see supra* FOF ¶¶ 93, 109.

245.    Defendants have also documented evidence of fraud happening from ballot harvesting, and the risks posed by ballot harvesting in coercing or unduly influencing voters, collecting blank ballots and illegitimately filling them out, engaging in vote buying, tampering with collected ballots, or failing to deliver or destroying collected ballots intentionally or unintentionally. *See supra* FOF ¶¶ 97, 100-113.

246.    While political entities like Plaintiffs may suffer injury because they cannot pressure voters into casting votes for their party's candidates, that injury is not an injury to the voter or the voter's rights. *See Crawford*, 553 U.S. at 195-96 & n.13 (plurality op.); *Qualkinbush*, 826 N.E.2d at 1190-91 (describing how "easily someone of influence could manipulate the[] votes" when assisting with absentee ballots).

247.    Plaintiffs proposed activities pose the highest risks of ballot harvesting: political groups (like Plaintiffs) who pay persons based on the number of ballots they collect to collect an unlimited number of ballots targeting the elderly, which may be most susceptible to undue influence or coercion. *See supra* FOF ¶¶ 93, 109.

248.    Limiting ballot harvesting to "sealed and voted" ballots would completely undermine the prohibition because the damage to the chain of custody would still hinder the State's ability to prevent and detect fraud. *See supra* FOF ¶¶ 108, 112. If harvesters are allowed to solicit people for their ballots, it becomes more difficult for the State to ensure Plaintiffs or any other harvesting group will not tamper with, destroy, or fail to return the ballots, intentionally or unintentionally. Ballot harvesting also creates the risk of harvesters attempting to influence a vote in exchange for their assistance. Broad prohibitions on ballot harvesting will mean that voters will know never to give their ballot to an outside

group (preventing fraud from occurring) and will mean that voters can inform about or the state can investigate any group that is engaging in such activities (allowing the detection of fraud). *See Qualkinbush*, 826 N.E.2d at 1199.

249.     The same is true of harvesting absentee ballot applications: it prevents groups from turning in the application without the voters' knowledge, stealing the ballot from the unsuspecting voters' mailbox, and casting a fraudulent vote; or manipulating voters into requesting an absentee ballot and, once received, turning control over to the harvester, *Cf. Qualkinbush*, 826 N.E.2d at 1187-88, 1190-91, *see also supra* FOF ¶ 104; or simply taking possession of the application but (intentionally or unintentionally) never turning it in, leaving the voter waiting for an absentee ballot that never arrives.

250.     Courts across the country have recognized the state's strong interest in fighting fraud and in protecting vulnerable voters from coercion justify prohibiting ballot harvesting. *See Qualkinbush*, 826 N.E. 2d at 1193, 1199; *see also id.* at 1195-96 (citing other courts upholding harvesting bans for similar reasons); *In re Canvass of Absentee Ballots of November 4, 2003 Gen. Election*, 843 A.2d 1223, 1232-35 (Pa. 2004); *Marks v. Stinson*, 19 F.3d 873, 877 (3d Cir. 1994) (describing massive fraudulent ballot harvesting in election where control of Pennsylvania Senate was at stake); *New Georgia Project v. Raffensperger*, No. 1:20CV1986, Order, Doc. 134 at 49-52 (N.D. Ga. Aug. 31, 2020) (denying injunctive relief under *Anderson-Burdick* challenge to ballot harvesting ban).

251.     Plaintiffs point to the Ninth Circuit's decision in *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1037 (9th Cir. 2020), but that decision did not evaluate a ballot harvesting ban under *Anderson-Burdick*, and instead evaluated its disparate impacts on minority communities under the Voting Rights Act. Moreover, the Ninth Circuit has stayed its decision pending review by the Supreme Court. Stay Order, *DNC v. Hobbs*, No. 18-15845 (9th Cir. Feb. 11, 2020); *see also* Nos. 19-1257 & 19-1258 (U.S.).

252.     No authority supports analyzing the *penalty* for violating an election law separate from the law itself. There is no right to a preferred penalty for violating valid laws. Accordingly, the criminal penalty for ballot harvesting has the same validity as the law prohibiting ballot harvesting.

253.     The state interests in the Ballot Harvesting Laws outweighs any burden imposed on voters, so Plaintiffs cannot succeed on the merits to their *Anderson-Burdick* challenge to these laws.

### 2.     Ballot Harvesting and the First Amendment (Count IV)

254.     Voters' First Amendment interests are not analyzed separately under this count because all alleged burdens on First and Fourteenth Amendment rights are analyzed together under *Anderson-Burdick. See Burdick*, 504 U.S. at 434; *Acevedo v. Cook Cty. Officers Electoral Bd.*, 925 F.3d 944, 948 (7th Cir. 2019); *Dudum v. Arntz*, 640 F.3d 1098, 1106 n.15 (9th Cir. 2011); *Democracy N. Carolina*, 2020 WL 4484063 at *50-51. As the party invoking the First Amendment, they have the burden to prove it applies. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984). Plaintiffs have not shown any case where a court has analyzed a First Amendment challenge to ballot harvesting laws separate from *Anderson-Burdick*.

255.     In any event, Plaintiffs have none of their own First Amendment interests at issue because their activity of collecting "*sealed* and *voted* ballots," Doc. 18, Am. Compl. ¶ 175, is conduct, not speech.

256.     Not all conduct is expressive because not all conduct related to speech becomes expressive conduct. *See Cmty. For Creative Non-Violence*, 468 U.S. at 297-98; *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006); *United States v. O'Brien*, 391 U.S. 367, 376 (1968). To determine whether the conduct at issue is protected under the First Amendment, courts examine (1) whether the conduct shows an "intent to convey a particularized message," and (2) whether "the

likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404 (1989).

257.    Plaintiffs are not trying to convey any message with discernable content that anyone would understand by the act of collecting and returning other people's votes of unknown content. *See Knox v. Brnovich*, 907 F.3d 1167, 1181 (9th Cir. 2018) (collecting absentee ballots is not speech); *Democracy N. Carolina*, 2020 WL 4484063 at *51-52 ("delivering absentee ballot requests is not expressive conduct"); *New Georgia Project v. Raffensperger*, No. 1:20CV1986, Order, Doc. 134 at 52-54 (N.D. Ga. Aug. 31, 2020) (denying injunctive relief in First Amendment challenge to ballot harvesting ban because collecting ballots is not expressive conduct); *see also Miller v. Thurston*, 967 F.3d 727, 738-39 (8th Cir. 2020) (notarizing and returning petition signatures is not speech); *Voting for America v. Steen*, 732 F.3d 382, 393 (5th Cir. 2013) (collecting voter registrations is not speech); *League of Women Voters v. Browning*, 575 F. Supp. 2d 1298, 1319 (S.D. Fla. 2008) (same).

258.    The only way to inject political speech into ballot harvesting is if the parties involved are discussing a ballot that can still be voted, allowing the harvester to influence the vote. If Plaintiffs intended to inject political speech into ballot harvesting, then Defendants' protection of voters' First Amendment rights by creating a safeguard that the ballot will be voted based on the intent of the voter, not someone else," *Qualkinbush*, 826 N.E.2d at 1199, would outweigh Plaintiffs' interest in altering voters' speech.

259.    Because Plaintiffs do not state that they want to engage in any conduct beyond the ministerial act of collecting sealed and voted ballots, they have failed to demonstrate any First Amendment injury. Plaintiffs First Amendment challenge in Count IV to the Ballot Harvesting Laws is unlikely to succeed.

260.     Plaintiffs also belatedly raised procedural due process claims at the evidentiary hearing on August 26, 2020, but because they did not challenge the Ballot Harvesting Laws under this theory in their Complaint, this argument is waived and cannot succeed on the merits.

### G.     Ballot Receipt Deadline

261.     Assuming the right to vote were at issue, Plaintiffs challenge to the Ballot Receipt Deadline fails.

262.     A "generally applicable deadline that applied to all would-be absentee voters would likely survive the *Anderson-Burdick* analysis, even if it resulted in disenfranchisement for certain. . . individuals." *Mays v. LaRose*, 951 F.3d 775, 792 (6th Cir. 2020). As the Tenth Circuit has observed, any deadline "will invariably burden some voters. . . for whom the earlier time is inconvenient," but these burdens are assessed in light of "a state's legitimate interest in providing order, stability, and legitimacy to the electoral process." *Utah Republican Party v. Cox*, 892 F.3d 1066, 1077 (10th Cir. 2018).

263.     Plaintiffs have not shown a significant burden on the right to vote imposed by the Ballot Receipt Deadline.

264.     "The most common state deadline for election officials to receive absentee/mailed ballots is on Election Day when the polls close."[4] Thirty-two states, including every state in this Circuit except Kansas, have the same deadline. *Id.*

265.     Voters may be mailed a requested ballot forty-five days before Election Day, or even earlier, and there is no evidence that voters who take this opportunity will not able to comply with the Ballot Receipt Deadline. *See supra* FOF ¶¶ 7, 72, 75-76, 82-83, 90.

---

[4] *Voting Outside the Polling Place: Absentee, All-Mail and other Voting at Home Options*, NAT'L CONF. OF STATE LEGIS., https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx.

266.     Plaintiffs have not proven how many voters are unable to comply with the Ballot Receipt Deadline. *See supra* FOF ¶¶ 75, 82, 90. At most, Plaintiffs point to how many voters in fact did not comply with the Deadline, but cannot give the reasons for doing so, whether it was because they were unable to or instead because they did not take reasonable efforts to comply or chose to wait too long to request or return their absentee ballot. Regulations that can be complied with by reasonable efforts are not significant burdens to the right to vote. *See supra* COL ¶ 219.

267.     Plaintiffs' alleged burdens focus on voters who wait until the last moment allowed to request or return their absentee ballot, but any votes not counted as a result of this practice is the choice of the voter, not a burden imposed by the State. Defendants are not responsible for the failure of voters to get their vote in on time because "voters who fail to get their vote in early cannot blame [state] law for their inability to vote; they must blame 'their own failure to take timely steps.' " *Thomas v. Andino*, No. 3:20CV1552, 2020 WL 2617329, at *26 (D.S.C. May 25, 2020) (quoting *Rosario v. Rockerfeller,* 410 U.S. 752, 758 (1973)). The Supreme Court similarly observed that voters who wait weeks into absentee voting and request a ballot at the last minute are suffering the typical burden of a late-requesting voter, not a burden imposed by state law. *See Republican Nat'l Comm.*, 140 S. Ct. at 1207. For example, a person who waits until ten minutes before the polls close and then gets caught in traffic on the way—through no fault of his own—cannot claim to be disenfranchised because he arrived at his polling location well after the polls closed. To the extent that Plaintiffs' argument focuses on the week-long period between the last moment to legally request a ballot and the Deadline by which the voted ballot must be received, the State could remedy any such burden by requiring voters to request their ballot *earlier* rather than allowing them to return their ballot *later*.

268.     Defendants are also not responsible for the problems of the U.S. Postal Service, which they do not manage. *Cf. Mays v. Thurston*, 4:20CV341, 2020 WL 1531359, at *2 (E.D. Ark. Mar. 30, 2020).

269.     In any event, the evidence shows that even those voters who request their ballot at the statutory request deadline are able to return their ballot by the Ballot Receipt Deadline. *See supra* FOF ¶¶ 72, 74, 82. The recent letter from USPS does not change the analysis because its remarks about needing 15 days to return absentee ballots are part of longstanding USPS messaging and not a new message caused by any recent changes to USPS. *See supra* FOF ¶¶ 80. And Oklahoma's decision to provide *more* time to request a ballot than USPS has long recommended does not render Oklahoma's other election laws unconstitutional.

270.     The Ballot Receipt Deadline is justified by the State's interest in orderly elections and promoting voter confidence in the election.

271.     States must have a point at which they stop receiving ballots and start counting them to determine the winner. *Cox*, 892 F.3d at 1077; *Friedman v. Snipes*, 345 F. Supp. 2d 1356, 1377 (S.D. Fla. 2004).

272.     The Deadline also "eliminates the problem of missing, unclear, or even altered postmarks, eliminates delay that can have adverse consequences, and eliminates the remote possibility that in an extremely close election … a person who did not vote on or before election day can fill out and submit a ballot later." *Nielsen v. DeSantis*, No. 4:20CV236, Doc. 332 at 3 (N.D. Fla. June 24, 2020).

273.     The deadline also secures voter confidence in the election: voters become less sure of the results if one candidate is a winner on election day, but as more ballots come in, the results are changed. Doc. 48, Ex. 2, Ziriax Decl. ¶ 37.

274.     The deadline also is necessary specifically for the General Election in November because the State Legislature's terms expire the fifteenth day after the November election every two years. *See supra* FOF ¶¶ 136-137.

275.     There state interests outweigh the reasonable and nondiscriminatory impact that any deadline, including the one at issue, would have on some voters.

276.     Multiple courts have found the exact same sort of deadline law valid. *See Thomas*, 2020 WL 2617329, at *26; *Friedman*, 345 F. Supp. 2d at 1377.

277.     Plaintiffs point to a case where a court in Wisconsin modified a ballot receipt deadline, but there the "[m]ost persuasive" justification was "the fact that the [Wisconsin Election Commission] itself does not oppose extending the deadline." *Bostelmann*, 2020 WL 1638374, at *17. This modification was also in light of massive problems with timely delivery of absentee ballots to voters, such that "even the most diligent voter may be unable to return his or her ballot in time to be counted." *Id.* Neither of these factors have not occurred in Oklahoma elections and there is no evidence that it will with any certainty occur in Oklahoma in November. At the Supreme Court, this extension was not appealed, but instead the Court declined to further extend the deadline despite claims that some voters still could not return their ballots in time. *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1206-08 (2020); *see also Andino*, 2020 WL 2617329, at *27 n.27 (distinguishing Wisconsin case in declining to enjoin South Carolina ballot receipt deadline).

278.     Similarly, a court in Georgia changed a ballot receipt deadline to a postmark deadline, but that was based on record evidence of electoral problems in Georgia that caused even those voters who requested their ballot "well in advance of the election" to receive their ballot only the day before election day, and the recent primary demonstrated voters were disenfranchised "due to Georgia's poor administration of absentee ballots." *New Georgia Project v. Raffensperger*, No. 1:20CV1986, Order, Doc. 134 at 13, 56-63 (N.D. Ga. Aug. 31, 2020). There is no such record evidence in this case: no voter has testified that they received their ballot late despite requesting it well in advance of the deadline and Oklahoma's recent June primary shows no evidence of poor administration of absentee ballots.

279.    Even if the court found the deadline invalid under *Anderson-Burdick*, rewriting the deadline would exceed the power of the court. *See Thompson*, 959 F.3d at 812 (federal courts can enjoin laws, but they cannot "usurp[ ] a State's legislative authority by re-writing its statutes' to create new law" (citation omitted)); *Democracy N. Carolina*, 2020 WL 4484063 at *45 (stating it is not the court's role to rewrite [the State's] election law.").

280.    Plaintiffs' proposed solution of relying on a postmark would undermine state interests because the U.S. Postal Service struggles to properly postmark election mail, especially if prepaid envelopes are involved. *See supra* FOF ¶ 87; Jesse McKinley, *Why the Botched N.Y.C. Primary Has Become the November Nightmare*, N.Y. TIMES (Aug. 3, 2020) (describing thousands of ballots rejected because of a lack of a postmark).[5]

281.    The burdens of the Ballot Receipt Deadline do not outweigh the state's interest in the Deadline, and Plaintiff's challenge in Count I to the Deadline cannot succeed.

282.    This Court's conclusion regarding the deadline under *Anderson-Burdick* controls the results under Count I as well as under Count III's procedural due process allegations because all alleged burdens on First and Fourteenth Amendment rights are analyzed together under *Anderson-Burdick*. *See Burdick*, 504 U.S. at 434; *Acevedo v. Cook Cty. Officers Electoral Bd.*, 925 F.3d 944, 948 (7th Cir. 2019); *Dudum v. Arntz*, 640 F.3d 1098, 1106 n.15 (9th Cir. 2011).

283.    In any event, there is also no viable procedure due process claim here because there is no evidence that if a voter requests early enough, the voter's ballot will not arrive before election day, and because those whose ballots are received after the Deadline are not erroneously deprived of any right—they failed to comply with state law.

---

[5] https://www.nytimes.com/2020/08/03/nyregion/nyc-mail-ballots-voting.html.

284.     Plaintiffs argue that voters who mail a ballot have "cast" their ballot and have a due process right to have it counted, but no case has ever held that the Constitution considers such a ballot to have been cast. For example, a person who obtains and fills out a ballot to vote in-person but does not submit the ballot at the polling place the same day has not "casted" his ballot, and he has no right to later turn in his ballot after Election Day and have it counted. Similarly, an absentee voter who fails to take reasonable efforts to ensure his ballot is received by election officials by Election Day cannot claim to have "cast" a ballot, or to have had been erroneously deprived of his right to vote. Meanwhile, the change in procedure Plaintiffs recommend would negatively impact the state's election-related deadlines. *See supra* FOF ¶¶ 136-137.

285.     Plaintiffs' claim in Count III also cannot succeed.

H.     **Postage**

1.     **Postage-Related *Anderson-Burdick* Allegations**

286.     Plaintiffs do not challenge any law regarding postage, but instead challenge the lack of an Oklahoma law appropriating funds to pre-pay for postage on absentee ballots.

287.     The lack of an appropriation is not a cognizable "law" for purposes of *Anderson-Burdick* analysis.

288.     Even if the right to vote were at issue, Plaintiffs cannot succeed in their demand that Oklahoma pay for postage for absentee ballots.

289.     No Oklahoma law requires that voters pay postage for absentee ballots. Voters can vote in-person or turn in their absentee ballot in-person. OKLA. STAT. tit. 26, § 7-104; *id.* § 14-108. Oklahoma law allows third parties to gift postage to voters. OKLA. STAT. tit. 26, § 16-106. The USPS has a policy of delivering absentee ballots even without sufficient postage. *See supra* FOF ¶ 86.

290.    The burden of postage is no more than "usual burdens on voting," *Crawford*, 553 U.S. at 197-98, not imposed by Oklahoma. Transporting a ballot to the election office is a typical burden of voting just like transporting oneself to the polls.

291.    Plaintiffs admit that there are many low-cost ways to get postage: use stamps already possessed, visit the post office, print stamps at home, or order online. Doc. 18, Am. Compl. ¶¶ 87-91.

292.    Plaintiffs have failed to show any individual voter will be unable to vote because of lack of postage, nor can they quantify how many voters they allege will be unable to vote because of lack of postage. *See supra* FOF ¶¶ 84, 90.

293.    Even assuming lack of prepaid postage is a burden imposed by the state, courts have held it is a valid evenhanded one. *See League of Women Voters of Ohio v. Larose*, 2020 U.S. Dist. LEXIS 91631 (S.D. Ohio Apr. 3, 2020); *Bruce v. City of Colorado Springs*, 971 P.2d 679, 684 (Colo. Ct. of Appeals 1998); *cf. Griffin,* 385 F.3d at 1130 (court could not require Internet voting, nor require state to "have to buy everyone a laptop, or a Palm Pilot or Blackberry, and Internet access").

294.    The State has an inherent and fundamental interest as sovereign in protecting and managing the public fisc. *Valot v. Se. Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1227 (6th Cir. 1997).

295.    The State's interest in fiscal responsibility is heightened during a crisis like COVID-19.

296.    Thus, assuming the lack of an appropriation is a restriction on voting, the State's heightened interests outweigh any burdens on voting. *See League of Women Voters of Ohio v. Larose*, 2020 U.S. Dist. LEXIS 91631 (S.D. Ohio Apr. 3, 2020); *Bruce v. City of Colorado Springs*, 971 P.2d 679 (Colo. Ct. of Appeals 1998); *cf. Griffin,* 385 F.3d at 1130. Plaintiffs cannot succeed in their challenge to Oklahoma's decision not to prepay for postage.

## 2.     Poll Tax (Count IV)

297.     Plaintiffs claim that Oklahoma's failure to prepay for postage on absentee ballots is a poll tax in violation of the Twenty Fourth Amendment. This claim cannot succeed on the merits.

298.     Oklahoma not prepaying postage is not a "poll tax" because a tax must be "deliberately imposed by the State." *Veasey v. Perry*, 135 S. Ct. 9, 12 (2014) (Ginsburg, J., dissenting); *see Hill v. Kemp*, 478 F.3d 1236, 1245 (10th Cir. 2007) (citing *Black's Law Dictionary* 1496 (8th ed. 2004)). The State not prepaying postage is also not a "tax" because a tax must "yield public revenue." *Hill*, 476 F.3d at 1245. Here, postage is paid to USPS, not the state.

299.     Courts have consistently rejected Plaintiffs' poll tax argument. *See Black Voters Matter Fund v. Raffensperger*, No. 1:20CV1489, 2020 WL 4597053, at *27 (N.D. Ga. Aug. 11, 2020) (dismissing postage-stamp poll tax argument); *Nielsen v. DeSantis*, No. 4:20CV236, Doc. 332 at 2 (N.D. Fla. June 24, 2020) ("Postage charged by the United States Postal Service—like the fee charged by any other courier or the bus fare for getting to the polls to vote in person—is not a tax prohibited by the Twenty-Fourth Amendment."); *New Georgia Project v. Raffensperger*, No. 1:20CV1986, Order, Doc. 134 at 43-49 (N.D. Ga. Aug. 31, 2020) (rejecting argument that failure to prepay postage violated *Anderson-Burdick* or prohibition on poll taxes).

300.     Even if Oklahoma not prepaying postage were a poll tax, the Tax Injunction Act instructs that this court could not enjoin Oklahoma because the state courts have a plain, speedy and efficient remedy to address tax issues. 28 U.S.C. § 1341; *Hill*, 478 F.3d at 1254 (citing OKLA. STAT. tit. 12, § 1397).

## I.     As-Applied Vs. Facial Relief

301.     Plaintiffs cannot succeed on their claims because they are seeking facial relief, but only make arguments as-applied to particular sets of voters.

302. In *Crawford*, the plurality opinion stated that it saw no basis to "invalidate the entire statute" at issue "even assuming an unjustified burden on some voters." *Crawford*, 553 U.S. at 203. And the concurrence wholly rejected the idea that laws that "are especially burdensome for some voters" would justify any relief. *See id.* at 208 (Scalia, J., concurring in the judgment).

303. The "burden some voters face[]" cannot "prevent the state from applying the law generally." *Frank v. Walker*, 819 F.3d 384, 386-87 (7th Cir. 2016). As a result, "[z]eroing in on the abnormal burden experienced by a small group of voters is problematic at best, and prohibited at worst." *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 631 (6th Cir. 2016).

304. The proper course for voters with particular burdens is to seek as-applied relief for themselves. *Frank*, 819 F.3d at 386.

305. Plaintiffs have introduced no evidence that the challenged laws impose undue burdens on all voters, or even a vast majority of voters. Indeed, Plaintiffs cannot show any of the laws prevent any particular voter from voting, and cannot quantify the number of voters who are unable to vote because of the challenged laws. *See supra* FOF ¶ 90.

306. What Plaintiffs seek here—facial invalidation—is what *Crawford* firmly rejected. Plaintiffs advance multiple allegations about how the laws at issue are especially burdensome for some voters, but seek complete invalidation of the laws for all voters on that basis. Because *Crawford* requires this Court to reject that request, Plaintiffs cannot succeed in their facial challenge.

## III.   BALANCE OF THE EQUITIES

### A.   Irreparable Harm to Plaintiffs

307. Plaintiffs suffer little but inconvenience from the denial of any injunction, as their asserted harms are speculative.

308.     Plaintiffs cannot show any particular member or voter cannot exercise one of the many opportunities to vote because of the challenged laws, individually or in combination. *See supra* FOF ¶ 90. Harm that is speculative or hypothetical will not suffice; the harm "must be both certain and great," not "merely serious and substantial." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1262 (10th Cir. 2004).

309.     Plaintiffs will not be irreparably harmed by the denial of an injunction.

### B.     Harm to Defendants

310.     "[B]arring the State from conducting this year's elections pursuant to a statute enacted by the Legislature … would seriously and irreparably harm the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018).

311.     The Supreme Court has instructed all other courts that it must weigh "considerations specific to election cases," including that court orders close to an election "can themselves result in voter confusion and consequent incentive to remain away from the polls." *Purcell*, 549 U.S. at 5 (2006).

312.     The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election," *Republican Nat'l Comm.*, 140 S. Ct. at 1207, to help prevent "serious disruption of [the] political process" right before an election, *Williams v. Rhodes*, 393 U.S. 23, 34-35 (1968).

313.     Under the *Purcell* principle, even July is too close to a November election to strike down an entire suite of election laws. *See Veasey v. Abbott*, 830 F.3d 216, 243 (5th Cir. 2016) (en banc); *see also Husted v. Ohio State Conference of N.A.A.C.P.*, 573 U.S. 988 (2014) (staying lower court injunction dated Sept. 4 that changed election laws 61 days before November election day).

314.     Here, Oklahoma is about 60 days from the final day of the election, but voting—namely, absentee voting—starts in just a few weeks (September 18).

315. Oklahoma has already conducted two elections during the pandemic (the June Primary and the Run-Off), so changing election rules at this date will cause electoral confusion. This Court rejects Plaintiffs' invitation to "tamper with election regulations" and impose never-before-used "election procedures [that] threaten to take the state into uncharted waters." *Thompson*, 959 F.3d at 812.

316. It is too late in Oklahoma's preparation for the November 2020 election to enter any injunction without causing disruption and risking voter disenfranchisement. *See supra* FOF ¶¶ 129-137. Changing any of the challenged laws would require printing of new absentee ballot materials, assembly of absentee ballot packets, and more burdens on county election boards that could very well delay the sending of absentee ballots—giving voters *less* time to fill out and return them. *Id.* And it would also jeopardize other important election deadlines. *Id.*

317. The *Purcell* principle commands district courts to deny a preliminary injunction regardless of whether Plaintiffs are likely to succeed on the merits of their claim. *See Purcell*, 549 U.S. at 5 (vacating an injunction based on timing while "express[ing] no opinion here on the correct disposition" of the merits); *Short v. Brown*, 893 F.3d 671, 680 (9th Cir. 2018); *Veasey v. Perry*, 769 F.3d 890, 895 (5th Cir. 2014).

318. The Supreme Court has already rejected the argument that COVID-19 alters the *Purcell* principle. *Compare* Resp'ts Br. 16, https://www.supremecourt.gov/DocketPDF/19/19A1016/140892/20200405143453458_2020-04-04%20Wis.%20April%207%20SCOTUS.pdf, *with Republican Nat'l Comm.*, 140 S. Ct. at 1206-08.

319. This Court will not engage in "interference by the judicial department with the electoral franchise of the people of this state, which "might well amount to a substantial destruction of that most important civil right." *Beebe v. Koontz*, 302 P.2d 486, 490 (Nev. 1956).

320.     By forgoing the filing of a motion for preliminary injunction when Plaintiffs filed this case in May, Plaintiffs failed to seek relief consistent with *Purcell*.

321.     The certain harm from an injunction, especially at this late hour in election preparation, outweighs Plaintiffs' hypothetical possibility of harm.

### C.     The Public Interest

322.     The public interest also supports denying any injunction here. "[G]iving effect to the will of the people by enforcing the laws they and their representatives enact serves the public interest." *Thompson*, 959 F.3d at 812.

323.     As expressed in the laws enacted by their representatives, the public wants their votes to count while minimizing the possibility of dilution by fraudulent ballots easily facilitated by signature fraud or ballot harvesting.

324.     The public has an interest in a deadline of Election Day so that the results can be tallied quickly after the campaign season is over, with less chance for sincere questioning of the results or interference by bad actors.

325.     The public also has not authorized the increased spending of their taxpayer money from a court order requiring expenditures of public funds for stamps or requiring printing of new ballot materials.

326.     Accordingly, given the timing and the interests of the state and the public, the equities favor denying an injunction and heavily favor denying any injunction that would affect elections this November. The public would not be served by the electoral chaos created by an injunction at this late date.

327.     For the foregoing reasons, Plaintiffs request for injunctive relief is DENIED and judgment is entered in favor of Defendants.

Respectfully Submitted,

s/   *Mithun Mansinghani*
MITHUN MANSINGHANI, OBA #32453
   *Solicitor General*
BRYAN CLEVELAND, OBA #33680
   *Assistant Solicitor General*
THOMAS SCHNEIDER, OBA #33047
   *Assistant Attorney General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
Mithun.Mansinghani@oag.ok.gov
Bryan.Cleveland@oag.ok.gov
Thomas.Schneider@oag.ok.gov

*Counsel for Defendants*

73

### **CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2020, I electronically transmitted the attached document to the Clerk of Court using the Electronic Case Filing System, which will transmit a Notice of Electronic Filing and a copy of the document to all counsel who have entered an appearance in this case. I further certify that I transmitted the attached document in both PDF and Word format to Courtroom Deputy Lisa Lyles.

s/  *Mithun Mansinghani*
MITHUN MANSINGHANI