## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

DCCC; OKLAHOMA DEMOCRATIC PARTY,    )
                                    )
                    Plaintiffs,     )  Case No. 20-CV-211-JED-JFJ
                                    )
v.                                  )
                                    )
 PAUL ZIRIAX, in his official capacity as    )
 SECRETARY OF THE OKLAHOMA STATE    )
 ELECTION BOARD, et al.,            )
                                    )
                    Defendants.     )

## OPINION AND ORDER

The plaintiffs, DCCC and Oklahoma Democratic Party, filed the operative
complaint in this action on June 11, 2020, seeking injunctive and declaratory relief relating
to various requirements imposed upon their constituents and members who choose to vote
by absentee ballot in the upcoming November, 2020 election.  Pursuant to 42 U.S.C. §
1983, the plaintiffs assert claims under the First, Fourteenth and Twenty-Fourth
Amendments to the United States Constitution.  The defendants, who are the Secretary of
the Oklahoma State Election Board and Members of that Board, oppose the relief
requested.

On August 19, 2020, the plaintiffs moved for a preliminary injunction. (Doc. 47).
Pursuant to Fed. R. Civ. P. 65(a)(2), the Court conducted a hearing on August 26, 2020 on
the plaintiffs' request for preliminary injunction and, with the parties' consent, advanced
the trial on the merits and consolidated it with the injunction hearing.  The Court admitted
into evidence Plaintiffs' Exhibits (PX) 1 through 26.  In addition, at the request of the

parties and without objection, the Court admitted as exhibits the attachments to the parties' briefing (Doc. 47 and 48), which include numerous witness declarations and documentary exhibits. (*See* 8/26/2020 Transcript (Tr.). at 5).

The Court also considered the live hearing testimony of Dr. Catherine Troisi, plaintiffs' expert in epidemiology and infectious disease, Dr. Marc Meredith, a political scientist from the University of Pennsylvania who has written extensively about election laws, and Ronald Stroman, the former Deputy Postmaster General of the United States Postal Service (USPS), the second highest-ranking USPS official, who served in that position from 2011 until June 1, 2020. The Court has also considered the plaintiffs' First Amended Complaint (Doc. 18), the defendants' Answer (Doc. 46), and the parties' arguments in writing as well as the oral arguments presented during the injunction trial.

Pursuant to Rules 52(a)(1), (2) and 65(d)(1) of the Federal Rules of Civil Procedure, and upon consideration of the evidence admitted at trial, including the demeanor and credibility of the witnesses who testified live, the Court makes the following findings of fact and enters the following conclusions of law.[1] This Opinion and Order shall also serve as the statement of reasons for the Court's ruling on the plaintiffs' request for injunctive and declaratory relief, in accordance with Fed. R. Civ. P. 65(d)(1)(A).

---

[1] Any findings of fact that are conclusions of law shall be construed accordingly, and any conclusions of law that are findings of fact shall be construed accordingly.

# I.    FINDINGS OF FACT

## A.    The COVID-19 Pandemic

The novel coronavirus disease of 2019 (COVID-19) needs little introduction. COVID-19 is a worldwide pandemic.  The Centers for Disease Control (CDC) currently reports that there have been over 6,000,000 cases of COVID-19 in the United States. Much of the country nearly shut down due to the virus during parts of the last 6 months, schools in many states have remained closed or delayed, and state and federal government offices have been impacted.  Since March, 2020, this Court has entered numerous General Orders regarding courthouse access and functions in light of the pandemic. (*See* General Order Nos. 20-05 et seq.).  In the latest General Order regarding courthouse operations, the Court again continued all civil and criminal hearings and trials scheduled on or before September 30, 2020, with telephonic or video hearings possible at the discretion of each judge. (General Order No. 20-24).  Because of the pandemic, the United States Supreme Court has conducted oral arguments by remote audio means, and the Tenth Circuit Court of Appeals is continuing to conduct oral arguments this month via video conference.

The reason for these unprecedented precautions is clear.  COVID-19 continues to be a dangerous threat to Americans and is still rapidly spreading in many areas of the country, including Oklahoma.  At the time the Court's first General Order was entered six months ago on March 17, 2020, the CDC had confirmed a total of 4,226 cases in the United States, and the State of Oklahoma had a total of 19 positive cases.  Today, the CDC reports over 6,500,000 cases, and the Oklahoma Department of Health reports over 71,000 positive

cases in the State of Oklahoma.  Over 900 Oklahomans, and nearly 200,000 people in the United States, have died from COVID-19.

The State of Oklahoma has a case fatality rate of over 1% and a high test-positivity rate, which indicate that "the virus is not under control" here. (Trial Transcript [Tr.] at 18).  There is no vaccine and no prophylactic medication.  (*Id.* at 19).  As a result, the only methods of preventing spread of the virus include avoiding contact with others, masking, physically distancing six feet or more, frequent environmental sanitation, and limiting circumstances where crowds can gather.  (*Id.*).  Oklahoma does not have a statewide mask mandate.  (*Id.* at 19).  The Oklahoma Solicitor General confirmed that Oklahoma voters will not be turned away from the polls for not wearing a mask:

> THE COURT:  Am I correct that there is no statewide mandate that would require Oklahoma voters to wear masks at in-person polling places?
>
> MR. MANSINGHANI:  That is correct, Your Honor.  Our protocols which were attached to Secretary Ziriax's deposition urge voters to wear masks, but we will not turn a voter away from the polling place simply because they are not wearing a mask.
>
> THE COURT:  All right.  Thank you.  The Oklahoma Election Board only strongly recommends that election workers and voters wear masks or cloth coverings at in-person voting sites; is that correct?
>
> MR. MANSINGHANI:  That is correct, Your Honor.

(*Id.* at 174:12-24).

Scientific data indicates that the virus can be transmitted from a person who is asymptomatic or before symptoms are exhibited.  (*Id.* at 23).  Although the risks of severe complications and death are possible for persons of any age, certain people, including those over 65, those who have diabetes, heart disease, or cancer, or who are obese or

immunocompromised, appear to be more susceptible to serious or deadly outcomes. (*Id.* at 23-24). Excluding age, an estimated 57 percent of people in the United States have a risk factor for severe COVID-19 illness. (*Id.*). The virus is spread through the mouth or nose, from coughs, sneezes, talking, singing, and shouting, which can spread droplets or aerosols not visible to the human eye, and through contact with surfaces infected with the virus. (*See id.* at 26-27).

There is scientific consensus that COVID-19 will continue to spread throughout the United States through the November 2020 general election (*see* PX 1 ¶¶ 22, 29), heightening concerns about in-person voting risks. Against this backdrop, and in the context of the upcoming November, 2020 general election, the plaintiffs filed this case due to legitimate concerns about the safety of in-person voting during the pandemic and what they view as voting barriers imposed by Oklahoma's absentee ballot laws. The plaintiffs challenge several provisions of Oklahoma law, which they claim will unreasonably burden voters who wish to vote by absentee ballot in order to avoid standing in line with numerous others to vote in-person, in potentially crowded spaces.

**B.    The Parties**

Plaintiff DCCC is the national congressional committee of the Democratic Party. (PX 24, ¶ 2). Its mission is to elect Democrats to Congress, including to Oklahoma's five congressional districts. *Id.* Accordingly, DCCC and the Democratic candidates it supports, including incumbent Democratic members of Congress, have an interest in ensuring that Democratic voters in Oklahoma have an opportunity to express their will regarding Democratic Party candidates running for elections. (*Id.*)

To achieve its mission, DCCC makes expenditures for, and contributions to, Democratic candidates for U.S. Congress and assists state parties throughout the country, including in Oklahoma. (*Id.* ¶ 3). During the 2018 election cycle, DCCC spent tens of millions of dollars across the country for this purpose. *Id.*  DCCC has made and will make similar expenditures for the 2020 election cycle in Oklahoma. *Id.*  DCCC has budgeted significant resources for its efforts in Oklahoma because it has as one of its highest priorities the election of an Oklahoma incumbent in a competitive seat. (*See id.*).

DCCC's efforts are focused particularly on supporting specific subsets of voters, including lower-income voters, elderly voters, and other voters who are at high risk of complications from COVID-19 and who may thus have greater concerns about in-person voting.  (*See id.* ¶ 5). DCCC represents that it has diverted resources to deal with the absentee ballot provisions.

Plaintiff Oklahoma Democratic Party (ODP) is an Oklahoma political party consisting of all registered voters in Oklahoma who declare themselves Democrats. (*See* PX 25 ¶¶ 2-3). The ODP has approximately 2.1 million members in Oklahoma.  (*Id.* ¶ 3). The mission of ODP is to elect Democrats to office at the federal, state, and local levels, and to educate voters. (*Id.*). As a result, ODP has an interest in ensuring that its voters, members, and constituents have an opportunity to express their will regarding Democratic Party candidates running for elections, as well as ballot measures and initiatives those individuals support. (*Id.*).

ODP expends significant resources, regularly engaging in voter assistance programs, including voter registration drives, voter education and community outreach, and "Get Out The Vote" efforts to encourage Oklahomans to vote. (*Id.* ¶ 4). The ODP represents that, due to the importance of absentee voting during the COVID-19 pandemic, ODP has diverted resources from its regular Get Out The Vote efforts and programs to elect Democratic Party candidates in Oklahoma, to address voter confusion relating to Oklahoma's absentee voting system. (*Id.* ¶ 6).

The defendants are Paul Ziriax, who is the Secretary of the Oklahoma State Election Board, Tom Montgomery, who is Chair of the Board, Dr. Tim Mauldin, who is Vice-Chair of the Board, as well as Board member Heather Mahieu Cline, and alternate Board members Jerry Buchanan and Debi Thompson. All defendants are named only in their official capacities.

## C.     Increased Numbers of Oklahoma Voters are Expected to Vote by Absentee Ballot in the November 2020 General Election

As a result of the COVID-19 pandemic, the State of Oklahoma has encouraged voting by absentee ballot.  (*See* PX 15 at 71:2-6).  In the Oklahoma June 30, 2020 Primary Election, 14% of the ballots cast on State Question No. 802 were absentee ballots, up from 3% cast on State Question No. 788 in the June 2018 Primary Election and 4% cast during the March 3, 2020 Primary Election. (*See* PX 2 ¶ 25; PX 15 at 69:2-4).  Oklahoma Election Board Secretary Ziriax testified that the number of votes case by absentee ballot is expected to increase with the November general election:

> Q.     Do you expect the volume of voting by mail to increase above what it was in the June election?

A.      Yes.

Q.      Why?

A.      Because turnout is always higher at a general election and especially in a presidential general election.  So it is very safe to assume that there will be more voters in every category that a voter might choose to vote, whether that's in-person on Election Day, in-person absentee or standard absentee.

(PX 15 at 72:6-18).

Dr. Meredith analyzed data from Oklahoma's June 2020 primary election and testified that there was a modest increase in mail ballot use from the Oklahoma presidential primary on March 3, 2020 (before the federal and state governments declared states of emergency in relation to COVID-19) to the June 30, 2020 statewide primary, after a state of emergency was declared.  (*See* PX 2 at 16-17, ¶ 27).  He further determined that the use of mail ballots increased for people of all ages, but it particularly increased for voters born in the 1920s, 1930s, and 1940s.  (*Id.*; *see also id.* at 17, Table 1).

**D.      During the Pandemic, Absentee Voting is Safer than In-Person Voting**

In-person voting in Oklahoma presents risks of COVID-19 infection, although the State has attempted to reduce the risks by putting in place numerous safeguards. (Doc. 48-2, Ziriax Declaration at ¶ 7; *see also id.*, Attachment 1, at 23-25 of 74).  Those safeguards include social distancing of poll workers and voters, sanitizing voting equipment before the polls open and then hourly after polls open, and other measures intended to decrease the risks of contracting COVID-19.  (*See id.*).  Voting in-person will likely still require standing in fairly close proximity to other voters and poll workers, for some time.  It also

appears that, to the extent that such distancing and other safety measures may result in slowing down the processing of voters, there may be an unintended consequence of lengthening the amount of time that voters may be standing in line, and thereby in proximity to other voters (some of whom may not be wearing masks) for a longer amount of time.

Due to these increased risks of in-person voting, voting by mail using Oklahoma's absentee ballot, is a safer option.  (*See* PX 1 at ¶ 30). However, the plaintiffs assert that Oklahoma's requirements to vote by absentee ballot create undue burdens that risk effectively disenfranchising many Oklahoma voters.

**E.     The Challenged Statutory Provisions**

Oklahoma laws regarding absentee voting are found at Title 26, Oklahoma Statutes, §§ 14-101 et seq.  Oklahoma law permits all voters to vote by absentee ballot.  *Okla. Stat. tit.* 26, § 14-105 ("Any registered voter may apply for an absentee ballot"). However, Oklahoma imposes upon absentee voters numerous requirements that the plaintiffs claim violate constitutional rights.

**1.     Absentee Voter Identification Requirement**

Plaintiffs maintain that Oklahoma's absentee voting identification requirements are an undue burden on Oklahomans' rights to vote, particularly in the context of the COVID-19 pandemic. Oklahoma law, as amended in May, 2020, requires that absentee ballots be completed with a proof of identification by one of the following methods, as applicable:

(a)      notarized by a notary public, *Okla. Stat.* tit. 26, 14-108(A);[2]

(b)      if the voter is "physically incapacitated," signed by two witnesses, § 14-113.2; or

(c)      if a state of emergency is declared within 45 days of the 2020 election, "in lieu of" notarization or two witness signatures, an absentee voter may attach a "photocopy of a form of identification described in subsection A of [§ 7-114]." *See* 2020 *Okla. Sess. Law Serv.* Ch. 10 (Senate Bill 210), § 3; Doc. 48, Ex. 2, Ziriax Decl. ¶ 15.  Methods of identification under § 7-114(A) include photo identification issued by a federal or state government, a federally-recognized tribe or nation, or a voter identification card. *Okla. Stat.* tit. 26, § 7-114.

On August 28, 2020, two days after the Court's August 26 trial proceedings, Oklahoma Governor Kevin Stitt renewed the state of emergency, with the intent of triggering the provisions of Senate Bill 210 for the November 3, 2020 general election.  As a result, for the November 2020 general election, absentee voters may verify their identities by including a copy of an approved form of identification with their affidavit envelope, as described above in (c). *See* Exec. Dep't Fourth Am. Exec. Order 2020-20, Gov. Stitt (Aug. 28, 2020), https://www.sos.ok.gov/documents/executive/1956.pdf.

---

[2]      Oklahoma also forbids a notary from notarizing more than 20 ballots in an election, except with written approval of the secretary of the county election board or when the notarizations take place at the notary's public place of business during normal business hours. *Okla. Stat.* tit. 26, § 14-108.1(C).

According to plaintiffs' infectious disease expert, Dr. Troisi, the notarization and two witness signature requirements of Oklahoma's absentee ballot system "have the potential to contribute to virus transmission." (PX 1 at ¶ 30). As Dr. Troisi opined:

> [F]or the upcoming November election in Oklahoma, voting in person presents a risk of infection with the coronavirus and voting by mail is a safer option for public health and safety, given that it is highly likely that the virus will be circulating during voting season. One of the ways the virus can be transmitted is through touching an environmental surface contaminated with the virus. A recent review of other coronaviruses found that they could survive from two hours to nine days on such surfaces, depending on the type of surface, temperature, and humidity. Although the virus can survive for short periods on some surfaces, it is unlikely to be spread from domestic or international mail, products or packaging, due to the time interval between sending and receipt of mail. However, touching the same piece of paper as well as close human contact necessitated by the witness/notary requirements in Oklahoma does have the potential to contribute to virus transmission. Other than the witness/notary requirements, voting by mail generally prevents close interactions. Voting by mail decreases the opportunities for virus transmission among voters who could otherwise be exposed to the virus while in line, signing poll books, and casting votes on voting machines that are repeatedly touched, within very short periods of time, by other people.

(PX 1 at ¶ 30, internal footnote sources omitted).[3]

Plaintiff's political scientist witness, Dr. Meredith, testified about the political science concept of the "calculus of voting," which describes the costs and benefits calculation that a potential voter conducts when deciding whether or not to vote. (*See* PX 2 at ¶ 15 et seq.; Tr. at 51 et seq.). The calculus of voting describes the potential voter's

---

[3]    While Dr. Troisi's declaration and testimony focused primarily on concerns of exposure from the two witness signature and notarization requirements, she further opined that "[o]btaining photocopies also may require leaving one's house and entering a business, interacting with others in close proximity, and potentially touching infected surfaces." (PX 1 at 32). She acknowledged, however, that there are methods of complying with the identification requirements that would not require close contact and would comply with COVID-19 health guidance. (*See* Tr. at 43-44).

"weighing the benefits they perceive they receive from voting, one's sense of civic duty that they fulfill when casting a ballot or feeling that they're contributing to something important, against the costs of voting." (Tr. at 51:17-25). "Costs could mean monetary costs, expenditures, but more frequently are referring to the opportunity costs of time that a potential voter must expend in order to successfully cast a ballot." (*Id.* at 51:25-52:3). "And the calculus of voting framework states that someone will cast a ballot, or at least attempt to cast a ballot when they perceive the benefits are greater than the cost of doing so." (*Id.* at 52:4-7).[4]

According to Dr. Meredith, "[t]he cost of submitting a copy of one of the forms of identification [notarization, witness signatures, or copy of identification] varies substantially among potential voters." (PX 2 at ¶ 54). For a potential voter with a working printer at home, the cost is "likely minimal," whereas "it can be costly to include a copy of such forms of identification" to a voter without a working printer, "particularly ... when the person is practicing vigilant social distancing, lacks access to transportation, or does not have immediately accessible a copy of one of these forms of identification." (*Id.*). Based upon a 2015 survey of over 5,000 households with printers, which estimated that 60.49% of American households had one or more printers, Dr. Meredith opined that "some

---

[4]     Dr. Meredith's testimony establishes that the costs of identification may vary significantly among potential voters, as those costs are personal and may differ from voter to voter. Without the testimony of any particular voter regarding the impact of the laws upon them, it is difficult for the Court to determine any voter's "calculus of voting," because it necessarily involves predicting what is a hypothetical voter's thoughts.

potential voters with the greatest need for an alternative to in-person witnessing are most likely to lack access to printers, scanners, copiers, or fax machines in their households." (*Id.* at ¶ 56). He further noted that, while he was "aware of no study that specifically asks about seniors' access to printers, scanners, copiers, or fax machines," he "expect[s] that older potential voters have less access to [those devices] than younger potential voters." (*Id.* at ¶¶ 57). At trial, he further opined that "older Oklahomans are going to be the least able to make a copy of their driver's license from within their residence." (Tr. at 74).

Dr. Meredith noted favorably that the State of Oklahoma has provided names and addresses of public places to obtain free notary and photocopy services. (*See* Tr. at 74:23-75:5). Secretary Ziriax and his office took these steps in an effort to facilitate absentee voting, which he expects to increase due to the COVID-19 pandemic. (*See* Doc. 48-2, ¶ 19). Those efforts have included partnering with Oklahoma banking and credit union associations to provide Oklahoma voters with greater access to notarization services. (*Id.*). As a result, numerous banks, credit unions, and other institutions across the state are offering free notarization and/or identification copying services, and many of them are offering such services via drive-thru. (*Id.*). **Voters can find the free services nearest them at https://www.ok.gov/elections/Notary_Services.html.** (*Id.*). **Voters can also access absentee voting tutorials at https://www.ok.gov/elections/Media/Videos/index.html.** (*Id.*). Dr. Troisi acknowledged that the witnessing and notarization requirements could be safely satisfied by utilizing proper social distancing and complying with other public health guidance. (*See* Tr. at 43-44).

13

In addition, the information provided by Dr. Meredith established that the percentage of mailed absentee ballots that were rejected based upon missing identification verification for the most recent June 30, 2020 Oklahoma primary actually *decreased* from the percentages rejected in prior elections.  (*See* PX 2 at 25, Table 2).  The photocopy alternative requirement was in effect for that primary, in light of the fact that the Governor had declared an emergency, making § 3 of S.B. 210 effective for that election.  Secretary Ziriax provided a general breakdown of the reasons that absentee ballots were rejected for the June 30, 2020 primary election.  (*See* Doc. 48-2 at 49 of 74, Attachment 4).  While the plaintiffs have asserted that absentee voters should merely be required to sign the ballot affidavit under penalty of perjury without being required to provide any identification, the data provided by Secretary Ziriax indicates that more absentee ballots were rejected for the June 30, 2020 primary for voters' failures to complete or sign the affidavit (a total of 1,050) than were rejected for not providing one of the methods of identification verification (which totaled 981).  (*Id.*).  A small number of absentee returns were also rejected for envelopes in which no ballots were returned.  (*See id.*).

Secretary Ziriax also presented evidence that the percentage of Oklahoma voters requesting and successfully returning absentee ballots that were counted actually *increased* in 2020 over similar primaries in 2012 and 2016.  (*Id.* at 16-17 of 74).  Dr. Meredith also acknowledged that thousands of elderly people who live alone were able to cast an absentee ballot during the pandemic. (Tr. at 115-116; PX 2 at ¶ 50).

In states which require a signature match rather than notarization, the percentage of ballots rejected for a signature that does not appear to match is "comparable" to the percentage of ballots rejected in Oklahoma's June 2020 primary for failure to comply with the identification requirements.  (*See* Tr. at 101:19-23).  Dr. Meredith also acknowledged significantly higher mail-in ballot rejection rates in recent primary elections (during COVID-19) in a few states that do *not* have notarization or witnessing requirements and in at least one state that does not have an election day receipt deadline.  (*See id.* at 109:10-110:22).

The plaintiffs' evidence shows the number of voters in recent elections, including the June 2020 election during the COVID-19 pandemic, who did not comply with one or more requirements for absentee voting, but it does not establish which voters were *unable* to obtain a photocopy of an identification or obtain a notary or witnesses.  The Court was not presented any evidence of any particular voter who was unable to meet the requirements, as modified by the declaration of a state of emergency.[5]

---

[5]    The plaintiffs provided declarations of two voters, associated with political organizations, both of whom reported voting absentee ballots in the June 2020 primary and were able to verify their absentee ballots without close contact with others. (*See* PX 22 [Habrock Declaration] at ¶ 22 (returned photocopy of identification); PX 23 [McAfee Declaration] at ¶ 8 (obtained a notarization from a friend on the friend's porch).  The Court also notes that the assistance that plaintiffs wish to provide their members and constituents (in connection with their challenges to the absentee ballot assistance and harvesting laws) carries similar potential risks of in-person contact or contact with shared papers (e.g. ballots or other documents).

## 2.      Election Day Receipt Deadline

The plaintiffs further challenge Oklahoma's mandate that mail-in absentee ballots shall be returned and received by the County Election Board "no later than 7:00 p.m. on the day of the election." *Okla. Admin. Code* § 230:30-11-5(a); *see also Okla. Stat.* tit. 26, § 14-104. (Doc. 18 at ¶ 6).  If a ballot is received after the deadline, the ballot is rejected, and a Notice of Rejection of Absentee Ballots will be mailed to the absentee voter whose ballot was received late. *Okla. Admin. Code* § 230:30-11-5(a).  Plaintiffs assert that the election day receipt deadline is especially problematic because Oklahoma law permits voters to request absentee ballots up to 5:00 p.m. on the Tuesday preceding an election, *see Okla. Stat.* tit. 26, § 14-103, and recently-publicized problems with the USPS threaten to jeopardize timely mail delivery.

Plaintiffs presented evidence, including the testimony of Ronald Stroman, a USPS expert, that absentee ballots not mailed a week before the election deadline may arrive too late to be counted. (*See* Stroman Declaration, PX 20 at ¶¶ 7-10; Tr. at 139:6 et seq.).  Mr. Stroman also testified about a letter from Thomas J. Marshall, General Counsel of the USPS, dated July 29, 2020, to Secretary Ziriax regarding mailing of Oklahoma ballots. (PX 21).  The letter stated that "[t]o allow enough time for ballots to be returned to election officials, domestic voters should generally mail their completed ballots at least one week before the state's due date . . . [by] no later than Tuesday, October 27, 2020."  (*Id.*).

Marshall further indicated that "certain state-law requirements and deadlines appear to be incompatible with the Postal Service's delivery standards and the recommended timeframe" set forth above.  (*Id.*).  Mr. Stroman, who has extensive experience with and

16

knowledge of USPS's ability to handle and deliver election mail, testified that, given Oklahoma's absentee voting deadlines, there is a high likelihood that thousands of ballots in Oklahoma will arrive after Election Day and will not be counted. (Tr. at 139:6-11; PX 20 at ¶¶ 10 et seq.).  He expressed agreement with Marshall's letter based on his view that Oklahoma's statutory deadlines are "too tight." (Tr. at 146:23 – 147:7).

Quantitative evidence of the actual impact of the election day deadline in Oklahoma during COVID-19 and in the midst of the highly-publicized 2020 issues with the USPS is mixed.  For the 2018 midterm election – before COVID-19 and prior to recently reported delays and issues at the USPS – the percentage of mailed ballots that were rejected due to being received after election day was slightly *greater* than the percentage of ballots rejected for that reason for the June 30, 2020 primary election.  (*See* PX 2 at ¶ 62 and Table 5).  In the June 30, 2020 primary election, 2,385 Oklahoma absentee ballots were rejected because they were received after Election Day. (Tr. at 78:7-14). That amounted to approximately 2.4 percent of the total mailed ballots received for that election. (*Id.*).  While that percentage is greater than some prior presidential and midterm elections, it is actually slightly less than the percentage received after election day for the 2018 midterms, such that it does not appear that COVID-19 or the recent postal problems have had a negative impact upon the percentage of ballots received late.  (*See* PX 2 at ¶ 62 and Table 5).

On the evidence provided, it is unclear whether ballots that were rejected because they were received after election day were postmarked before election day, making it difficult to determine whether or not some rejected ballots were mailed *after* election day. (*See id.*; *see also id.* at ¶ 64 [data included identity of "each person who requested a mail

17

ballot, the type of mail ballot, the date a mail ballot was sent to a voter, and *the date the county received the mail ballot*, if returned, for the June 30, 2020 statewide primary," but did not include whether the ballot was *postmarked*]).  As Dr. Meredith acknowledged:

> Q.   So using that experience as a starting point, if the court were to extend the Election Day Receipt Deadline by three days, what percentage of ballots that were rejected in June would be saved?
>
> A.   I can't give the exact number because the data provided by the defendants to me didn't contain the postmark, so I can't tell you that all of the ballots would be counted because some might have been received after Election Day because they weren't postmarked in time. . . .

(Tr. at 82:15-23).

The plaintiffs argue that the likelihood of absentee ballots not being returned on time is compounded because Oklahoma law allows voters to request absentee ballots up to a week before Election Day. *See Okla. Stat*. tit. 26, § 14-103. While that expands the time-frame for requesting a ballot, voters can request a ballot much earlier, may receive their ballots up to 45 days before the election, and return them by mail well in advance of the deadline to be delivered to the County Election Board to be counted.  In addition, voters who may decide one week before election day that they wish to vote by absentee ballot may do so with the intent to hand deliver the ballot in-person to the County Election Board up to the end of business hours the day before the election.  *See Okla. Stat.* tit. 26, §§ 14-104, 14-108. In light of these available options, the receipt deadline constitutes no more than a minimal burden on voters, including those who wait until seven days before the election to request an absentee ballot.

Secretary Ziriax testified that, if county election officials were required to count two or three thousand additional ballots on the Friday after the Tuesday election, in addition to the provisional ballots which they count on Friday, they would do so because they are known for working however many hours are required to count ballots before the Friday county certification deadline. (PX 15 at 106:16-107:9; *see id.* at 56:11-18).

The defendants assert that state interests justify the rejection of ballots received after election day. The state claims that such interests include an "interest in orderly elections and promoting voter confidence in the election" and that the deadline is "necessary specifically for the General Election in November because the State Legislature's terms expire the fifteenth day after the November election every two years." (Defendants' proposed findings and conclusions, Doc. 54 at ¶¶ 270, 274; *see also id.* ¶ 136). These interests are significant. Specifically, state law requires that county election boards certify election results by the Friday following Tuesday election day, and the State Election Board must certify the statewide results by the Tuesday after election day. *Okla. Stat.* tit. 26, § 7-136. The plaintiffs recognize that, if the Court grants the requested relief of delaying the election day receipt deadline by seven days, the Court would also have to delay the county and state certification deadlines by a week. However, such delays would leave only 24 hours before the new members of the State House of Representatives are seated. (*See Okla. Stat.* tit. 14, § 137; Doc. 48-2 at ¶ 32). The remedy requested by the plaintiffs would require numerous judicial-modifications of Oklahoma legislation, which the Court is disinclined to do because of the disruption to the State's overall electoral process.

The Court shares Mr. Stroman's and the plaintiffs' concerns that many absentee ballots mailed days before the election may be received after the election day deadline and will not be counted. However, the plaintiffs' proposed remedy would risk severely interrupting Oklahoma's election processes. Specifically, the plaintiffs request that the Court enjoin enforcement of the election day receipt requirement and mandate that election officials count every ballot received up to seven days after election day, so long as the ballot is not postmarked after election day:

> Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, are hereby enjoined from rejecting ballots that are postmarked by the day of an election and arrive at their respective county election board within seven days of election day. For the purposes of this Order, postmark shall refer to any type of imprint applied by the United States Postal Service to indicate the location and date the Postal Service accepts custody of a piece of mail, including bar codes, circular stamps, or other tracking marks. Where a ballot does not bear a postmark date, the election official reviewing the ballot should presume that it was mailed on or before Election Day unless the preponderance of the evidence demonstrates that it was mailed after Election Day. Defendant shall instruct all relevant local election officials to count all absentee mail ballots that are otherwise validly cast and postmarked on or before Election Day so long as they are received within seven days of election day. The county certification deadline of the Friday after Election Day and the state certification deadline of the Tuesday after Election Day shall be extended for such amount of time as is needed for all absentee mail ballots that are otherwise validly cast and postmarked on or before Election day to be counted.

(Plaintiffs' Proposed Injunction Order, ¶ 4). The requested remedy would not only require a presumption that un-postmarked ballots were actually mailed before election day, but would also require that the Court judicially extend the county and state election certification deadlines beyond a week after the election. (*See id.*).

20

Dr. Meredith's testimony supports a less dramatic remedy.  His analysis of ballots received after the June 30 primary election indicated that, of the 2,399 ballots that were rejected for being received late, 1,730 (more than 72%) were received the day after the election and 302 (more than 12.5%) were received two days after election day. (PX 2 at ¶ 64). Such data "show that even a modest extension of the deadline for receiving mail ballots would have" resulted in the vast majority of 2,399 late received ballots being counted. (*Id.*).  However, even that remedy would require the Court to fashion a somewhat arbitrary deadline and, if the percentages for the November general election turn out to be similar, that less drastic remedy would still not result in every late-received vote being counted.

The Court has serious concerns that the plaintiffs' requested remedy – imposing a presumption that a ballot without a postmark was postmarked by election day and requiring that such vote be counted if received up to a week after election day – would present a significant risk of voting fraud.  Under that proposal, ballots could be mailed after election day and would be counted.  As a result, the Court finds that remedy to be untenable and unreasonably risky. It appears that plaintiffs may have viewed the requested presumption necessary in light of Mr. Stroman's testimony that the USPS may "skip processing" of ballots in states (like Oklahoma) that do not depend on a postmark, in an effort to speed up delivery of absentee votes to county election officials:

> What the Postal Service tries to do, we really – at least when I was there – we really tried to work with boards of election because ... we understood these time frames were much too tight.  So sometimes what we would do is that we would skip the processing step.  Now, this is totally inconsistent with Postal Service operations policy.  And we've had a debate about whether you do that, because once you start to go around the process, mistakes invariably get made.  But in an effort to help some states, we skip the processing step –

> *we'll get a postmark if you need a postmark* – now, *if you don't need a postmark, you know, you don't*, but we skip the processing step and go right to the board of election.

(Tr. at 149:5-18, emphasis added).

Because Oklahoma has for years required that ballots be "received" by election day, rather than "postmarked" by election day, Mr. Stroman's testimony (and the plaintiffs' proposed presumption) indicate that the USPS may at times deliver absentee ballots without processing or postmarking those ballots. A last-minute change of Oklahoma's "receipt" deadline to a "postmark" deadline would potentially result in the rejection of more absentee ballots, because those received after election day where the USPS "skipped processing" and did not include a postmark would be rejected. The USPS would have little time to ensure that all of its staff understood the required sea-shift in handling of Oklahoma absentee ballots.

Based upon the evidence, the Court finds that requiring the counting of ballots received after election day would risk serious interruption in the Oklahoma electoral process, would not necessarily result in the counting of all ballots mailed before election day, and could even result in an increase in the number of ballots that would be rejected.

### 3.   Criminalization of Absentee Ballot Assistance and Collection

Plaintiffs argue that statutes enacted for the first time effective May 21, 2020 unconstitutionally burden the right to vote and violate constitutional rights to speech and association. (Doc. 18 at ¶ 151, Count IV). Relevant statutes (a) define "absentee ballot harvesting," *Okla. Stat.* tit. 26, § 14-101.1, (b) make it "a felony for any person to engage in or to conspire to engage in absentee ballot harvesting... involving ten or more absentee

ballots" in any election, *id.*, § 16-104.1, and (c) render such conduct a misdemeanor where fewer than ten absentee ballots are "harvest[ed]," *id.*, § 16-126.  (*See* Doc. 47 at 10 of 35). "Ballot harvesting" is defined as follows:

1.      Collecting or obtaining an absentee ballot from another person with the intent to submit, transmit or return the ballot to election officials on behalf of that person;

2.      Submitting, returning or transmitting an absentee ballot to election officials on behalf of another person;

3.      Collecting or obtaining an absentee ballot from another person under a false pretense or promise of transmitting, returning or submitting it to election officials on behalf of that person;

4.      Requesting or receiving an absentee ballot on behalf of another person;

5.      Partially or fully completing an application for an absentee ballot on behalf of another person without that person's prior consent; or

6.      Notarizing or witnessing more absentee ballots than allowed by law.

*Okla. Stat.* tit. 26, § 14-101.1(A).

Actions that would otherwise be ballot harvesting are "not ... deemed to be ballot harvesting" when done by certain classes of people, including (1) a voter's assistant or agent acting pursuant to Title 26, (2) absentee voting board members who assist voters confined to nursing homes or veterans centers, (3) employees of the Federal Voting Assistance Program, the U.S. Department of Defense or the Oklahoma National Guard who assist uniformed-services voters in returning or transmitting absentee ballots, (4) "a spouse, relative in the first or second degree of consanguinity or affinity or cohabitant of a voter who forwards an absentee ballot to the voter when absent from the home," (5) "a voter's

spouse who, with the voter's consent, returns the voter's absentee ballot by mail," or (6) "an official action by an election official that is required or authorized by law." *Id.*, § 14-101.1(B). In addition, a person's "gifting of an envelope, stamp, or both an envelope and a stamp for the purpose of mailing in a ballot" is permissible. *See Okla. Stat.* tit. 26, § 16-106.

According to the plaintiffs, those statutes will burden voters who may have difficulty returning their ballots themselves, and organizations like the plaintiffs should be permitted to help voters request and return their absentee ballots without threat of prosecution. Defendants respond that voters who are physically incapacitated may utilize an agent who is at least 16 years of age to apply for an absentee ballot, who will be the person's agent for that election. *See Okla. Stat.* tit. 26, § 14-110.1.[6] Under more limited circumstances, an agent for a voter who becomes physically incapacitated in the week before election day may return the principal's ballot. *See id.*, § 14-115.1. There are also exceptions for an absentee voting board member who assists a voter confined to a nursing home or veterans' center; and for an election official taking official action authorized by law. *Id.*, § 101.1(B)(2), (3).

---

[6]     Oklahoma expanded the definition of physically incapacitated to include any voter who: (1) has tested positive for COVID-19 and is receiving medical treatment or is subject to a quarantine ordered by the voter's personal physician or the county health department; (2) has been tested for COVID-19 and is quarantined or self-isolating while awaiting results; (3) has symptoms of COVID-19 and has been advised to quarantine or self-isolate; (4) is a member of a group considered at "higher risk of severe illness due to age or underlying health conditions as defined by the CDC" and is thus subject to a "stay at home" or "safer at home" or similar order; and (5) has received a written recommendation from his or her personal physician that due to an underlying health condition the voter should not leave his or her home due to the pandemic.  SB 210, 2020 *Okla. Sess. Laws* 10, § 3(C).

The plaintiffs submitted declarations of Lani Habrock, who is the Government Affairs Director of Counsel on American-Islamic-Relations – Oklahoma (CAIR-OK) (PX 22), Nicole McAfee, the Director of Policy and Advocacy at the American Civil Liberties Union (ACLU) (PX 23), Jacqui Newman, the Deputy Executive Director and Chief Operating Officer for plaintiff DCCC (PX 24), and Alicia Andrews, the Chair of plaintiff ODP (PX 25).  Ms. Andrews was also deposed.  (PX 26).  The plaintiffs cite the testimony and declarations of those witnesses as supporting their claims that the Oklahoma statutes criminalizing absentee ballot harvesting and requests (1) burden absentee voters (*see, e.g.,* PX 22 ¶ 17; PX 23 ¶ 15; PX 24 ¶¶ 10, 12; PX 25 ¶¶ 9-10) and (2) violate the plaintiffs' speech and association rights.  (*See, e.g.,* PX 24 at ¶¶ 9-12; PX 25 at ¶¶ 8-10; PX 26 at 55:4-6, 56:9-15, 57:9-24).  For example, plaintiffs assert that, if the Court were to enjoin those provisions, third party assistants and political organizations could assist voters with requesting absentee ballots, which "could have the additional effect of decreasing the number of ballots that are requested at the last minute, easing administrative burdens, and decreasing the chances that a voter will be disenfranchised by a late-arriving ballot." (Plaintiffs' proposed findings and conclusions, ¶ 56).

The Court finds that the challenged ballot harvesting and assistance laws constitute no more than a minimal burden on a voter's right to vote. In addition, the laws prohibit specific conduct and do not appear to prohibit or criminalize the plaintiffs' speech, voter education efforts or publications, or efforts to get out their members' votes.

### 4.     Postage

The plaintiffs challenge the state's "refusal to prepay for postage to return completed absentee ballots" (Doc. 18 at ¶ 6).  According to the plaintiffs, the state's refusal to pay for postage burdens voters and amounts to an unconstitutional poll tax.  (*Id.* at ¶¶ 154-155).  In response, the defendants note that the state is not collecting or imposing any tax upon a voter's right to vote, because the post office collects any revenue from postage. In addition, the defendants note that the cost of obtaining postage is minimal, and Oklahoma law now expressly permits the gifting of stamps and envelopes for purposes of assisting voters with returning absentee ballots.  *Okla. Stat.* tit. 26, § 16-106.

## F.     The State's Asserted Interests

The defendants assert that the state's interests in preventing voter fraud justify the absentee ballot identification requirements and absentee ballot harvesting prohibitions. They provided a declaration of Kimberly W. Strach, who has over 19 years of education, experience, and professional training in election administration, compliance, and fraud investigations in the State of North Carolina.  Ms. Strach cited a September 2005 report of the Commission on Federal Election Reform, which was co-chaired by former President Jimmy Carter and former Secretary of State James A. Baker III.  Among the Commission's determinations and recommendations was a concern that, "because it takes place outside the regulated environment of local polling locations, voting by mail creates increased logistical challenges and the potential for voter fraud, especially if safeguards are lacking or when candidates or political party activists are allowed to handle mail-in or absentee

ballots." (Doc. 48-5 at ¶ 43; *see also* May 6, 2020 Carter Center Statement on Voting by Mail for 2020 U.S. Elections).

Ms. Strach also cited the 2005 Report authors' specific concerns of blank ballots mailed to the wrong address or to large residential buildings, pressure or intimidation being exerted upon those who vote outside of the polling place, and economically-downtrodden voters being susceptible to vote-buying schemes. (*Id.* at ¶ 45). The portion of the 2005 report referenced by Ms. Strach indicated that "[a]bsentee ballots remain the largest source of potential voter fraud," citing absentee ballot fraud in a 1998 Miami mayoral election, which was declared fraudulent and required a new election, as well as other concerns.

The defendants argue that notary or witness signatures help protect vulnerable voters by ensuring a known neutral observer prevented coercion of the absentee voter. (*See* Doc. 48-2 at ¶¶ 26-27; Doc. 48-5 at ¶¶ 36, 48-55). They also maintain that the identification verification requirements, including the alternative of providing a copy of permissible identification, make it harder to commit voter fraud, and make it easier for the state to detect fraud and determine the extent of any such fraud, because the discovery of any fraud can lead to the detection of other fraud. (*See* Doc. 48-2 at ¶¶ 26-28, Doc. 48-5 at ¶¶ 28-30, 35). Plaintiffs' expert, Dr. Meredith, agreed with Ms. Strach's opinion that the witness requirement in North Carolina "was helpful in the prosecution of that case" of voter fraud. (Tr. at 88:18-20). However, Dr. Meredith pointed out that the witness requirement was not the reason that the fraud was initially detected, nor did the requirement in North Carolina deter the fraud. (*Id.* at 88:21-25).

The defendants identified a number of examples of voter fraud in Oklahoma, one of which occurred almost 40 years ago, another in 1956, and a handful of other more recent examples. (*See* Doc. 48-2 at ¶ 22; PX 15 at 102-105). Other instances cited by the defendants involved allegations of fraud by people in other states who forged mail-in ballots that were mailed to a prior resident of the household or a ballot addressed to a dead relative or tenant (*see* Doc. 48-6 at 44-45, 84, 86, 88), returned multiple absentee ballots that had been stolen (*id.* at 55-56), or allegedly took, forged, and returned ballots of elderly voters (*id.* at 60-61). Ms. Strach also provided details of recent absentee voter fraud in North Carolina during the time she was employed by the North Carolina State Board of Elections (*see* Doc. 48-5 at ¶¶ 8-13), including the 2018 North Carolina Congressional election, which involved ballot harvesting and fraud, payment for collection of absentee ballots (*id.* at ¶¶ 14-27), requiring a new election. While there are numerous examples of voter fraud across the nation, the Court notes that they represent an extremely minuscule percentage of the hundreds of millions of votes returned in elections in the United States in recent years.

Secretary Ziriax testified that the recent addition of Oklahoma's "ballot harvesting" prohibitions were in part inspired by the absentee voter fraud and ballot harvesting that led to the overturning of the United States Congressional election in North Carolina in 2018. (*See* Doc. 48-2 at ¶¶ 23-24; *see also* PX 15 at 121-23). He also testified as to the reason for the limitation on the number of ballots any one notary can notarize, which was based upon a "major absentee voting scandal in Aider [sic] County about ten years ago," which involved a notary public "who made money by guarantying a certain number of absentee

28

votes at an election," had numerous absentee ballots sent to his P.O. Box, and then notarized and returned all of them.  (PX 15 at 103).  He was caught after two of the voters voted in-person, after he had already returned their absentee ballots. (*See id.* at 104).

The plaintiffs suggest that the state's cited concerns about voter fraud are dubious, noting that Secretary Ziriax acknowledged that he had previously stated that "voting fraud is exceptionally rare in Oklahoma and not a major issue here." (*See* PX 15 at 108:6-22). However, Ziriax testified to his belief that voter fraud in Oklahoma is exceptionally rare *because of* "the protections that are provided under Oklahoma law for in-person voting ... [and the] protections that are in place for absentee voting including the verification of the ID of a voter and the chain of custody law...."  (*Id.* at 108:16-22).

While voter fraud has in recent years been exceptionally rare in Oklahoma, that may well be due to the Oklahoma voter identification requirements that have been in place for several years, mandating that in-person voters show identification and absentee voters verify their ballots by obtaining a notary signature. Without any identification requirement placed upon absentee voting, there would be much less of a deterrent to a person who wishes to forge and return another's ballot by mail, as the ability to detect such fraud would be significantly reduced.  In contrast, a person wishing to vote another person's ballot would have to engage in much riskier behavior to do so in-person, where they would have to appear in public, before trained election officials, where there may be video cameras, where they will have to provide a photo identification matching the name of the person for whom they are fraudulently trying to cast a ballot, and where they will face a risk that they provide a name of a voter who has already voted and signed the voting log for that election,

and thus be detected on-the-spot.  In other words, the 2005 Commission's concern that "[a]bsentee ballots remain the largest source of potential voter fraud" seems not only logical, but extremely likely, especially if the Court were to eliminate any identification requirement for absentee mail-in ballots, while in-person voting requires identification.

A concern for in-person voter fraud, which as noted seems much more risky to the perpetrator and thus much less likely to be perpetrated than mail-in voter fraud, was a weighty enough state interest to justify an Indiana voter identification requirement upon in-person voters.  *See Crawford v. Marion County Election Bd.*, 553 U.S. 193, 195-197 (2008) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters. Moreover, the interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process.  While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear.").  While the Court finds that concerns about voter fraud in Oklahoma may be overstated in light of the exceeding rarity in Oklahoma history, those concerns are legitimate and weighty.

## II.     CONCLUSIONS OF LAW

### A.     Standing

The defendants argue that the two organizational plaintiffs, the DCCC and the ODP, do not have standing with respect to the challenged Oklahoma absentee ballot provisions. There are no individual plaintiffs. The DCCC and ODP assert that they have direct organizational, as well as associational, standing to challenge Oklahoma election laws.

Because standing is jurisdictional, it must be addressed first. *Dine Citizens Against Ruining Our Environment v. Bernhardt*, 923 F.3d 831, 840 (10th Cir. 2019).

Article III of the United States Constitution restricts federal jurisdiction to "cases" or "controversies." U.S. Const. art. III, § 2, cl. 1. To satisfy the case or controversy requirement, a plaintiff must generally demonstrate standing by establishing (1) an injury in fact, (2) a sufficient causal connection between the alleged injury and the conduct complained of, and (3) a likelihood that the injury "will be redressed by a favorable decision." *Fish v. Schwab*, 957 F.3d 1105, 1117 (10th Cir. 2020) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014). "'Put simply, a plaintiff must establish three elements: an injury-in-fact, causation, and redressability.'" *Id.* (quoting *Bronson v. Swensen*, 500 F.3d 1099, 1106 (10th Cir. 2007)).

### 1. Direct Organizational Standing

As noted in the above factual findings, the ODP consists of all Oklahoma registered voters who declare themselves Democrats, and its mission is to elect Democrats to office and to educate voters. As a result, ODP has an interest in ensuring that its voters have an opportunity to vote for Democratic Party candidates, and ODP expends significant resources in voter education and Get Out The Vote efforts to encourage Oklahomans to vote. The ODP represents that, due to the importance of absentee voting during the COVID-19 pandemic, it has diverted resources from its regular efforts and programs to address issues relating to Oklahoma's absentee voting system.

These facts provide a basis for direct organizational standing for the ODP. The facts are similar to the types of organizational harm that were found to support organizational

standing in numerous cases.  For example, in *Crawford v. Marion County Election Board*, 472 F.3d 949, 951 (7th Cir. 2007), the Seventh Circuit determined that the Democratic Party had standing to challenge Indiana's photo identification law.  In determining that the party had standing, the court noted that "the new law injures the Democratic Party by compelling the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote."  *Id.*  The court further noted that "[t]he fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury."  *Id.*  Upon review on certiorari, the Supreme Court agreed that the Democratic Party had standing. *Crawford*, 553 U.S. 181, n.7 (2008) ("We also agree with the unanimous view of [the Seventh Circuit] that the Democrats have standing to challenge the validity of [Indiana's photo ID law].").

Other courts have found organizational standing to challenge election laws.  *See, e.g., DSCC and DCCC v. Simon*, No. 62-CV-20-585, 2020 WL 4519785, at *17 (Minn. Dist. Ct. July 28, 2020) (holding DCCC had standing to challenge law prohibiting voter assistance, which forced it to divert resources, even though DCCC already engages in voter outreach); *Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824, 841 (D. Ariz. 2018) (finding that plaintiffs DNC, DSCC, and the Arizona Democratic Party had direct organizational standing to challenge certain election laws because those laws would require them "to retool their GOTV strategies and divert more resources to ensure that [their voters are able to vote]"), *aff'd*, 904 F.3d 686 (9th Cir. 2018), *rev'd on other grounds and remanded sub nom. Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989 (9th Cir. 2020)

(en banc); *Democratic Nat'l Comm. v. Bostelmann et al.*, No. 3:20-cv-00249-wmc, 2020 WL 1320819, at *3 (W.D. Wis. Mar. 20, 2020) (holding that the DNC and the Democratic Party of Wisconsin had established direct organizational standing because the challenged elections laws "will require them to expend additional resources to assist their members and constituents to overcome these burdens to exercise their right to vote"); *see also generally Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-379 (1982) (allegations that housing steering practices impaired organization's ability to provide counseling and referral services for certain home seekers and a consequent drain on the organization's resources constituted "more than simply a setback to the organization's abstract social interests," and therefore supported organizational standing).

In addition, the ODP challenges the voter assistance and ballot harvesting provisions, which criminalize behavior that ODP itself would like to engage in to assist the organization's voters, especially during the pandemic. The ODP challenges those laws on the basis of its own First Amendment rights, and therefore has direct standing to challenge those provisions. *See, e.g.*, *Priorities USA v. Nessel*, 2020 WL 2615766 *18 (E.D. Mich. May 22, 2020) (plaintiff had standing to challenge statute prohibiting assisting voters with absentee ballots); *Simon*, 2020 WL 4519785, *7-11 (DCCC had adequately pled direct organizational standing to assert claims of speech infringement due to laws prohibiting voter assistance in ballot return).

Based on the foregoing, the ODP has direct organizational standing to pursue the challenges to the Oklahoma absentee ballot laws at issue in this case. Because this case seeks only injunctive relief, the Court need not address standing of the other plaintiff. *See*

33

*Crawford*, 472 F.3d at 951 ("Only injunctive relief is sought, and for that only one plaintiff with standing is required" such that the standing of the other plaintiffs "need not be addressed"); *Arizona Democratic Party v. Hobbs*, ___ F. Supp. 3d __, 2020 WL 5423898, *5 (D. Ariz. Sept. 10, 2020) ("Only one plaintiff needs standing when, as here, only injunctive relief is sought.").

### 2.      Associational Standing

The plaintiffs also argue that they have associational standing to pursue claims on behalf of their members.  "When, as here, an organization sues on behalf of its members, the organization has standing if: '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Dine Citizens*, 923 F.3d at 840 (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).  With respect to the requirement that the ODP's members would otherwise have standing to sue in their own right, a plaintiff has direct standing if "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (quoting *Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).

Based on the evidence in the record, the Court concludes that the ODP has associational standing to challenge the Oklahoma absentee ballot statutes at issue in this case.  The interests the ODP seeks to protect are germane to the organization's purpose of

getting out the votes of its members, and the relief requested and claims asserted do not require the presence of individual members. The plaintiffs have alleged particularized, imminent disenfranchisement or undue burdens upon their member voters' rights to vote, which are fairly traceable to the election laws with which Secretary Ziriax is charged with enforcing.

The plaintiffs have presented evidence that, due to the COVID-19 pandemic, a record number of Oklahoma voters, including Democratic voters, are expected to want to forego the risks of in-person voting during the upcoming November general election. They have also presented evidence of a significant number of Oklahoma voters' absentee ballots that have been rejected due to the identification requirements and election day receipt deadline. Standing has been found in similar circumstances. *See, e.g., Hobbs*, 2020 WL 5423898, *5 (finding the Arizona Democratic Party had standing to sue to challenge an election day deadline on behalf of its members); *Reagan*, 329 F. Supp. 3d at 841 (Plaintiffs DNC, DSCC, and the Arizona Democratic Party had associational standing to challenge claims on behalf of their constituents who would be burdened by Arizona's ballot collection ban); *Bostelmann*, 2020 WL 1320819 at *3 (DNC and the Democratic Party of Wisconsin had standing to sue on behalf of their members); *Simon*, 2020 WL 4519785 at *11 (DCCC had adequately pled associational standing on behalf of its "members, constituents, canvassers, and volunteers" who were allegedly harmed by Minnesota's law prohibiting voter assistance); *Texas Democratic Party v. Hughs*, No. SA-20-CV-08-OG, 2020 WL 4218227, at *4-*5 (W.D. Tex. July 22, 2020) (Texas Democratic Party and

DCCC had adequately alleged associational standing on behalf of their members allegedly harmed by Texas's voter registration laws).

**B.      Standards Applicable to Permanent Injunctions**

To obtain a permanent injunction, a party "must prove: (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Southwest Stainless, LP v. Sappington*, 582 F.3d 1176, 1191 (10th Cir. 2009).

**C.      Actual Success on the Merits: Plaintiffs' Constitutional Challenges to Oklahoma Absentee Ballot Provisions**

**1.      The *Anderson-Burdick* Balancing Test**

The plaintiffs challenge all of the absentee ballot-related provisions under the First and Fourteenth Amendments to the United States Constitution.  "The right to vote is 'a fundamental political right, ...preservative of all rights.'"  *Fish*, 957 F.3d at 1121-22 (citation omitted).  "'No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined.'" *Id.* (quoting *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964)). The First and Fourteenth Amendments prohibit states from placing burdens on citizens' right to vote that are not reasonably justified by "important regulatory interests." *Anderson v. Celebrezze*, 460 U.S. 780, 788-89 (1983); *see also Burdick v. Takushi*, 504 U.S. 428, 434 (1992).  However, the

right to vote in any manner is not absolute. *Burdick*, 504 U.S. at 433. States may generally prescribe the times, places, and manner of holding elections. *Id.*

There is no "litmus test" or "bright line" separating regulations that properly impose order from those that unduly burden it. *Fish*, 957 F.3d at 1122 (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) and *Crawford*, 553 U.S. at 190). Instead, the courts considering such election law challenges are to apply a balancing test under *Anderson* and *Burdick*, which requires that the court "weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the state as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).

The Circuits have referred to the balancing as involving a "sliding scale" test, where "the more severe the burden imposed, the more exacting [the court's] scrutiny; the less severe, the more relaxed [the court's] scrutiny." *Fish*, 957 F.3d at 1124 (quoting *Ariz. Libertarian Party v. Hobbs*, 925 F.3d 1085, 1090 (9th Cir. 2019)). No matter how "slight" the burden on voting rights "may appear," "it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford*, 553 U.S. at 191.

## 2. Identification / Verification Requirement

Based upon the evidence, the Court concludes that the witness identification requirements have the potential to impose some burden on Oklahoma voters who wish to vote by absentee ballot. Those burdens are somewhat heightened for absentee voters who

are strictly heeding expert medical and epidemiological advice to keep a distance from others. However, the State's alternative means (a copy of identification) for completion and return of an absentee ballot, and its partnering with numerous banks and credit unions to provide free, drive-thru photocopy and notarization service, reduce the likelihood that the alternative means of identification verification will impose more than a minor burden upon the plaintiffs' proposed hypothetical Oklahoma voter wanting to vote by absentee ballot due to legitimate and serious concerns about the pandemic. Moreover, the evidence established that there are socially-distanced methods of ballot verification under the Oklahoma requirements.

The plaintiffs' challenges to Oklahoma's absentee ballot identification requirement are presented in the context of the COVID-19 pandemic. If the notarization and two-witness requirements were the only means of identification during the COVID-19 pandemic, those requirements would undoubtedly be more burdensome to potential absentee voters. However, given the declaration of a state of emergency, enacting the alternative photocopy means by which a potential voter can validate identification for an absentee ballot, the Court considers any burden to be minor rather than substantial. For voters who do not have access to a copier at home, a friend, family member, or neighbor can assist in obtaining a copy of a voter's identification card, and that can be done without close, in-person contact. The plaintiffs have not presented any evidence of any voter who will be unable to vote during the pandemic using one of the alternative means of identification verification on the absentee ballot. The mere possibility that the burden may be greater on a small subset of voters does not entitle the plaintiffs to the sweeping relief

they seek here.  *See Crawford*, 553 U.S. at 199-200 (noting higher relative burdens to some voters, with most voters apparently able to comply with the photo identification requirement or other available options, did not entitle plaintiffs to relief sought).

As set forth in the above Findings of Fact, the state's interest in preventing voter fraud is sufficiently weighty to justify the alternative requirements for a voter to verify her identity on her absentee ballot. *See Crawford*, 553 U.S. at 195-197 ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters. Moreover, the interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process.  While the most effective method of preventing election fraud may be debatable, the propriety of doing so is perfectly clear.").  While voter fraud has in recent years been exceptionally rare in Oklahoma, Secretary Ziriax testified to his belief that the rarity was due at least in part to Oklahoma's voter identification requirements, which have been in place for several years, mandating that in-person voters show identification and absentee voters verify their ballots by obtaining a notary signature.  In addition, the Court noted in its above findings that, without any voter identification requirement (the relief the plaintiffs request), the risk of potential voter fraud using absentee ballots undoubtedly increases.  As the Supreme Court noted in *Crawford*, 553 U.S. at 191, a state's "interest in deterring and detecting voter fraud" is "unquestionably relevant to the State's interest in protecting the integrity and reliability of the electoral process."

Finally, the data available from the June 30, 2020 primary, which was conducted during the COVID-19 pandemic and with the emergency procedures in place (as will be

the case with the November 2020 general election), do not support a conclusion that the alternative requirements imposed a substantial burden.  The data showed that voter participation increased during that primary, rejection rates for failure to comply with the identification requirements decreased as compared to recent general elections, few votes (0.14%) were rejected for failure to comply with the identification requirements, less than the number of ballots rejected for failing to complete the ballot affidavit that the plaintiffs assert should be the only step required to verify a ballot. (*See* Doc. 48-2 at ¶¶ 34-35).

The record does not include evidence that any particular voter was *unable* to comply, or indicate why there was any alleged inability to comply with the alternative means of verifying an absentee ballot (notary or a copy of identification) or incapacitated absentee ballot (two witnesses or a copy of identification).  The Court notes that the state's interests, as well as the identification laws themselves, are reasonable, nondiscriminatory, and legitimate.  *See Crawford*, 553 U.S. at 185.  Those interests in preventing and having a means of detecting voter fraud are sufficiently weighty to justify the relatively minor burden imposed on absentee voters in the November election as a result of the identification requirements.

The Supreme Court has shown reluctance to interfere with state election requirements and officials during the pandemic.  For example, the Supreme Court stayed a district court preliminary injunction that, *inter alia*, halted Alabama's absentee ballot verification laws, which are stricter than Oklahoma's because they require voters to both include a photocopy of their ID and have it notarized or witnessed. *Merrill v. People First of Alabama*, No. 19A1063, 2020 WL 3604049, at *1  (July 2, 2020); *see also Republican*

40

*Nat'l Comm. v. Common Cause RI*, No. 20A28, 2020 WL 4680151, at *1 (Aug. 13, 2020) (declining to stay decision of "state election officials [to] support the challenged decree"); *Republican Nat'l Committee v. Democratic Nat'l Committee*, __ U.S. __, 140 S. Ct. 1205, 1207 (April 6, 2020) (staying district court preliminary injunction that required state to count absentee ballots postmarked after election day and noting that the "Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election."). This Court is similarly reluctant to upend Oklahoma's absentee ballot and election system where the evidence does not establish more than a minor burden on voters and the requested changes would potentially impact the integrity of the election.

### 3.     The Election Day Receipt Deadline

The evidence does not support an alteration of Oklahoma's election day receipt deadline. The evidence is mixed, given that it is unclear whether ballots received after election day for the June 30 election were postmarked before the election deadline or were mailed after election day. The plaintiffs did not establish that any voters were or will be actually *unable* to request and return absentee ballots by the election day receipt deadline. It seems likely that there will be ballots that are not counted because some voters may not request a ballot until a week before the election and/or may not mail their ballot back with sufficient time to be received by the election day deadline. However, the State has provided alternatives that significantly reduce that potential burden and risk, because State law permits the return of an absentee ballot in-person up to the day before the election, and a voter can avoid problems with mail delay by requesting a ballot 45 days before the election

and timely completing and returning it to ensure that it arrives before the election day deadline.

Because the State offers voters wishing to vote by absentee ballot options to ensure their votes are timely returned, voters who fail to ensure timely return of their ballots should not blame the law for their inability to vote. *See, e.g., Thomas v. Andino*, No. 3:20CV1552, 2020 WL 2617329, at \*26 (D.S.C. May 25, 2020) (quoting *Rosario v. Rockerfeller,* 410 U.S. 752, 758 (1973)). The Supreme Court similarly observed that voters who wait weeks into absentee voting and request a ballot at the last minute are suffering the typical burden of a late-requesting voter, not a burden imposed by state law. *See Republican Nat'l Comm.*, 140 S. Ct. at 1207. An absentee voter is responsible for acting with sufficient time to ensure timely delivery of her ballot, just as a voter intending to vote in-person must take appropriate precautions by heading to the polls with a sufficient cushion of time to account for traffic, weather, or other conditions that might otherwise interfere with their ability to arrive in time to cast a ballot.

To the extent that the plaintiffs' claim that the timing issue is compounded by state law permitting voters to request an absentee ballot up to one week before the election – which allows a voter less time to timely return a ballot by mail – a remedy changing the deadline for seeking an absentee ballot to two weeks before the deadline would make more sense, and potentially result in fewer rejected ballots, than the relief requested by the plaintiffs.  However, the Court has not been asked to provide such a remedy, and does not conclude that it would be justified, as it could result in cutting off people who, for personal reasons, decide seven or eight days before the election that they will not be able to vote in-

person on election day and thus wish to vote by absentee ballot hand-delivered by the day before the election.

A "generally applicable deadline that applied to all would-be absentee voters would likely survive the *Anderson-Burdick* analysis, even if it resulted in disenfranchisement for certain. . . individuals." *Mays v. LaRose*, 951 F.3d 775, 792 (6th Cir. 2020). As the Tenth Circuit has observed, any deadline "will invariably burden some voters. . . for whom the earlier time is inconvenient," but these burdens are assessed in light of "a state's legitimate interest in providing order, stability, and legitimacy to the electoral process." *Utah Republican Party v. Cox*, 892 F.3d 1066, 1077 (10th Cir. 2018).[7]

Whereas the burden of the election day receipt deadline is minimal, the State has established sufficiently weighty interests that justify the deadline, such that the law is not unconstitutional under the *Anderson-Burdick* balancing test. The deadline "eliminates the problem of missing, unclear, or even altered postmarks, eliminates delay that can have adverse consequences, and eliminates the remote possibility that in an extremely close

---

[7]     Similar to Oklahoma, the following states require that absentee or mail-in ballots must be received by or before election day: Alabama, Ala. Code § 17-11-18; Arizona, A.R.S. § 16-547; Arkansas, Ark. Code Ann. § 7-5-411; Colorado, Colo. Rev. Stat. § 1-7.5-107; Delaware, Del. Code Ann. tit. 15, § 55-5508; Florida, Fla. Stat. Ann. § 101.67; Hawaii, Haw. Rev. Stat. § 15-9; Idaho, Idaho Code § 34-1005; Kentucky, Ky. Rev. Stat. § 117.086(1)(b); Maine, Me. Stat. tit. § 21-A, § 755; Michigan, Mich. Comp. Laws § 168.764a (Step 6); Missouri, Mo. Ann. Stat. § 115.293(1); Montana, Mont. Code Ann. § 13-13-232, Nebraska, Neb. Rev. Stat. Ann. § 32-950; New Hampshire, N.H. Rev. Stat. § 657:22; New Mexico, N.M. Stat. Ann. § 1-6-10; Oregon, Or. Rev. Stat. § 253.070; Rhode Island, R.I. Gen. Law § 17-20-8; South Carolina, S.C. Code § 7-15-420; South Dakota, S.D. Codified Laws, § 12-19-12; Tennessee, Tenn. Code Ann. § 2-6-304; Vermont, Vt. Stat. Ann., tit. 17, § 2543; Wisconsin, Wisc. Stat. § 6.87(6); and Wyoming, Wyo. Stat. Ann. § 22-9-119.

election … a person who did not vote on or before election day can fill out and submit a ballot later." *Nielsen v. DeSantis*, No. 4:20CV236, Doc. 332 at 3 (N.D. Fla. June 24, 2020). The deadline also secures voter confidence in the election: voters become less sure of the results if a candidate is declared a winner on or shortly after election day, but the results are changed several days or a week later. (*See* Doc. 48-2 at ¶ 37).  As noted, alteration of the deadline as the plaintiffs request would likely impact the beginning of, or preparation for, the State Legislature's new terms, which expire the fifteenth day after the November election every two years. These state interests outweigh the reasonable and nondiscriminatory impact that the deadline may have on some voters.  Other courts have found similar election day receipt deadlines to be valid. *See Thomas*, 2020 WL 2617329, at \*26; *Friedman v. Snipes*, 345 F. Supp. 2d 1356, 1377 (S.D. Fla. 2004).

The issues involved in cases where courts modified a ballot receipt deadline are distinguishable.  In *Bostelmann*, 2020 WL 1638374, at \*17, the Wisconsin Election Commission did *not oppose* extending the deadline, and the modification followed massive problems with timely delivery of absentee ballots to voters, such that "even the most diligent voter may be unable to return his or her ballot in time to be counted." *Id.*; *see also Thomas*, 2020 WL 2617329, at \*27 n.27 (distinguishing Wisconsin case in declining to enjoin South Carolina ballot receipt deadline).

One federal district court in Georgia changed the receipt deadline to require the counting of absentee ballots postmarked by election day and received within three days after election day.  *New Georgia Project v. Raffensperger*, __ F. Supp. 3d __, 2020 WL 5200930, \*28 (N.D. Ga. 2020).  The Georgia federal court noted that, as in *Bostelmann*,

there was evidence of problems in Georgia that caused even those voters who requested their ballots "well in advance of the election" to receive their ballots only the day before election day, and the recent primary demonstrated voters were disenfranchised "due to Georgia's poor administration of absentee ballots." *New Georgia Project*, at **6, 24. There is no such record evidence in this case, as no Oklahoma voter testified to receiving their ballot too late to timely return it under one of Oklahoma's options for doing so, and the plaintiffs have not provided any evidence that delays like those involved in Wisconsin and Georgia are likely to occur with respect to Oklahoma ballots for the November election.

### 4.    Absentee Ballot Request and Assistance Criminalization

The ballot request assistance and ballot harvesting prohibitions make it a felony for plaintiffs to request or return 10 or more absentee ballots for eligible voters, and a misdemeanor to do the same for fewer than 10 absentee ballots. *Okla. Stat.* tit. 26, §§ 14-101.1(A)(4), 16-104.1, 16-126.   Oklahoma law also disallows others, except a voter's spouse, from returning an absentee voter's ballot. *See Okla. Stat*. tit. 26, §§ 14-101.1(A)-(B), 14-108(A); *Okla. Admin. Code* § 230:30-11-1.1(a).; *Okla. Stat.* tit. 26, § 14-101.1(A)(1), (2), (B)(5).  The plaintiffs challenge these provisions on two grounds, arguing first, that the provisions constitute an undue burden on absentee voters and second, that the laws violate the plaintiffs' own First Amendment speech and association rights.

### a.    Alleged Burden on Absentee Voters

The evidence that the ballot assistance and ballot request prohibitions unduly burden Oklahoma absentee voters is slim and largely speculative.  Dr. Meredith merely offered his *ipse dixit* opinion that "Oklahoma's restrictions on assistance on requesting or returning

mail ballots will disenfranchise potential voters in the 2020 presidential election, particularly among potential voters who are vigilantly social distancing to prevent contracting or spreading COVID-19." (PX 2 at ¶ 97). He also opined that "some people will be unable to return a mail ballot if the only person that could provide them assistance doing so is their spouse," which opinion was based on "statements by interest groups ... who perform lobbying on the basis of voting issues and [say] that their constituents need assistance getting their mail ballots returned." (Tr. 125:12-24).

Even if the Court were to assume that the requirements will burden some voters, the state has presented evidence that the provisions were enacted on a non-discriminatory, bipartisan basis, in an effort to avoid the type of ballot harvesting and ballot payment scheme at issue in 2018 in North Carolina, which required a new election for a Congressional seat. (*See, e.g.,* Doc. 48-2 at ¶¶ 23-24; PX 15 at 121-23; Doc. 47-11 at 47-50; *see also* Doc. 48-5 at ¶¶ 8-27). Secretary Ziriax also cited a "major absentee voting scandal in Aider [sic] County about ten years ago," which involved a notary public who made money by guarantying absentee votes, had numerous absentee ballots sent to his P.O. Box, and then notarized all of them. (PX 15 at 103).

The state's interests in preventing potential ballot harvesting and related fraud is also supported by the September 2005 report of the Carter-Baker chaired Commission on Federal Election Reform, in which the Commission noted a concern that, "because it takes place outside the regulated environment of local polling locations, voting by mail creates increased logistical challenges and the potential for voter fraud, *especially if safeguards are lacking or when candidates or political party activists are allowed to handle mail-in*

*or absentee ballots*."  (Doc. 48-5 at ¶ 43; *see also* May 6, 2020 Carter Center Statement on Voting by Mail for 2020 U.S. Elections) (emphasis added).  Under a *Burdick-Anderson* balancing, the state's interests are weighty in comparison to any burden imposed upon a potential absentee voter's right to vote.

### b.    Plaintiffs' First Amendment Rights

The plaintiffs' claim that the absentee ballot request, assistance, and harvesting prohibitions violate their speech and association rights also fails because the actions that are prohibited by the challenged laws involve conduct, not speech.

While the First Amendment forbids the abridgement of "speech," the Supreme Court has recognized that actions that are intended to communicate a particularized message can constitute symbolic speech protected by the First and Fourteenth Amendments.  *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984); *see also Texas v. Johnson*, 491 U.S. 397, 404 (1989).  Examples include burning an American flag as part of a demonstration, wearing an armband in protest of war, and civil rights-era sit-ins at "whites only" locations.  *See Johnson*, 491 U.S. at 404; *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505 (1969); *Brown v. Louisiana*, 383 U.S. 131, 141-42 (1966).  The Supreme Court has noted that there is not a "limitless variety of conduct [that] can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea."  *Spence v. Washington*, 418 U.S. 405, 409 (1974).

It appears that courts considering similar assistance or harvesting laws are split as to whether ballot collection is expressive conduct protected by the First Amendment.  *Compare Knox v. Brnovich*, 907 F.3d 1167, 1181 (9th Cir. 2018) (ballot collection is not

speech subject to First Amendment protections); *New Georgia Project*, 2020 WL 5200930, **21-22 ("collecting ballots does not qualify as expressive conduct"); *Miller v. Thurston*, 967 F.3d 727, 738-39 (8th Cir. 2020) (notarizing and returning petition signatures is not speech); *Voting for America v. Steen*, 732 F.3d 382, 393 (5th Cir. 2013) (collecting voter registrations is not speech); *League of Women Voters v. Browning*, 575 F. Supp. 2d 1298, 1319 (S.D. Fla. 2008) (same) *with Democracy North Carolina v. North Carolina State Bd. of Elec.*, __ F. Supp. 3d __, 2020 WL 4484063, *49-50 (M.D.N.C. 2020) (finding that assisting voters in completing a request for an absentee ballot was expressive conduct, but collecting and delivering absentee ballot request forms is not); *DSCC v. Simon*, No. 62-cv-20-585, 2020 WL 4519785, at *29 (D. Minn. July 28, 2020) (reducing the number of individuals who could provide assistance to potential voters diminishes speech and associational rights of party organizations).

With respect to the particular laws at issue here, completing a ballot request for another voter, and collecting and returning ballots of another voter, do not communicate any particular message. Those actions are thus not expressive, and are not subject to strict scrutiny. The plaintiffs assert that "[t]he conversations and interactions between DCCC and the [ODP] and their respective organizers and voters surrounding requests for and the submission of ballots are forms of protected political speech and association." (Doc. 18 at ¶ 177). However, the laws do not prohibit or criminalize the plaintiffs from engaging in "conversations and interactions" with their constituents and members regarding absentee ballots. There is no claim that the laws prohibit plaintiffs from encouraging their members to request an absentee ballot, providing a website link or other education to the voter about

how to do so, or conveying that timely voting is important.  Instead, the laws prohibit specific conduct of applying for another's absentee ballot, receiving another voter's completed ballot for the purpose of returning it, and mailing another's ballot.

As noted above, the state has advanced evidence that the challenged laws were enacted to prevent voter fraud and ballot harvesting, which overcomes any purported burden upon voters under an *Anderson-Burdick* balancing. Based upon the same state interests, the restrictions are reasonably related to a legitimate governmental purpose, such that the law passes rational basis review.  *See New Georgia Project*, 2020 WL 5200930, *21-22.

### 5. Postage

Plaintiffs challenge Oklahoma's failure to provide postage-paid envelopes for voters to return their ballots, both as an unconstitutional burden on the right to vote under the First and Fourth Amendments (Count I, *see* Doc. 18 at ¶ 148) and as an unconstitutional poll tax in violation of the Twenty-Fourth Amendment to the United States Constitution (Count II, *see id.* at ¶ 155).

### a. *Anderson-Burdick* Balancing

Oklahoma law does not address the issue of payment of postage for absentee ballots. Oklahoma does not prepay postage on the absentee ballot envelopes.  However, absentee voters may avoid postage altogether and return their absentee ballots at the county election board before 5:00 p.m. the day before the election, *Okla. Stat.* tit. 26, §§ 7-104, 14-108, or they may receive postage gifted from third parties, *id.*, § 16-106.

The plaintiffs have not established that the lack of postage will result in disenfranchisement or an undue burden on any voter.  The defendants note that the state is not required to allocate funds to prepay postage, and it is the USPS, not the state, that determines whether to require and collect postage.  The plaintiff's postal expert, Mr. Stroman, testified that the policy of the USPS "is to deliver the ballot, irrespective of whether it has postage or not," although he recognized that particular carriers may mistakenly return the ballot for insufficient postage.  (Tr. at 167-168).

The Court determines that the burden is light, given the above.  At least one court recently rejected a similar claim under *Anderson-Burdick* and did not find a constitutional violation.  *New Georgia Project*, 2020 WL 5200930 at *19.  Postage is a type of "usual burden[ ] of voting," *see generally Crawford*, 553 U.S. at 197-98, and is not one that is imposed by the state in any event.  The state's fiscal interests are sufficient to justify its not allocating funds to prepay for postage for absentee ballots.

### b.    Poll Tax

Plaintiffs contend that the state's failure to prepay postage on the absentee ballot envelopes constitutes a "poll tax" in violation of the Twenty-Fourth Amendment.  That Amendment provides that the right to vote "shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax." U.S. Const. amend. XXIV, § 1.

The undersigned agrees with courts that have recently determined that a state's failure to prepay postage for mail-in ballots is not a "poll tax" in violation of the Twenty-Fourth Amendment.  *See New Georgia Project*, 2020 WL 5200930 at *19-20; *Black Voters*

*Matter Fund v. Raffensperger*, __ F. Supp. 3d __, 2020 WL 4597053, at *27 (N.D. Ga. Aug. 11, 2020); *Nielsen v. DeSantis*, No. 20-CV-236, Doc. 332 (N.D. Fla. June 24, 2020).

**D.    Balancing of Harms and the Public Interest**

The Court has concluded that the challenged provisions do not violate the Constitution. As a result, the plaintiffs have not succeeded on the merits of their Constitutional claims.  In light of the Court's balancing under *Anderson-Burdick*, the Court has already engaged in an analysis of relative burdens between the plaintiffs and defendants and the interests of the public with respect to voting and Oklahoma's election system. (*See supra, passim*).

In addition, the Court concludes that significant weight should be placed on the state's evidence that changes to Oklahoma's absentee ballot laws at this date have the risk of delaying the delivery of absentee ballots and causing significant confusion among voters wishing to vote by absentee ballot.  (*See* Doc. 48-2 at ¶¶ 11, 29, 39-42).  In short, the ballots, ballot envelopes, and instructions for the ballot envelopes have necessarily already been printed in July and August, and to require reprinting or a change in election procedures would risk significant voter confusion, delay of receipt of absentee ballots, and disenfranchising or dissuading voters who may otherwise wish to vote by absentee ballot. *See Republican Nat'l Committee*, 140 S. Ct. at 1207 ("lower federal courts should ordinarily not alter the election rules on the eve of an election.").

**III.    CONCLUSION**

Life has become more difficult and risky during the COVID-19 pandemic, and many voters have serious, legitimate concerns about voting in-person due to an increased risk of

contracting the virus from being near others. The virus is not under control in Oklahoma, and there is no statewide mask mandate. The concerns about voting during the pandemic, especially as to elderly and other voters who are at a higher risk for serious outcomes, are justified.  However, the state has put in place alternatives that do not necessarily require that voters have direct contact with others in order to cast an absentee ballot, and the evidence and law substantiate that the state's interests in preventing voter fraud and promoting certainty and confidence are sufficiently weighty to overcome any minor burden imposed upon Oklahoma voters during the pandemic.

For the foregoing reasons, the plaintiffs' request for injunctive relief (Doc. 18, 47) is **denied**.  The Court has determined the merits of plaintiffs' Amended Complaint for declaratory and injunctive relief, and judgment will be entered in favor of the defendants, terminating this action.

SO ORDERED this 17th day of September, 2020.

JOHN E. DOWDELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT